From: Michael Savaglio <msavaglio@eagleships.com>
Sent: Friday, June 14, 2019, 9:57 AM
To: Eagle Operations <operations@eagleships.com>
Subject: FW: NEW LONDON EAGLE / MEDMAR cp dd 10.6.19 full terms recap
Attachments: Eagle Charter Compliance Wording TIME 7 14 16.pdf; Eagle cp proforma tc 11 Feb 2016.pdf; New London Eagle_Q88Dry_07Jun2019.pdf; Medmar_Inc.__2019-6-12__12-21-27.pdf; Background Medmar Company profile Jan19.pdf

Fixture report

+++ TIME CHARTER +++

- Acct.
- c/p dtd. June 10th, 2019

MV New London Eagle

- Delivery: AFSPS Corpus Christi
- Redelivery: 1 SP Singapore/Japan Range int. N.China
- Hire: USD 19.500 daily inclot
- Laycan: June 21/26 - 2019
- Ilohc: USD 5.000 lsum
- C/V/E: USD 1.500 pmpr
- Commissions: 5 % ttl = 3.75 % pct add comm + 1.25 % pct brokerage
- Intended cargo: HSS

- Nett TC Equiv. / Duration: usd 18.152 ex Houston in 53.3 days

- company: New London Eagle LLC
- voyage no: 201905
- broker: London Shipbroking London
- cgo fixed via: Eagle Bulk Europe
- next open: Shanghai Area mid August 2019

- General comment: decent paying business since Loading port nearby vessel's charter free position and voyage to N.China desired due to upcoming Docking

- Counterparty Vetting: new counter party
Infospectrum 5 Point rating - see reports & background attached
References - checked with Nomikos, Norden and RWE who advised that charterers performance been and is immaculate

- Ops comment

Thanks & Best Regards



**Jan-Philipp Rauno**
Director
Eagle Bulk Europe GmbH
+49 40 4600080-10 (direct)
+49 40 4600080-0 (office)
+49 172 2908391 (mobile)
eurochart@eagleships.com
jprauno@eagleships.com
www.eagleships.com

**From:** mail@londonshipbroking.com
**Sent:** 6/10/2019 6:53:38 PM
**To:** eurochart@eagleships.com
**Subject:** NEW LONDON EAGLE / MEDMAR cp dd 10.6.19 full terms recap

[External Email - Please use caution]

# London Shipbroking Co. Ltd.

c/o The Baltic Exchange, 38 St. Mary Axe, London EC3A 8BH
Tel: MF direct: +44 207 993 5761; JW direct: +44 207 993 2452
Email: mail@londonshipbroking.com

Date: 10/06/2019, Time: 17:38:11, Our Ref: 200533-JHN NEW LONDON EAGLE /
MEDMAR cp dd 10.6.19 full terms recap

JAPHI/JOHN

New London Eagle/Medmar cp dd 10.6.19

Please find hereunder full recap: please confirm in writing it agrees with your notes:

ACCT MEDMAR INC (FULL STYLE BELOW)

Vessel/Owners:

| Date updated: | Jan 12 2018 |
|---|---|
| Vessel name (IMO #): | New London Eagle (9754991) |

| Ship type: | Geared single deck bulk carrier, engine and bridge aft | | | |
|---|---|---|---|---|
| Owners:<br>? | New London Eagle LLC<br>Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands, MH 96960 | | | |
| Contact:<br>?<br>?<br>?<br>? | Eagle Shipping International (USA) LLC<br>300 First Stamford Place, Stamford, CT 06902, USA<br>+1 203 276 8100<br>operations@eagleships.com | | | |
| Year built / yard: | 2015 / Dayang | | | |
| Flag: | Marshall Islands | | | |
| Class: | Lloyd's | | | |
| Notation: | +100A1 Bulk Carrier, CSR, BC-A, GREB[20], Hold Nos. 2 and 4 May Be Empty, ESP, *IWS | | | |
| LOA / beam: | 199.99m / 32.26m | | | |
| Loadline: | DWAT (mt) | Draft (m) | TPC | ? |
| Summer Salt Water: | 63,140 | 13.3 | 62.13 | ? |
| Cargo capacity: | Grain (m3) | Bale (m3) | HC dims (m) | Max homo load (mt) |
| Hold 1: | 12376.2 | 12067.8 | 14.76 x 17.02 | 9870 |
| Hold 2: | 16501.4 | 16089.0 | 22.14 x 18.64 | 13159 |
| Hold 3: | 16006.0 | 15605.9 | 22.14 x 18.64 | 12764 |
| Hold 4: | 16518.2 | 16105.2 | 22.14 x 18.64 | 13172 |
| Hold 5: | 16089.0 | 15686.8 | 22.14 x 18.64 | 12830 |
| Total: | 77490.9 | 75554.7 | - | - |
| Holds: | Single skin / hoppered tank tops / natural ventilation / CO2 / A60 fitted / grab suitable | | | |
| | Strengthened for heavy cargoes; holds 2 and 4 may be left empty | | | |
| Hatch covers: | 2 section, double skin, folding type (not suitable for cargo) each fitted with 2 x 650mm diameter grain feed holes | | | |
| Cranes: | 4 x Masada Mitsubishi electro-hydraulic type SWL hook 36mt / SWL grab 28.8mt | | | |
| Grabs: | 4 x Guven 14.0 m3 radio remote control | | | |
| Speed and consumption | Full speed (warranted) | | Economical speed (warranted) | |
| Loaded condition: | abt 14.0 knots on abt 30.0 mt IFO + 0.1 mt GO | | abt 12.0 knots on abt 22.0 mt IFO + 0.1 mt GO | |
| Ballast condition: | abt 14.0 knots on abt 27.5 mt IFO + 0.1 mt GO | | abt 12.0 knots on abt 18.5 mt IFO + 0.1 mt GO | |
| Port/anchorage consumption: | Idle | ? | Working | ? |
| | abt 3.0 mt IFO per 24 hr | | abt 8 hr 3.7 mt / 16 hr 4.9 mt / 24 hr 6.0 mt IFO | |
| Above excluding additional consumption for ballasting or deballasting, boiler in port, and cleaning holds at sea or in port. | | | | |
| When seawater temperature exceeds 32.0 degC for more than 6 hours in any noon report period a speed loss of 0.5 knots is expected if sailing and an additional fuel consumption of 0.5 mt is expected if in port due to extreme seawater cooling system demands. | | | | |
| The vessel shall have the liberty to use GO for maneuvering on departure/arrival, starting of A/E, navigating in shallow/restricted/busy waters, canals, and rivers. | | | | |
| Warranted speed and consumption applies in good weather conditions up to and including Beaufort wind force 4 and Douglas sea state 3 (maximum significant wave height of 1.25 m) free from adverse effects of currents and swell, even keel at summer draft or less, and excluding voyages less than 48 hours transit time from sea pilot to sea pilot, passages with restricted visibility, congested waters, straits, narrowed waters, and while maneuvering, leaving and entering ports, and in extreme hot/cold climates. Positive current shall not be used in diminishing vessel's performance. About qualifies both speed and consumption, and means up to 5% additional fuel consumption and up to 0.5 knots lower speed. Speed underperformance to be offset against under-consumption. | | | | |
| Periods of less than 24 hours, from noon report to noon report, of continuous good weather to be expressly excluded from determination of the vessel's performance. Any performance claims are to be based on good weather performance only, and when at least twenty percent of the sea days are good weather days. | | | | |
| Owners are delivering the vessel to Charterers with HSIFO (380cSt) and LSMGO. During the currency of this charter, Charterers are only permitted to supply these grades to the vessel. Bunkers provided must be in accordance with ISO 8217:2010 specification. Vessel can only be bunkered up to 85 percent tank capacity. Comingling of bunker stems not allowed. | | | | |
| International GRT/NRT: | 35873 / 21218 | | | |
| Constant: | 400 mt (always to be confirmed by Master) | | | |
| Insurance: | P&I: West of England | | H&M: Various insurers placed via JLT NY | |
| IACS/IG PANDI: | Yes / Yes | | | |
| | Above description all about | | | |

BALTIC Q'NAIRE: attached for guidance only

vessel as described in owner's description (there is no wog in there we believe)

NEXT DUE DRYDOCK/DUE SPECIAL SURVEY: Dec 2020

H+M VALUE: will be in certificates

Last cargoes: Cement, bauxite, coal, salt, grains, grains, grains

LAST 6 PORTS OF CALL INCL BUNKERING ONES:

HOUSTON D UNITED STATES
GIBRALTAR B
CANAKKALE L TURKEY
SAN NICOLAS (GREECE) D GREECE
TROMBETAS L BRAZIL
DAKAR D SENEGAL
AMSTERDAM L NETHERLANDS

++

PLS PROVIDE FULL VSL ITINERARY & AGENTS FULL STYLE/ADDRESS AT LAST
DPORT:
Port: Houston, Texas
Berths: 1.Houston Cement West (36,300MTS)
2.Houston Cement East (13,200MTS)
ETA: 09 June 2019 / 1500
Thereafter cleaning for grains for about 2 days

Readiness: Basis Completion of cargo on June 19 AGW we anticipate about 2 days needed
afterward to finish cleaning (we have hired a professional cement cleaning company to prepare to
grain standards)
Would estimate Readiness at **Corpus June 22/23 AGW**

ProBulk Agency, LLC
As Agents Only

Georgios Kazanis
Office: 281-337-8100
Fax: 281-337-8145
Mobile: 832-472-7993
Email: ops@probulkagency.com

PLS ADVISE FULL C/P CHAIN: headowned

OWNERS TO BE INSERTED IN C/P: see above

MANAGERS FULL STYLE/ADDRESS : see above

OWNERS P&I CLUB: see above

TROPICAL DWT/DRAFT OF THE VSL: see questionnaire

OWNERS GTEE PERFORMING VSL IS A SELF-TRIMMING BC , HAS NO CENTRE LINE
BULKHEAD(S) , IS SUITABLE FOR LOADING GRAINS ACCORDING TO LATEST
SOLAS RULES AND REGULATIONS.

VSL HAS NOT TRADED RUSSIAN PACIFIC PORTS AND GYPSY MOTH AFFECTED
AREAS FOR THE LAST TWO YEARS AND IS FREE OF ASIAN GYPSY MOTH

VSL IS CLASSED HIGHEST LLOYDS OR EQUIVALENT.

PLS ADVISE IF VESSELS CLASS HAS CHANGED IN THE LAST 12 MONTHS
VSL IS FULLY PNI COVERED WITH RECOGNISED INTL SOCIETY / PNI- PLS ADVISE
VSL HAS ISM CERTIFICATE AND DOC VSLOR OTHERS UNDER ONWERS CONTROL
ARE NOT BLACKLISTED BY ARAB BOYCOTT COMITTEE
VSL HAS NO IRANIAN/ISRAELI INTERESTS
VSL IS FULLY FITTED FOR SUEZ CANAL TRANSIT INCL LIFTING MOORING BOATS,
IF REQUIRED

VSL NOT BLACKLISTED BY PARIS, MED OR TOKYO MOUS: Vessel is NOT Blacklisted
by mentioned LOUs of charterers terms.

VSL IS GRAIN FITTED SELFTRIMMING BULK CARRIER AND CAN LOAD FULL
CARGO OF BULK GRAINS W/O ANY STRAPPING/BAGGING/SECURING AND/OR
ADDITIONAL TRIMMING.

OWNERS CONFIRM THAT NEITHER THE VESSEL NOR ANY INDIVIDUAL INVOLVED
IN OPERATION AND/OR OWNERSHIP AND/OR TRADING OF THE VESSEL IS
CONSIDERED A "SANCTIONED" PERSON AND/OR ENTITY BY US OFFICE OF
FOREIGN ASSETS CONTROL. CHARTERERS HAVE THE OPTION TO CANCEL THE
CONTRACT ANYTIME IF THE PERFORMING SHIP AND/OR HEAD OWNERS AND/OR
DISPONENT OWNERS OR ANY OWNERS IN THE CHAIN APPEARS TO BE LISTED BY
ISD ISSUED BY US DEPT. OF TREASURY - OFFICE OF FOREIGN ASSETS CONTROL
, EEWWW.USTREAS.GOV/OFFICES/ENFORCEMENT/OFAC/SDN. VESSEL'S IMO
NUMBER:

*********************************************************************
*****
pls provide provisional stow plan w/out additional b/s/s/t using trimmed ends for max intake
on 38.5ft tfw HSS stowing around 47cuft with bunkering Balboa with 12m fwad arrival draft
shanghai - owrs rvtg

pls adv dwat on 38.5 ft tfw under revised panama draft effective 12th june: 51486 mts

- OWRS TO SEND FLWG VSL'S VALID TRADING CERTS : as received from owners and forwarded to chrts by lsb 16.28/16.29 london time

- CLASS
- P&I
- H&M
- REGISTRY
- ISM
- DOC
- INT'L TONNAGE CERTIFICATE
- ISSC
- SAFETY CONSTRUCTIONS
- SAFETY EQUIPMENT
- SAFETY RADIO
- INTERNATIONAL LOADLINE
- IOPP


F O R

- Medmar Inc.
122, Blue Mountain Road
P.O. Box 127
Providenciales
Turks and Caicos Islands
British West Indies

-P&I : WEST OF ENGLAND

-DELY AFSPS 1 sp CORPUS CRISTI

-LAY/CANCEL June 21/26th 24.00 hrs local time – eta June 22/23 AGW

-NOTICE UPON FIXING , THEN ON DAILY BASIS

-ONE TCT VIA USG AND PANAMA CANAL WITH BULK GRAIN CARGO (INTENTION BULK HSS) TRADING ALWAYS VIA SA(S) SB(S) SP(S)WITH HARMLESS/LAWFUL CGO AWIWL AA EXCEPT NAABSA WHERE CUSTOMARY

-DURATION ABT 50-55 DAYS WOG

-REDELY DLOSP 1SP SPORE-JPN —intended redel china (present port nantong or shanghai but subject to change)

-HIRE USD 19.500- PDPR IOT PAYABLE EVERY 15D IN ADVANCE. payment cl as per owners except read 'payments' in last line

-1ST HIRE PAYMENT AND VALUE OF BOD TO BE PAID W/IN 3 BANKING DAYS
AFTER VSL DELIVERY. TOGETHER WITH 1ST HIRE PAYMENT CHARTS WILL PAY
FOR VALUE OF BOD AND HAVE THE RIGHT TO DEDUCT ESTIMATED VALUE OF
BUNKER ON REDELY FROM LAST SUFFICIENT HIRE PAYMENT.

-ILOHC: USD 5000 LSUM

-C/E/V: USD 1500 PMPR

-BUNKER CLAUSE
Est ROB arr Corpus Christi: IFO 510 / LGO 185 MT
Bor about same quantities as actually having been on board on delivery
Same prices bends usd 425 pmt ifo and usd 675 pmt lsgo
Oo to bunker for their own acc pvdd does not interfere with charterers operations, same never to
be unreasonably withheld

-VSL ON ARRIVAL LOADPORT TO BE READY TO LOAD…..
As per owners CP

-GA/ARBITRATION LONDON/ENGLISH LAW TO APPLY ALSO DURING NEGOS.

-TIME FOR DELY/REDELY TO BE LOCAL TIME AND FOR HIRE CALCULATION TO BE
ADJUSTED TO GMT

-CHARTERERS CONFIRM THAT ACCORDING TO ALL OF THE US/EU/UK
INTERNATIONAL TRADING SANCTIONS LISTS NONE OF THEIR 25% PERCENT OR
MORE OWNERS ARE CURRENTLY LISTED AND THAT SHOULD THIS CHANGE,
THEY ARE TO NOTIFY CTM IMMEDIATELY

-OWISE AS PER OWNERS CP (AS ATTACHED)

-OWNER'S SANCTION CLAUSE AS ATTACHED TO FORM INTEGRAL PART OF THE
CONTRACT

-3.75 ADD + 1.25% LSB

-chrts subjects lifted within time

end main terms recap

cp details recap

as per main terms and logical amendments/deletions based on chrts attached proforma and
below agreed alterations:

l 214 after 'two' insert 'working'

l 257 delete 'and to be towed'

cl 27 delete 3rd paragraph

cl 84 delete

cl 103 delete as agreed

end cp details recap

Many thanks indeed for all your efforts and support in concluding this fixture

if you can forward your cp in a word/.doc format I can draw up the cp.
Thanks and best regards
John Weir
Dir: +44 207 993 2452
Mob: +44 7802 600 985

*[Message sent via SOFTWAY Communicator]*

**MODIFIED BIMCO WORDING for Time Charter Parties:**

(a) The Owners shall not be obliged to comply with any orders for the employment of the Vessel in any carriage, trade or on a voyage which, in the reasonable judgment of the Owners, will expose the Vessel, Owners, managers, crew, the Vessel's insurers, or their re-insurers, to any sanction or prohibition imposed by any State, Supranational or International Governmental Organisation.

(b) If the Vessel is already performing an employment to which such sanction or prohibition is subsequently applied, the Owners shall have the right to refuse to proceed with the employment and the Charterers shall be obliged to issue alternative voyage orders within 48 hours of receipt of Owners' notification of their refusal to proceed. If the Charterers do not issue such alternative voyage orders the Owners may discharge any cargo already loaded at any safe port (including the port of loading). The Vessel to remain on hire pending completion of Charterers' alternative voyage orders or delivery of cargo by the Owners and Charterers to remain responsible for all additional costs and expenses incurred in connection with such orders/delivery of cargo. If in compliance with this Sub-clause (b) anything is done or not done, such shall not be deemed a deviation.

(c) The Charterers shall indemnify the Owners against any and all claims whatsoever brought by the owners of the cargo and/or the holders of Bills of Lading and/or sub-charterers against the Owners by reason of the Owners' compliance with such alternative voyage orders or delivery of the cargo in accordance with Sub-clause (b).

(d) The Charterers shall procure that this Clause shall be incorporated into all sub-charters and Bills of Lading issued pursuant to this Charter Party.

***(e) For purposes of this Clause, references to sanctions or prohibitions shall include sanctions or prohibitions imposed by the UN and its Security Council, EU (including its member states), the UK and/or U.S. , in each case as if such sanctions or prohibitions were binding on each party referenced (to the extent compliance with would not violate the laws and regulations of the U.S.). The Charterers shall promptly provide information as reasonably necessary for Owners to determine compliance with this Clause.

**Code Name: "NYPE 93"**
Recommended by:
The Baltic and International Maritime Council (BIMCO)
The Federation of National Associations of
Ship Brokers and Agents (FONASBA)

# T I M E   C H A R T E R

New York Produce Exchange Form
*Issued by the Association of Ship Brokers and Agents (U.S.A.), Inc.*

November  6th,1913 -  Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946;
Revised June 12th, 1981; September 14th, 1993.

| | |
|---|---|
| THIS CHARTER PARTY, made and concluded in *Stamford, Connecticut*, | 1 |
| ............................................... | |
| this..........11*th* ............................................. day of February 2016, ...... ~~19~~ ................ | 2 |
| Between *Crowned Eagle Shipping LLC, Marshall Islands*, ............................................................ | 3 |
| ........................................................................................................................ | 4 |
| **Owners** of the Vessel described below, and *Global Maritime Investments Ltd., Cayman Islands*, | 5 |
| | 6 |
| ........................................................................................................................ | 7 |
| **Charterers** | 8 |

**Description of Vessel**                                                                                                    9

Name    "*Crowned    Eagle*"    -    see    *Description    Clause    46*.................    10
~~Flag.................Built..........................(year).~~    
~~Port and number of Registry~~    ....................................................................    11
~~Classed.....................................................in.............~~    12
~~Deadweight...........................................................long*/metric* tons (cargo and bunkers, including freshwater and~~    13
~~stores not exceeding.........................long/metric tons) on a salt water draft of ...............................~~    14
~~on summer freeboard.~~    15
~~Capacity.........................................cubic feet grain...........................................cubic feet bale space.~~    16
~~Tonnage.....................................GT/GRT.~~    17
~~Speed about.............knots, fully laden, in good weather conditions up to an including maximum~~    18
~~Force.............on the Beaufort wind scale, on a consumption of about....................long*/metric*~~    19
~~tons of...........................~~    20

*~~Delete as appropriate~~.*    21
*~~For further description see Appendix "A" (if applicable)~~*    22

**1.    Duration**    23

The Owners agree to let and the Charterers agree to hire the Vessel from the time of delivery for a period    24
of *minimum 11 months to about 13 months time charter, with "about" meaning plus or minus 15 days*    25
*in Charterers' option, via safe port(s), safe berth(s), safe anchorage(s), always afloat, always*    26
*accessible,*    
*always within Institute Warranty Limits except NAABSA allowed as per NYPE Clause 12. Vessel not*    27
*to*    
*follow ice breakers or force ice,* within below mentioned trading limits.    28

**2.    Delivery**    29

The Vessel shall be placed at the disposal of the Charterers at *on dropping last outbound sea pilot one*    30
*safe port India any time day or night, Sundays and holidays included, intention Mumbai without*    31

guarantee............................................................................................................ 32
........................................................................ The Vessel on her *arrival first load port* ~~delivery~~ 33

for ordinary cargo service, having water ballast and with sufficient power to operate all cargo-handling gear 35
simultaneously. *See also Clause 68.* 36
The Owners shall give the Charterers *first notice of delivery upon clean fixing, then daily notices of* 37
*delivery.* ~~not less than .............days notice of expected date of delivery.~~ 38

### 3.   On-Off Hire Survey 39

*At first and last ports, the parties shall each appoint a representative (Surveyor, Master or* 
*Superintendent) for the purpose of conducting a joint on-hire and off-hire bunker and condition* 
*survey. Joint on-hire survey to be in Owners' time and joint off-hire survey to be in Charterers' time.* 
*Vessel only to be considered off-hire during the on-hire survey if time is actually lost to Charterers.* 
*Each party to bear their own survey costs.*

~~Prior to delivery and redelivery, the parties shall, unless otherwise agreed, each appoint surveyors, for their~~ 40
~~respective accounts, who shall not later than at first loading/last discharging port, respectively, conduct~~ 41
~~joint on-hire/off-hire surveys, for the purpose of ascertaining quantity of bunkers on board and the condition~~ 42
~~of the Vessel. A single report shall be prepared on each occasion and signed by each surveyor, without~~ 43
~~prejudice to his right to file a separate report setting forth items upon which the surveyors cannot agree.~~ 44
~~If either party fails to have a representative attend the survey and sign the joint survey report, such party~~ 45
~~shall nevertheless be bound for all purposes by the findings in any report prepared by the other party.~~ 46
~~On-hire survey shall be on Charterers' time and off-hire survey on Owners' time.~~ 47

### 4.   Dangerous Cargo/Cargo Exclusions 48

(a) The Vessel shall be employed in carrying lawful merchandise excluding *those cargoes as described in* 49
*Clause 47.* ~~any goods of a dangerous,~~ 
~~injurious, flammable or corrosive nature unless carried in accordance with the requirements or~~ 50
~~recommendations of the competent authorities of the country of the Vessel's registry and of ports of~~ 51
~~shipment and discharge and of any intermediate countries or ports through whose waters the Vessel must~~ 52
~~pass. Without prejudice to the generality of the foregoing, In addition the following are specifically~~ 53
~~excluded: livestock of any description, arms, ammunition, explosives, nuclear and radioactive materials.~~ 54
*See Clause 47.* 55
................................................................................................................................. 56
................................................................................................................................. 57
................................................................................................................................. 58
................................................................................................................................. 59
................................................................................................................................. 60
................................................................................................................................. 61
................................................................................................................................. 62
................................................................................................................................. 63
................................................................................................................................. 64

~~(b)  If IMO-classed cargo is agreed to be carried, the amount of such cargo shall be limited to~~ 65
~~.............................. tons and the Charterers shall provide the Master with any evidence he may~~ 66
~~reasonably require to show that the cargo is packaged, labelled, loaded and stowed in accordance with IMO~~ 67
~~regulations, failing which the Master is entitled to refuse such cargo or, if already loaded, to unload it at~~ 68
~~the Charterers' risk and expense.~~ 69

### 5.   Trading Limits 70

The Vessel shall be employed in such lawful trades between safe ports and safe places 71
within *world-wide trading always afloat, always via safe berth(s), safe port(s), safe anchorage(s),* 72
*always within Institute Warranty Limits and always* excluding *the following countries: Albania, CIS* 73

*Pacific, Cuba, Turkish-occupied Cyprus, Eritrea, Ethiopia, Haiti, Iran, Iraq, Kampuchea, Lebanon,*    74
*Liberia, Libya, Myanmar, North Korea, Sierra Leone, Somalia, Syria, Israel, Djibouti, Kenya, Nigeria,*
*Namibia but Walvis Bay allowed, Oman, Western Sahara, Sudan, Venezuela*
*Yemen, and all war and/or piracy risk/like areas and areas of hostility and countries/areas/individuals*    75
*excluded by UN and/or USA.*
*Cargoes destined for Iraq permitted provided UN and/or USA authorized and approved. It is*    76
*Charterers' responsibility to arrange all required documentation in this regard and a copy of same to*
*be furnished to the Master prior to sailing loading port. All costs/time associated with the furnishing*
*of the necessary documents and also with fulfilling the required procedures to be for Charterers'*
*account.*
*No Gulf of Aden trading.*
*Charterers are not permitted to load any cargo breaching UN and/or USA embargoes. Vessel not to*
*trade directly between China and Taiwan.*
*Cuba permitted provided under US licensed cargoes.*
*All required licences and documentation to be furnished to the vessel prior loading.*
*Syria permitted provided restrictions by US Government are lifted.* ~~as the Charterers shall direct.~~

**6.**    **Owners to Provide**    77

The Owners shall provide and pay for the insurance of the Vessel, except as otherwise provided, and for    78
all provisions, *fresh water (except fresh water required by shore personnel when loading/discharging*    79
*at an anchorage or due to prolonged delay (exceeding 25 days) in port, and for hold cleaning, in which*
*case fresh water to be supplied by Charterers), drinking water, lubricating oil,* cabin, deck, engine-room
and other necessary stores, including boiler water; shall pay for
wages, consular shipping and discharging fees of the crew and charges for port services pertaining to the    80
crew; shall maintain the Vessel's class and keep her in a thoroughly efficient state in hull, machinery and    81
equipment for and during the service, and have a full complement of officers and crew. *See Clause 67.*    82

**7.**    **Charterers to Provide**    83

The Charterers, while the Vessel is on hire, shall provide and pay for all the bunkers except as otherwise    84
agreed; shall pay for port charges (including compulsory watchmen and cargo watchmen and compulsory    85
garbage disposal), ~~all communication expenses pertaining to the Charterers' business at cost,~~ *compulsory*    86
*and/or customary* pilotages, *cost of pilotage in Dardanelles if required by master and cost of Skaw*
*pilotage to comply with IMO recommendations to be for Charterers account,*
towages, agencies, commissions, consular charges (except those pertaining to individual crew members    87
or flag of the Vessel), and all other usual expenses except those stated in Clause 6, but when the Vessel    88
puts into a port for causes for which the Vessel is responsible (other than by stress of weather), then all    89
such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew    90
shall be for the Owners' account. Fumigations ordered because of cargoes carried or ports visited while    91
the Vessel is employed under this Charter Party shall be for the Charterers' account. ~~All other fumigations~~    92
~~shall be for the Charterers' account after the Vessel has been on charter for a continuous period of six~~    93
~~months or more.~~ *See Clause 51 - Deratting Certificate.*    94

The Charterers shall provide and pay for necessary dunnage and also any extra fittings requisite for a    95
special trade or unusual cargo, but the Owners shall allow them the use of any dunnage *and other equipment*    96
already aboard
the Vessel. Prior to redelivery the Charterers shall remove their dunnage and fittings at their cost and in    97
their time. *The foregoing is subject to vessel/cargo trading exclusions and bulk carrier fitness*    98
*certificate and cargo securing manual.*

**8.**    **Performance of Voyages**    99

(a) The Master shall perform the voyages with due despatch, and shall render all customary assistance    100
with the Vessel's crew. The Master shall be conversant with the English language and (although    101
appointed by the Owners) shall be under the orders and directions of the Charterers as regards    102

employment and agency; and the Charterers shall perform all cargo handling, including but not limited to loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging and tallying at their risk and expense, under the supervision of the Master.

103
104
105

(b)    If the Charterers shall have reasonable cause to be dissatisfied with the conduct of the Master or officers, the Owners, shall, on receiving particulars of the complaint, investigate the same, and if necessary, make a change in the appointments.

106
107
108

## 9.    Bunkers

109

*Bunkers on delivery about 1600-1700 MT IFO plus about 70-80 MT MDO.*
*Bunkers on redelivery to be about same as actually on board on delivery.*
*Bunker prices both ends: USD 478.00 per metric ton IFO and USD 700.00 per metric ton MDO.*

*Value of bunkers to be paid on delivery together with first hire payment.*

*Charterers have the option to deduct value of bunkers on redelivery from last sufficient hire payment(s).*

*Charterers/Owners to have the privilege to bunker the vessel prior delivery/redelivery provided same does not interfere with vessel/cargo operations.*

(a)    The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel and diesel oil remaining on board the Vessel as hereunder.   The Vessel shall be delivered with: ...............................................long*/metric* tons of fuel oil at the price of.....................................per ton; .................................tons of diesel oil at the price of....................................per ton. The Vessel shall be redelivered with: ................................tons of fuel oil at the price of ....................................per ton; ......................tons of diesel oil at the price of........................per ton.

110
111
112
113
114
115

*\* Same tons apply throughout this clause.*

116

(b)    The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and auxiliaries and which conform to the specification(s) as set out in Appendix A *Clause 46 and which meet applicable regulations for ports visited and areas transited.*
The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform to the mutually agreed specification(s) or otherwise prove unsuitable for burning in the Vessel's engines or auxiliaries, the Owners shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker consumption, nor for any time lost and any other consequences.

117
118
119
120
121
122
123
124

## 10.    Rate of Hire/Redelivery Areas and Notices

125

The Charterers shall pay for the use and hire of the said Vessel at the rate of $............................................... U.S. currency, daily, or $...........................................U.S. currency per ton on the Vessel's total deadweight carrying capacity, including bunkers and stores, on....................................summer freeboard, per 30 days, *Hire to be per day, pro rata, including overtime payable every 15 days in advance*

126
127
128

*First hire payment to be made within 3 banking days after vessel's delivery together with the value of bunkers on delivery,*
commencing on and from the day of her delivery, as aforesaid, and at and after the same rate for any part of a *day* month; hire shall continue until the hour of the day of her redelivery in like good order and condition, ordinary wear and tear excepted, to the Owners (unless Vessel lost) at *on dropping last outbound sea pilot of China, Vietnam, Taiwan, Indonesia, Philippines, any time day or night, Sundays and holidays*

129
130
131
132

Included.                                                                                          133

                                                                                                    134
The Charterers shall give the Owners not less than **25/15/10/7** days **approximate** notice **with probable**    135
**port/country** followed by **5/4/3/2/1 day's definite notices of redelivery** of the Vessel's
~~Expected~~ date and ~~probable~~ port of redelivery.                                              136

For the purpose hire calculations, the times of delivery, redelivery or termination of charter shall be    137
adjusted to GMT.                                                                                   138

**11.      Hire Payment**                                                                          139

(a)      *Payment*                                                                                 140

Payment of hire shall be made **to Owners' nominated bank** so as to be received by the Owners or their    141
designated payee ~~in~~
viz **remit by wire direct to bank account as nominated by Owners:**                                142
.....................................................................................................    143
.....................................................................................................    144
.....................................................................................................    145
....~~in~~
......................................................~~currency, or~~ in United States Currency, in funds available to the    146
Owners on the due date, 15 days in advance, and for the last month or part of same the approximate    147
amount of hire, and should same not cover the actual time, hire shall be paid for the balance day by day    148
as it becomes due, if so required by the Owners. Failing the punctual and regular payment of the hire,    149
or on any fundamental breach whatsoever of this Charter Party, the Owners shall be at liberty to    150
withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners)    151
may otherwise have on the Charterers.                                                              152

**Hire and all monies due to the Owners under this Charter Party will be paid to Owners' bank as stated**
**above. Charterers will not agree to the assignment of hire, monies due under this Charter Party nor**
**the Charter Party itself in any circumstances whatsoever.**

At any time after the expiry of the grace period provided in Sub-clause 11 (b) hereunder and while the    153
hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold    154
the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever    155
for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and hire    156
shall continue to accrue and any extra expenses resulting from such withholding shall be for the    157
Charterers' account.                                                                               158

(b)      *Grace Period*                                                                            159

Where there is failure to make punctual and regular payment of hire and/or bunker due to oversight,    160
negligence, errors
or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners    161
**3 (three)** clear banking days (as recognized at the agreed place of payment) written notice to rectify the    162
failure, and when so rectified within those **3 (three)**............ days following the Owners' notice, the payment    163
shall stand as regular and punctual.

Failure by the Charterers to pay the hire within **3 (three)**............... days of their receiving the Owners' notice    165
as provided herein, shall entitle the Owners to withdraw as set forth in Sub-Clause 11 (a) above.

(c)      *Last Hire Payment*                                                                        167

Should the vessel be on her voyage towards port of redelivery at the time the last and/or the penultimate    168

payment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners and the Charterers may agree upon as being the estimated time necessary to complete the voyage, and taking into account bunkers actually on board, to be taken over by the Owners and estimated disbursements for the Owners' account before redelivery. Should same not cover the actual time, hire is to be paid for the balance, day by day, as it becomes due. When the Vessel has been redelivered, any difference is to be refunded by the Owners or paid by the Charterers, as the case may be, **within 60 days after redelivery**. 169 170 171 172 173 174

(d)   _Cash Advances_ 175

~~Cash for the Vessel's ordinary disbursements at any port may be advanced by the Charterers, as required by the Owners, subject to a 2½ percent commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application of such advances.~~ 176 177 178

## 12.    Berths 179

The Vessel shall be loaded and discharged in any safe dock or at any safe berth or safe place that Charterers or their agents may direct, provided the Vessel can safely enter, lie and depart always afloat at any time of tide **except NAABSA in Argentina/Uruguay/Brazil where it is customary for similar size vessels to safely lie aground and per the terms of the following BIMCO NAABSA clause:. Always subject to the Owners' approval, which is not to be unreasonably withheld, the Vessel during loading and/or discharging may lie safely aground at any safe berth or safe place where it is customary for vessels of similar size, construction and type to lie, if so requested by the Charterers, provided always that the Charterers have confirmed in writing that vessels using the berth or place will lie on a soft bed and can do so without suffering damage.**
**The Charterers shall indemnify the Owners for any loss, damage, costs, expenses or loss of time, including any underwater inspection required by class, caused as a consequence of the Vessel lying aground at the Charterers' request.** 180 181 182

## 13.    Spaces Available 183

(a) **No cargo to be loaded on decks and hatch covers.** The whole reach of the Vessel's holds, ~~decks~~ and other cargo spaces (not more than she can
reasonably and safely stow and carry), also accommodations for supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for the Vessel's Officers, crew, tackle, apparel, furniture, provisions, stores and fuel. 184 185 186 187

~~(b)    In the event of deck cargo being carried, the Owners are to be and are hereby indemnified by the Charterers for any loss and/or damage and/or liability of whatsoever nature caused to the Vessel as result of the carriage of deck cargo and which would not have arisen had deck cargo not been loaded.~~ 188 189 190

## 14.    Supercargo and Meals 191

The Charterers are entitled to appoint a supercargo, who shall accompany the Vessel at the Charterers' risk**, Charterers' supercargo, before boarding vessel, to sign Owners' ISM Letter of Indemnity form** and see that voyages are performed with due despatch. He is to be furnished with free
accommodation and same fare as provided for the Master's table, the Charterers paying at the rate of **USD 10.00**............................... per day. The Owners shall victual pilots and customs officers, ~~and also, when authorized by the Charterers or their agents, shall victual tally clerks, stevedore's foreman, etc.,~~
Charterers paying at the rate of **USD 1,500 per month or pro rata for all victualling, gratuities and cost of cables.** ~~per meal for all such victualling.~~ **For port calls in Black Sea Charterers to pay an additional usd 5,000 per port.** 192 193 194 195 196 197

**15.**   <u>Sailing Orders and Logs</u>                                                  198

The Charterers shall furnish the Master from time to time with all requisite instructions and sailing    199
directions, in writing, in the English language, and the Master shall keep full and correct deck and engine  200
logs of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the   201
Charterers, their agents or supercargo, when required, with a true copy of such deck and engine logs,    202
showing the course of the Vessel, distance run and the consumption of bunkers. Any log extracts      203
required by the Charterers shall be in the English language.                          204

**16.**   <u>Delivery/Cancelling</u>                                                    205

If required by the Charterers, time shall not commence before *0001 hours local time April 17, 2016,* and   206
should the
Vessel not be ready for delivery on or before *April 28, 2016,* but not later than *2359*...........hours *local time,*  207
the Charterers shall have the option of cancelling this Charter Party *latest on the day of Vessel's readiness.*  208
*Vessel's itinerary: ETA Mumbai April  13, 2016, all going well, weather permitting, without guarantee.*
*ETCD Mumbai April 20, 2016, all going well, weather permitting, without guarantee.*

<u>Extension of Cancelling</u>                                                   209

If the Owners warrant that, despite the exercise of due diligence by them, the Vessel will not be ready   210
for delivery by the cancelling date, and provided the Owners are able to state with reasonable certainty   211
the date on which the Vessel will be ready, they may, at the earliest seven days before the Vessel is     212
expected to sail for the port or place of delivery, require the Charterers to declare whether or not they will  213
cancel the Charter Party. Should the Charterers elect not to cancel, or should they fail to reply within two  214
days or by the cancelling day, whichever shall first occur, then the seventh day after the expected date    215
of readiness for delivery as notified by the Owners shall replace the original cancelling date. Should the   216
Vessel be further delayed, the Owners shall be entitled to require further declarations of the Charterers   217
in accordance with this Clause.                                            218

**17.**   <u>Off Hire</u>                                                          219

In the event of loss of time from deficiency and/or default and/or strike of Officers or crew, or deficiency  220
of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the    221
arrest of the Vessel, (unless such arrest is caused by events for which the Charterers, their servants,    222
agents or subcontractors are responsible), or detention by average accidents to the Vessel or cargo unless  223
resulting from inherent vice, quality or defect of the cargo, drydocking for the purpose of examination or   224
painting bottom, or by any other similar cause preventing the full working of the Vessel, the payment of   225
hire and overtime, if any, shall cease for the *actual* time thereby lost. Should the Vessel deviate or put back  226
during a voyage, contrary to the orders or directions of the Charterers, for any reason other than accident  227
to the cargo or where permitted in lines 257 to 258 hereunder, the hire is to be suspended from the time  228
of her deviating or putting back until she is again in the same or equidistant position from the destination  229
and the voyage resumed therefrom. All bunkers used by the Vessel while off hire shall be for the Owners'  230
account. In the event of the Vessel being driven into port or to anchorage through stress of weather,     231
trading to shallow harbors or to rivers or ports with bars, any detention of the Vessel and/or expenses    232
resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be      233
reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, the time so lost, and  234
the cost of any extra bunkers consumed in consequence thereof, and all extra proven expenses may be    235
deducted from the hire.                                                 236

**18.**   <u>Sublet</u>                                                          237

Unless otherwise agreed, the Charterers shall have the liberty to sublet the Vessel for all or any part of   238
the time covered by this Charter Party, but the Charterers remain responsible for the fulfillment of this   239

Charter Party.                                                                                          240

### 19.   Drydocking                                                                                    241

~~The                           Vessel                        was                        last~~           242
~~drydocked.................................................................................~~           

~~*(a) The Owners shall have the option to place the Vessel in drydock during the currency of this Charter~~   243
~~at a convenient time and place, to be mutually agreed upon between the Owners and the Charterers, for~~      244
~~bottom cleaning and painting and/or repair as required by class or dictated by circumstances.~~            245

*(b) Except in case of emergency no drydocking shall take place during the currency of this Charter     246
Party.                                                                                                 247

### 20.   Total Loss                                                                                    249

Should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or     250
being last heard of) shall be returned to the Charterers at once.                                      251

### 21.   Exceptions                                                                                    252

The act of God, enemies, fire, restraint of princes, rulers and people, and all dangers and accidents of the   253
seas, rivers, machinery, boilers, and navigation, and errors of navigation throughout this Charter, always     254
mutually excepted.                                                                                     255

### 22.   Liberties                                                                                     256

The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels    257
in distress, and to deviate for the purpose of saving life and property, **and Vessel to remain on-hire.**      258

### 23.   Liens                                                                                         259

The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amounts due     260
under this Charter Party, including general average contributions, and the Charterers shall have a lien on     261
the Vessel for all monies paid in advance and not earned, and any overpaid hire or excess deposit to be     262
returned at once.                                                                                      263

The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien or encumbrance     264
which might have priority over the title and interest of the Owners in the Vessel. The Charterers         265
undertake that during the period of this Charter Party, they will not procure any supplies or necessaries     266
or services, including any port expenses and bunkers, on the credit of the Owners or in the Owners' time.     267

### 24.   Salvage                                                                                       268

All derelicts and salvage shall be for the Owners' and the Charterers' equal benefit after deducting      269
Owners' and Charterers' expenses and crew's proportion.                                                270

### 25.   General Average                                                                               271

General average shall be adjusted according to York-Antwerp Rules 2016 ~~1974, as amended 1990~~,        272
in **The United Kingdom according to English law** and settled in **United**                            273
**States** currency.                                                                                    274

The Charterers shall procure that all bills of lading issued during the currency of the Charter Party will     275
contain a provision to the effect that general average shall be adjusted according to York-Antwerp Rules     276
1974, as amended 1990, thereof and will include the "New Jason                                         277

Clause" as per Clause 31.                                                                    278

Time charter hire shall not contribute to general average.                                  279

**26.     Navigation**                                                                       280

Nothing herein stated is to be construed as a demise of the Vessel to the Time Charterers.  The Owners   281
shall remain responsible for the navigation of the Vessel, acts of pilots and tug boats *except strike and/or*   282
*boycott not directed against Owners*, insurance, crew,
and all other matters, same as when trading for their own account.

                                                                                            283

**27.     Cargo Claims**                                                                     284

Cargo claims as between the Owners and the Charterers shall be settled in accordance with the Inter-Club   285
New York Produce Exchange Agreement of February 1970, as amended May, 1984, or any subsequent   286
modification or replacement thereof.                                                        287

The Owners shall in no case be responsible for loss of or damage to cargo howsoever arising prior to loading
into and after discharge from the Vessel or while the goods in the charge of another owner nor in respect of
deck cargo.

*Where the Vessel/Owners are liable for loss or shortage of cargo under this Charter Party or any bill(s)*
*of lading issued hereunder, they shall be responsible only for that part of the loss or shortage that*
*exceeds two percent (2.0%) of the Bill of Lading weight. The Charterers shall indemnify, defend and*
*hold harmless the Owners in respect of any claims by cargo receivers for cargo shortages of up to*
*2.0% of the Bill of Lading weight, the vessel remaining on-hire during any delays so caused.*

**28.     Cargo Gear and Lights**                                                            288

The Owners shall maintain the cargo handling gear of the Vessel which is as follows: *See vessel's*   289
*description clause 46.*
.........................................................................................................................................   290
.........................................................................................................................................   291
.........................................................................................................................................   292
providing gear (for all derricks or cranes) capable of lifting capacity as described. The Owners shall also   293
provide on the Vessel *sufficient lights* for night work lights as on board, but all additional lights over those   294
on board shall be at the Charterers' expense
The Charterers shall have the use of any gear on board the Vessel.                           295
If required by the Charterers, the Vessel shall work night and day and all cargo handling gear shall be   296
at the Charterers' disposal during loading and discharging. In the event of disabled cargo handling gear, or   297
insufficient power to operate the same, the Vessel is to be considered to be off hire *(prorata to the number*   298
*of operable cranes)* to the extent that
time is actually lost to the Charterers and the Owners to pay stevedore stand-by charges occasioned   299
thereby, *up to a maximum of one labor shift*, unless such disablement or insufficiency of power is caused   300
by the Charterers' stevedores. If
required by the Charterers but always with owners' prior approval, the Owners shall bear the cost of hiring   301
shore gear in lieu thereof, in which case the vessel shall remain on hire. *Owners option to arrange shore*   302
*crane themselves and for their account, alternatively if Charterers arrange same then Owners are to*
*approve the hiring and cost in advance.*

**29.     Crew Overtime**                                                                    303

~~In lieu of any overtime payments to Officers and crew for work ordered by the Charterers or their agents,~~   304
~~the Charterers shall pay the Owners, concurrently with the hire............................................per month~~   305

or pro rata.

**30.**   **Bills of Lading**

(a) The Master shall sign the Bills of Lading or Waybills for cargo as presented in conformity with Mate's or Tally Clerk's receipts.  However, the Charterers may sign Bills of Lading ~~or Waybills~~ on behalf of the Master, with the Owners' prior written authority, always in conformity with Mate's or Tally Clerk's receipts. **No combined transport, liner or through Bills of Lading are allowed.**
**Seaway Bill only permitted against Owners' prior approval, which not to be unreasonably withheld.**
~~(b) All Bills of Lading or Waybills shall be without prejudice to this Charter Party and the Charterers shall indemnify the Owners against all consequences or liabilities which may arise from any inconsistency between this Charter Party and any Bills of Lading or Waybills signed by the Charterers or by the Master at their request.~~

~~(c) Bills of Lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and Receivers' risk, expense and responsibility, without liability on the part of the Vessel or her Owners for any loss, damage, expense or delay howsoever caused."~~

**31.**   **Protective Clauses**

This Charter Party is subject to the following clauses, all of which are also to be included in all Bills of Lading or Waybills issued hereunder:

(a)      CLAUSE PARAMOUNT
"This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, the Hague Rules, or the Hague-Visby Rules, as applicable, or such other similar national legislation as may mandatorily apply by virtue of origin or destination of the bills of lading, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said applicable Act.  If any term of this bill of lading be repugnant to said applicable Act to any extent, such term shall be void to that extent but no further."

and

(b)      BOTH-TO-BLAME COLLISION CLAUSE
"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the Owners of said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ships or objects, other than or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

and

(c)      NEW JASON CLAUSE
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract or otherwise, the goods, Shippers, Consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred,

and shall pay salvage and special charges incurred in respect of the goods.    348

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if salving ship    349
or ships belonged to strangers.  Such deposit as the carrier or his agents may deem sufficient to cover    350
the estimated contribution of the goods and any salvage and special charges thereon shall, if required,    351
be made by the goods, Shippers, Consignees or Owners of the goods to the carrier before delivery."    352

and    353

(d)      TRADE - DRUG CLAUSE    354
"In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986 or any re-enactment thereof, the    355
Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested    356
narcotic drugs and marijuana to be loaded or concealed on board the Vessel.    357

Non-compliance with the provisions of this Clause shall amount to breach of warranty for consequences    358
of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel    359
harmless and shall keep them indemnified against all claims whatsoever which may arise and be made    360
against them individually or jointly.  Furthermore, all time lost and all expenses incurred, including fines,    361
as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account    362
and the Vessel shall remain on hire.    363

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this    364
Clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable    365
time the Vessel is released and at their expense put up the bails to secure release of the Vessel.    366

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the    367
event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the    368
Vessel's personnel."    369

and    370

(e) ~~WAR CLAUSES~~    371
~~"(i) No contraband of war shall be shipped.  The Vessel shall not be required, without the consent of the~~    372
~~Owners, which shall not be unreasonably withheld, to enter any port or zone which is involved in a state~~    373
~~of war, warlike operations, or hostilities, civil strife, insurrection or piracy whether there be a declaration~~    374
~~of war or not, where the Vessel, cargo or crew might reasonably be expected to be subject to capture,~~    375
~~seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de~~    376
~~facto authority or any purported governmental organization maintaining naval, military or air forces).~~    377

~~(ii) If such consent is given by the Owners, the Charterers will pay the provable additional cost of insuring~~    378
~~the Vessel against hull war risks in an amount equal to the value under her ordinary hull policy but not~~    379
~~exceeding a valuation of............................................  In addition, the Owners may purchase and the~~    380
~~Charterers will pay for war risk insurance on ancillary risks such as loss of hire, freight disbursements,~~    381
~~total loss, blocking and trapping, etc.  If such insurance is not obtainable commercially or through a~~    382
~~government program, the Vessel shall not be required to enter or remain at any such port or zone.~~    383

~~(iii) In the event of the existence of the conditions described in (i) subsequent to the date of this Charter,~~    384
~~or while the Vessel is on hire under this Charter, the Charterers shall, in respect of voyages to any such~~    385
~~port or zone assume the provable additional cost of wages and insurance properly incurred in connection~~    386
~~with Master, Officers and crew as a consequence of such war, warlike operations or hostilities.~~    387

~~(iv) Any war bonus to Officers and crew due to the Vessel's trading or cargo carried shall be for the~~    388
~~Charterers' account."~~    389

**32.      War Cancellation**    390

In the event of the outbreak of war (whether there be a declaration of war or not) between any two or more of the following countries: **The United States of America, The United Kingdom, Russia, South Korea,**
**The People's Republic of China, and the vessel's flag state which renders the due fulfilment of this Charter Party impossible, then the Owners and the Charterers together may mutually decide to cancel this Charter Party, whereupon the Charterers shall** ..........................................................................
~~either the Owners or the Charterers may cancel this Charter Party.  Whereupon, the Charterers shall~~
redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near open and safe port as directed by the Owners; or, if she has no cargo on board, at the port at which she then is; or, if at sea, at a near open and safe port as directed by the Owners.  In all cases hire shall continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this Charter Party shall apply until redelivery.

391
392

393
394
395
396
397
398
399
400
401
402

**33.  Ice**

403

The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights or lightships have been or are about to be withdrawn by reason of ice, nor where there is risk that in the ordinary course of things the Vessel will not be able on account of ice to safely enter and remain in the port or area or to get out after having completed loading or discharging.  ~~Subject to the Owners' prior approval the Vessel is to follow ice-breakers when reasonably required with regard to her size, constructions and ice-class.~~

404
405
406
407
408
409

**34.  Requisition**

410

Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter Party, the Vessel shall be deemed to be off hire during the period of such requisition, and any hire paid by the said government in respect of such requisition shall be retained by the Owners.  The period during which the Vessel is on requisition to the said government shall count as part of the period provided for in this Charter Party.

411
412
413
414
415

If the period of requisition exceeds **60 (sixty) days** ........................~~months~~, either party shall have the option of cancelling this Charter Party and no consequential claim may be made by either party.

416
417

**35.  Stevedore Damage**

418

Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all damage to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their agents in writing as soon as practical but not later than 48 hours after any damage **has occurred**. ~~is discovered~~.  Such
notice to specify the damage in detail and to invite Charterers to appoint a surveyor to assess the extent of such damage. **If hidden damage, same to be notified to Charterers latest on completion of discharge.**

419
420
421

422
423

(a)  In case of any and all damage(s) affecting the Vessel's seaworthiness and/or the safety of the crew and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs of such damage(s) at their expense and the Vessel is to remain on hire until such repairs are completed and if required passed by the Vessel's classification society.

424
425
426
427

(b) Any and all damage(s) not described under point (a) above shall be repaired at the Charterers' option before or after redelivery concurrently with the Owners' work.  In such case no hire and/or expenses will be paid to the Owners except and insofar as the time and/or the expenses required for the repairs for which the Charterers are responsible, exceed the time and/or expenses necessary to carry out the Owners' work.

428
429
430
431
432

**36.  Cleaning of Holds**

433

The Charterers shall provide and pay extra for sweeping and/or washing ad/or cleaning of holds between     434
voyages and/or between cargoes provided such work can be undertaken by the crew and is permitted by     435
local regulations at the rate of....................................................................................per hold.     436

In connection with any such operation, the Owners shall not be responsible if the Vessel's holds are not     437
accepted or passed by the port or any authority.  The Charterers shall have the option to re-deliver     438
the Vessel with unclean/unswept holds against a lumpsum payment of...........in lieu of cleaning. **See Clause**     439
**61.**

## 37.  Taxes     440

Charterers to pay all local, state, national taxes and/or dues assessed on the Vessel or the Owners     441
resulting from the Charterers' orders herein, whether assessed during or after the currency of this Charter     442
Party including any taxes and/or dues on cargo and/or freights and/or hire (excluding     443
taxes levied by the country of the flag of the Vessel or the Owners).     444

*All taxes and/or dues on vessel and/or cargo and on Charter hire and freight arising as of cargoes*
*carried or ports visited under this Charter Party shall be for Charterers' account except taxes levied*
*by*
*vessel's flag and in connection with port of vessel's registry, which to be for Owners' account.*

## 38.   Charterers' Colors     445

The Charterers shall have the privilege of flying their own house flag and painting the Vessel with their     446
own markings.  The Vessel shall be repainted in the Owners' colors before termination of the Charter     447
Party.  Cost and time of painting, maintaining and repainting those changes effected by the Charterers     448
shall be for the Charterers' account.     449

## 39.   Laid Up Returns     450

The Charterers shall have the benefit of any return insurance premium receivable by the Owners from their     451
underwriters as and when received from underwriters by reason of the Vessel being in port for a minimum     452
period of 30 days if on full hire for this period or pro rata for the time actually on hire.     453

## 40.   Documentation     454

The Owners shall provide any documentation relating to the Vessel that may be required to permit the     455
Vessel to trade within the agreed trade limits, including, but not limited to, certificates of financial     456
responsibility for oil pollution, provided such oil pollution certificates are obtainable from the Owners'     457
P & I Club, valid international tonnage certificate, Suez and Panama tonnage certificates, valid certificate     458
of registry and certificates relating to the strength and/or serviceability of the Vessel's gear.     459

## 41.   Stowaways     460

(a) (i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining     461
access to the Vessel by means of secreting away in the goods and/or containers shipped by the     462
Charterers.     463

          (ii)  If, despite the exercise of due care and diligence by the Charterers, stowaways have gained     464
access to the Vessel by means of secreting away in the goods and/or containers shipped by the     465
Charterers, this shall amount to breach of charter for the consequences of which the Charterers     466
shall be liable and shall hold the Owners harmless and shall keep them indemnified against all     467
claims whatsoever which may arise and be made against the.  Furthermore, all time lost and all     468
expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account     469

and the Vessel shall remain on hire.                                                                  470

~~(iii)  Should the Vessel be arrested as a result of he Charterers' breach of charter according to~~  471
~~sub-clause (a) (ii) above, the Charterers shall take all reasonable steps to secure that, within a~~  472
~~reasonable time, the Vessel is released and at their expense put up bail to secure release of the~~  473
~~Vessel.~~                                                                                            

~~(b) (i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained~~    475
~~access to the Vessel by means other than secreting away in the goods and/or containers shipped~~    476
~~by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including~~    477
~~fines, shall be for the Owners' account and the Vessel shall be off hire.~~                          478

~~(ii)  Should the Vessel be arrested as a result of stowaways having gained access to the Vessel~~   479
~~by means other than secreting away in the goods and/or containers shipped by the Charterers,~~      480
~~the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel~~   481
~~is released and at their expense put up bail to secure the release of the Vessel.~~                  482

*Above BIMCO clause (1993) to be replaced by updated clause:*

*BIMCO Stowaways Clause for Time Charter Parties 2009*

*(a) If stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers or by any other means related to the cargo operation, this shall amount to breach of charter. The Charterers shall be liable for the consequences of such breach and hold the Owners harmless and keep them indemnified against all claims; costs (including but not limited to victualling costs for stowaways whilst on board and repatriation); losses; and fines or penalties, which may arise and be made against them. The Charterers shall, if required, place the Owners in funds to put up bail or other security. The Vessel shall remain on hire for any time lost as a result of such breach.*

*(b) Save for those stowaways referred to in sub-clause (a), if stowaways have gained access to the Vessel, all expenses, including fines or penalties, shall be for the Owners' account and the Vessel shall be off hire for any time lost.*

## 42.  Smuggling                                                                                     483

~~In the event of smuggling by the Master, Officers and/or crew, the Owners shall bear the cost of any~~  484
~~fines, taxes, or imposts levied and the Vessel shall be off hire for any time lost as a result thereof.~~  485
*See Clause 59.*

## 43.  Commissions                                                                                   486

A commission of **1.25%** percent **for equal division** is payable by the Vessel and the Owners to   487
**H.         Clarkson         London,         and         BBT         Tradeships**                     488
**LLC**................................................................................................
..........................................................................................................  489
..........................................................................................................  490
on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.  491

## 44.  Address Commission                                                                            492

An address commission of **3.75**.......................................percent is payable to **Charterers**..........................  493
..........................................................................................................  494
..........................................................................................................  495

.............................................................on hire earned and paid under this Charter.     496

**45.   Arbitration**     497

~~(a)    NEW YORK~~     498
~~All disputes arising out of this contract shall be arbitrated at New York in the following manner, and~~     499
~~subject to U.S. Law:~~     500

~~One Arbitrator is to be appointed by each of the parties hereto and an third by the two so chosen.  Their~~     501
~~decision or that of any two of them shall be final, and for the purpose of enforcing any award, this~~     502
~~agreement may be made a rule of the court.  The Arbitrators shall be commercial men, conversant with~~     503
~~shipping matters.  Such Arbitration is to be conducted in accordance with the rules of the Society of~~     504
~~Maritime Arbitrators Inc.~~     505

~~For disputes where the total amount claimed by either party does not exceed US $.........................**~~     506
~~the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society~~     507
~~of Maritime Arbitrators Inc.~~     508

(b)   LONDON     509
All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree     510
forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business     511
in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping,     512
one to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire.  No     513
award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as     514
above, unless objection to his action be taken before the award is made.  Any dispute arising hereunder     515
shall be governed by English Law.     516

For   disputes   where   the   total   amount   claimed   by   either   party   does   not   exceed   US     517
$**50,000.00**.............................**    
the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime     518
Arbitrators Association.     519

*\* Delete para (a) or (b) as appropriate*     520

*\*\* Where no figure is supplied in the blank space this provision only shall be void but the other provisions*     521
*of this clause shall have full force and remain in effect.*     522

If mutually agreed, clauses **46**.......................to **105**................, both inclusive, as attached hereto are fully     523
incorporated in this Charter Party.     524

**The Charterers**                         **The Owners**

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

## 46. Vessel's Description

VESSEL: CROWNED EAGLE (IMO 9418729)
OWNERS: Crowned Eagle Shipping LLC, Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro,
        Marshall Islands, MH 96960
CONTACT: Eagle Shipping International (USA) LLC AS AGENTS TO OWNERS
        300 First Stamford Place, Stamford, CT 06902
        Tel: (+) 1 203 276 8100
        Email: operations@eagleships.com
BUILT: Nov-08
YARD: IHI CORPORATION, AICHI WORKS, JAPAN
FLAG: MARSHALL ISLANDSCLASS: NKK
NOTATION: NS* (CSR, Bulk Carrier-Type A, BC-XII, GRAB 20), (PSCM), (ESP), (IWS), MNS*
TYPE: GEARED SINGLE DECK BULK CARRIER, STRENGTHENED FOR HEAVY CARGOES, HOLDS NO. 2
        AND 4 MAY BE LEFT EMPTY
DWAT: 55,940 MT ON 12.735 M SSW LOA/BM: 190.0 M/ 32.26MTPC 56.94
TONNAGE: GRT/NRT 31532/18765      PANAMA DWT: 50200    SCGT SUEZ:
        32491.03      CONSTANT: 350 MT

| M3/DIMS: | GRAIN M3 | BALE M3 | H/C DIMS M | MAX HOMO LOAD T |
|---|---|---|---|---|
| Hold #1: | 12060.43 | 11042.22 | 14.56 X 18.60 | 14748 |
| Hold #2: | 15706.72 | 14650.88 | 20.93 X 18.60 | 14770 |
| Hold #3: | 14777.22 | 13775.41 | 20.93 X 18.60 | 14777 |
| Hold #4: | 14770.43 | 13812.35 | 20.93 X 18.60 | 15707 |
| Hold #5: | 14747.66 | 13781.41 | 20.93 X 18.60 | 12060 |
| Total: | 72062.46 | 67062.27 | | |

HOLDS: SINGLE SKIN/HOPPERED TT'S/NATURAL VENTILATION/GRAB SUITABLE
HATCHCOVERS: 4 PANEL TSUJI JACK-KNIFE FOLDING TYPE HYDRAULIC DOUBLE SKIN, FLAT TOP AND
        BOTTOM PLATE (NOT FOR CARGO) EACH FITTED WITH 2 X 700MM DIA CEMENT
        LOADING HOLES
CRANES: 4 X IHI H300190-260B (20deg) SWL HOOK 30MT / GRAB 24MT
GRABS: 4 X SMAG PEINER/ MZGL 12500-6-B-S DUAL MOTOR SCOOP 12.5 Cu. Metres
        FITTED WITH FOUR SPILL PLATES REDUCING VOLUME TO 12.5/10/8.5/7.0/5.3 M3 FOR
        FREE FLOWING CARGO ONLY.
SPD/CONS: BALLAST
        ABT 13.5 KTS / ABT 30.5 MT
        ABT 12.0 KTS / ABT 21.2 MT
        LADEN (UP TO 11.5M AVG DRAFT)
        ABT 13.0 KTS / ABT 30.6 MT
        ABT 11.5 KTS / ABT 22.1 MT
        LADEN (ABOVE 11.5M AVG DRAFT)
        ABT 13.0 KTS / ABT 33.7 MT
        ABT 11.5 KTS / ABT 24.4 MT
        IN PORT IDLE ABT 2.7 MT
        IN PORT WKG ABT 8 HRS 3.5 MT / 16 HRS 4.3 MT / 24 HRS 5.0 MT

Above excluding additional consumption for boiler in port, ballasting and de-ballasting.

Eco speeds given in good faith for guidance only and without guarantee.

"About" means having an allowance of 0.5 knots on speed and 5% on bunkers consumption.

Vessel shall perform throughout the period of this Charter Party from commencement of sea passage to end of sea passage, up to and including Beaufort wind force 4 (maximum true wind speed of 16.0 knots) and Douglas sea state 3 (maximum significant wave height of 1.25 m), and excluding periods of adverse swell, adverse current, and alterations of speed for safety, etc.  Periods of less than 24

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

hours of continuous good weather to be expressly excluded from determination of vessel's performance.

When entering ECA, Charterers to arrange timely supply of appropriate and sufficient IFO and MGO to enter and exit ECA with 4 days' margin (for changeover and unpumpables). Before fixing for ECA Charterers to ensure sufficient separate empty IFO/MGO tanks are available. Ultra-low-sulphur fuel oils are not acceptable. Only MGO not containing FAME - biodiesel (fatty acid methyl ester) to be supplied as ECA fuel.

Bunkers supplied throughout the duration of this Charter Party are to be in accordance with grades 380cSt ISO 8217 RMG35; 2010 and MDO ISO 8217 DMB. Charterers are allowed to bunker 2005 specs in cases where 2010 specs are not available.

INS: P&I: WEST OF ENGLAND
H&M: VARIOUS INSURERS PLACED VIA JLT NY
IACS: YES
IG PANDI: YES
LOGS:NO STANCHIONS OR FITTINGS

ABOVE DESCRIPTION ALL ABOUT

| Charterers: | GMI – Global Maritime Investments Ltd.<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman<br>KY1-9002<br>Cayman Islands |
|---|---|

| | Commercial Manager: | Andrew Thompson |
|---|---|---|
| | Direct Telephone: | +44 207 842 4995 |
| | Facsimile: | +44 207 023 4829 |
| | Mobile: | +44 7798603334 |
| | Email: | andrewthompson@m2mship.com |

| | Operations Manager: | Gail Todd<br>C/O Goulandris Brothers Lts<br>34A Queen Anne's Gate<br>London SW1H 9AB<br>United Kingdom |
|---|---|---|

| | Direct Telephone: | +44 207 227 1960 |
|---|---|---|
| | Facsimile: | +44 207 023 4829 |
| | Mobile: | +44 7818 060 868 / +44 7713 643 895 |
| | Email: | gmiops@goulandbros.co.uk |

| Owners: | Crowned Eagle Shipping LLC<br>**C/O Eagle Shipping International (USA) LLC**<br>300 First Stamford Place<br>5th Floor<br>Stamford CT 06902<br>USA |
|---|---|

| | Email: | operations@eagleships.com |
|---|---|---|
| | Website: | www.eagleships.com |

2

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

47.    *Cargo Exclusions*
All dangerous, injurious and inflammable or self-combustible cargoes (IMO B cargoes) and the following:

Acids, alcohol, aggregates. all cargo prohibited under vessel loading manual, aluminum dross, ammonium nitrate, ammonium phosphate, ammonium sulphate, ammunition, arms, black powder, blasting caps and detonator caps, bombs and any kind of explosives, dynamite, TNT, asbestos, asphalt, bagged rice, bitumen, borax, calcium carbide, calcium hypochloride, caustic soda, charcoal, clay, cobblestones permitted with Soft Loading Clause only, containers, copra and by-products, cotton, creosoted goods, direct reduced iron ore, DRI fines, expellers, ferro silicon, non-harmless or corrosive fertilizers (harmless MAP/DAP/urea, potash permitted), fishmeal, granite blocks, hides, hot briquetted iron ore, HBI fines, Indian coal, industrial chemicals and wastes, iron oxide, livestock, logs, manioc, metallic fines, milled rice, mobile homes, naphtha, nuclear and radioactive goods or wastes of any kind, palm kernel and expellers, petroleum or its by-products, pitch, pond coal, pyrites/pyrite ore, quicklime, radio isotopes, refuse and garbage of any kind, resins, rice bran, river and sea sands, all scraps including motor blocks and turnings (except as per below), silicon manganese, sludge ore, sponge iron, sulphur, nitrates, including Chilean nitrates, nickel ore, sunflower seed expellers, tar, tobacco, turpentine, yachts, zinc ashes, any deck cargo and any cargo which exceeds vessel's tank top strength.

All cargoes to be loaded and carried according to IMO/US Coast Guard or similar authorities' regulations, including SOLAS, Department of Trade recommendations also to apply.

IMO cargoes of Class 1 + 7 always excluded.

During the Charter, Charterers are allowed to lift 3 (three) total cargoes of the following dirty cargoes. Dirty cargoes may not be consecutive.

Dirty cargoes not to be last cargo.

After completion of loading and completion of discharge of a "dirty" cargo, all affected/polluted areas/ship's facilities to be thoroughly washed down with fresh water to Master's satisfaction at Charterers' account/time and expense.

*Alumina / Soda Ash / Mineral Sand*
Charterers to have the option to carry alumina, soda ash, mineral sand including Silica sand, during the currency of this charter party provided Owners are not to be responsible for passing hold survey. If vessel fails hold survey, any/all time lost to be for Charterers account and vessel to remain on hire. In addition, any/all extra costs or expenses incurred for cleaning of vessel's holds to be for Charterers account unless same caused solely by lack of maintenance, in which case same to be for Owner's account.

Soda ash allowed, but not as first cargo and no deductions to be made from hire in respect to vessel cleanliness whatsoever even if caused by previous cargo residues or condition of vessel's holds, including but not limited to proper maintenance.

*Scrap*
Charterers option to carry up to a maximum of one cargo of scrap limited to HMS 1+2 scrap only and always provided same is non oily and excludes motor blocks and turnings. When carrying scrap, the first layers to be gently lowered onto the vessel's tanktops reaching up to 2 meters to provide a proper

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

cushion.  Charterers shall at their time and expense arrange holds survey before loading and after discharging to ascertain damages to holds, if any.

Should electro magnets be used during the loading or discharging, then the risk / time / expense of re-calibrating vessel's compass (if necessary) to be for Charterers account.

Scrap not to be last cargo prior redelivery and not to be carried on a consecutive voyage basis.

*Cement – Cement Clinker*
Charterers option to load maximum one cargo of either Bulk Cement and/or Cement Clinker but not to be consecutive nor consecutive with other dirty cargoes and not to be last cargo prior to redelivery.

1. Charterers undertake to use holds as few as possible provided vessel's stability, trim and stress permit.

2. Cargo is to be loaded, stowed, carried, and discharged strictly in accordance with applicable national/ international regulations and/or IMO code and recommendations at the Charterers' time, risk and expenses.

3. Cement Holes:

i) All cutting and restoring of cement holes to be performed at Charterers' time and expense and to be fully supervised/ attended/ approved by classification surveyor with written documents.

ii) Holes not to be cut within the same frame space with the existing cement holes and to be cut at the suitable place of hatch cover in accordance with vessel's builder's specification.

iii) When restoring cement holes, chill plates or similar material if deemed necessary by Master/surveyor, to be fitted for complete welding in order to reinstate the hatch covers back to their original condition.

iv) After completion of restoring of holes, hose test to be carried out in presence of classification surveyor and the test result should be to his satisfaction. Otherwise the Charterers have the obligation to rectify the situation until and when satisfied by surveyors.

v) All time for preparing, cutting and restoring up to classification surveyor's satisfaction as well as all expenses including classification surveyor's fees and expenses shall be for Charterers account.

4. Welt protection to bilge well of all holds is strictly necessary to keep smooth suction while discharging hold washing water by using gum tapes (plaster) or equivalent.

5. After loading, Charterers undertake to arrange at their expense any special/extra trimming and/or leveling of cargo to Master's satisfaction and also Charterers to give reasonable time to allow for the cargo to settle and any air to escape before vessel's departure from loading berth/port, and vessel to remain on-hire.

6. Charterers indemnify Owners of all possible cargo solidification, due to hold sweating which is impossible to avoid by proper operation of existing natural ventilation system.

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

7. Charterers to arrange and supply hatch sealing tape at their time and cost and also provide sufficient fresh water for cleaning vessel including accommodation front and decks and also to arrange for removal of residues from holds to master's satisfaction.

8. The Charterers may request the Vessel's crew to perform above services with paying lumpsum US$700 bonus per hold in addition to regular intermediate hold cleaning fee, provided that the Owners and Vessel shall not guarantee that holds will be sufficiently cleaned/accepted at next loading port.

All other cargoes allowed under this Charter Party are allowed consecutive after cement cargoes with Charterers ultimately responsible for cleanliness of holds and subsequent inspections.

*Petcoke*
Maximum 2 liftings allowed but shall not be consecutive voyages with other dirty cargoes and shall not be last voyage before redelivery, which is to be loaded, stowed, carried, and discharged strictly in accordance with applicable national/international regulations and/or IMO code and recommendations at the Charterers' time, risk and expenses.

1. Petroleum coke mentioned herein only limited to the type of non-hazardous, non-dangerous green delayed type and/or calcined type and metallurgical type.

2. If Charterers exercise such option, Charterers undertake to use holds as few as possible, provided vessel's stability/trim and stress permit.

3. Such cargo to be loaded, stowed, trimmed and discharged in strict accordance to latest IMO and/or any other latest regulations/rules applicable to such cargo.

4. Should any additional/special washing down of holds before loading be reasonably recommended, proposed, required by Master, Charterers undertake to arrange it at their time/expense.

5. Charterers, after discharge, to arrange at their expense/time, any additional/special washing down of holds carrying such cargo by chemical as Master reasonably considers it necessary. Charterers are allowed to use ship's crew to perform cleaning as necessary against paying US$ 700 per hold lump sum in addition to regular hold cleaning allowance but always subject to prior consent of Master/crew and local regulations permitting and all time so used shall be for Charterers' account.

6. Any directly related extra expense resultant there from/incurred thereby (such as hold cleaning to Master's satisfaction/hold surveys etc.) and any detention through any of the above causes shall be for the Charterers' account.

*Salt*
Charterers are permitted to carry maximum one cargo of salt whether full or part cargo during the entire currency of period on following conditions.  Lime washing, or Holdblock application, if requested by Owners or Charterers, to be for Charterers' time and expense during the entire currency of period on following conditions.

1. Charterers undertake to use holds as few as possible, provided vessel's stability trim and stress permit.

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

2. Prior to loading, all holds/ surface areas assigned for salt to be lime washed or Holdblocked by Charterers at their time, expense and risk to the satisfaction of Master and independent surveyors appointed by Charterers at their time/expense.

3. Cargo to be loaded/stowed/trimmed/discharged in strict accordance with latest IMO and/or any other latest regulations/rules applicable to such cargo.

4. All fresh water used for irrigation onto salt during loading/ voyage/ discharging to be for Charterers' account.

5. Upon completion of discharge, Charterers to supply sufficient cleaning product as recommended by products manufacturers and arrange at their time, risk and expense for shore labour to remove the limewash/Holdblock from holds to the Master's complete satisfaction which not to be unreasonably withheld and to the satisfaction of an independent surveyor.

6. Charterers to supply sufficient fresh water at their expense for washing down of all holds.

7. Any extra expenses resultant therefrom/ incurred thereby (such as hold cleaning to Master's satisfaction/hold survey etc.) and any detention through any of the above causes to be for Charterers' account.

8. Charterers are allowed to use ship's crew to perform application of lime wash against paying US $400.00 per hold in addition to normal hold cleaning allowance but always subject to prior consent of Master/crew and local regulations permitting.   All time used to be for Charterers' account.

9. Owners/Master shall not be held responsible for passing hold inspection for loading next cargo.

10. To protect and neutralize water collected in hold bilges, Charterers to supply sufficient "bilgecoat" as required by the master / owners and deliver to the vessel before loading. As an alternative, Charterers may supply sufficient caustic soda flakes or pearl which when dissolved in fresh water makes an alkaline solution.

*Sulphur*

Charterers are permitted to carry maximum one cargo of sulphur whether full or part cargo during the entire currency of period on following conditions.  Lime washing, or Holdblock application, if requested by Owners or Charterers, to be for Charterers' time and expense during the entire currency of period on following conditions.

1. Charterers undertake to use holds as few as possible, provided vessel's stability trim and stress permit.

2. Prior to loading, all holds/ surface areas assigned for sulphur to be lime washed or Holdblock-ed by Charterers at their time, expense and risk to the satisfaction of Master and independent surveyors appointed by Charterers at their time/expense.

3. Cargo to be loaded/stowed/trimmed/discharged in strict accordance with latest IMO and/or any other latest regulations/rules applicable to such cargo.

4. All fresh water used for irrigation onto sulphur during loading/ voyage/ discharging to be for Charterers' account.

6

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

5. Upon completion of discharge, Charterers to supply sufficient cleaning product as recommended by products manufacturers and arrange at their time, risk and expense for shore labour to remove the limewash/Holdblock from holds to the Master's complete satisfaction which not to be unreasonably withheld and to the satisfaction of an independent surveyor.

6. Charterers to supply sufficient fresh water at their expense for washing down of all holds.

7. Any extra expenses resultant therefrom/ incurred thereby (such as hold cleaning to Master's satisfaction/hold survey etc.) and any detention through any of the above causes to be for Charterers' account.

8. Charterers are allowed to use ship's crew to perform application of lime wash against paying US $400.00 per hold in addition to normal hold cleaning allowance but always subject to prior consent of Master/crew and local regulations permitting.  All time used to be for Charterers' account.

9. Owners/Master shall not be held responsible for passing hold inspection for loading next cargo.

10. To protect and neutralize water collected in hold bilges, Charterers to supply sufficient "bilgecoat" as required by the master / owners and deliver to the vessel before loading. As an alternative, Charterers may supply sufficient caustic soda flakes or pearl which when dissolved in fresh water makes an alkaline solution.

*Concentrates*
Concentrates not to be counted as a 'dirty' cargo, i.e., not part of the maximum 3 (three) dirties.

However, it is understood and agreed that Lead Concentrates always to be excluded.

Charterers may carry maximum two cargoes of concentrates; same always to be loaded, stowed and discharged according to IMO and local regulations.

1. Prior to commencement of loading, Charterers/Shippers are to provide laboratory analysis/certificate evidencing that both the flow moisture point and transportable moisture limit of such cargo are within the limit as set out by IMO.

2. Such cargo to be loaded, stowed, trimmed and discharged strictly according to latest IMO and/or any other regulations/rules applicable to such cargo.

3. After loading, Charterers undertake to arrange for special extra trimming and/or leveling of the cargo to satisfaction of Master and independent surveyor appointed by Charterers / Shippers at their expense and time.

4. Any directly related expenses resultant therefrom/incurred thereby (such as hold cleaning to Master's satisfaction/hold survey) and any detention through any of above causes to be for Charterers' account.

*Steel Slabs*
Charterers are allowed to load steel slabs.

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

1. In the unlikely event of any problems en route to discharged ports that involve the cargo shifting or becoming unsecured or unstable, it is clearly understood that the Master has the right to deviate to a nearby suitable port/place, which he deems appropriate.

2. The cargo is to be properly dunnaged, chocked up, lashed and secured to Master's satisfaction at Charterers' risk and expense. Charterers must supply sufficient dunnage, lashing materials for loading such cargo.

3. If same deemed necessary by Owners, Charterers and/or Shippers and/or Receivers at their expense and time to appoint local surveyor/supercargo at load port who is to give assistance/advice to the Master during loading operation.

4. At discharge, removal of dunnage always to be Charterers responsibility, risk and expense and in accordance with local and international regulations.

5. No California Block Stowage

Charterers to remain responsible for the passing of loading survey(s) as required.

All cargoes to be loaded, stowed, discharged in strict conformity with IMO, IMSBC Code and local regulations. Any extra fittings/equipment/expenses, etc. which are required to observe such regulations to be undertaken by Charterers at their time/expense.

All consumable and standard protective material, fresh water, brushes, ladders, etc., to be arranged and paid for by Charterers.

<u>Steel Coils</u>

It is expressly understood that the Master is to be provided with the full packing list, number of coils, weight of each coil(s), and dimensions of each coil(s), prior to arrival at load port.

Charterers are fully aware that the vessels holds are natural ventilation.

Cargo to be properly loaded, stowed and dunnaged to Masters satisfaction, always within the vessels TT strengths and per the vessels loading and securing manual(s).

Liner Bills of Lading permitted providing they are fully Charterers Liner Bill of Ladings on Charterers form and signed only by the Charterers .

<u>Cargo Safety</u>
Unless the cargoes are elsewhere excluded in this agreement, the vessel will load any permitted, lawful, properly certified, safe, cargo which comply with all IMO regulations found in the Code of Safe Practice For Bulk Cargoes (IMSBC Code) or any similar regulations in effect at the time of loading) and applicable local regulations in effect at the time of loading.

Charterers and/or Shippers shall provide proper and valid certification of all cargoes, including but not limited to cargoes that may liquefy, that complies with all regulations in effect at the time of loading to the Master before loading. The vessel shall have the right to refuse to commence loading if such certification is not provided before loading and the vessel shall remain on hire and will not be responsible for any time lost or cost incurred due to failure to comply with the foregoing.

Notwithstanding any of the certification presented, should it become evident that the certification is questionable or questions about the true condition of the cargo affecting the safety of the vessel arise,

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

the Master and/or Owners may require the cargo to be again certified by a competent authority and/or surveyed before it is loaded by a competent surveyor. Should the survey and/or cargo testing, including a can test regarding liquefaction, find that any of the specifications affecting safety of the vessel to prosecute the intended voyage (such as moisture, density, temperature, etc) are not within acceptable limits, then the cargo will be considered as unlawful and the vessel shall reject that cargo. It is understood and agreed that the vessel will not load until safe cargo is presented. All time, risk and expense for unlawful or unsafe cargoes being presented, including those expenses incurred by Owners regarding surveyors/surveys/cargo testing, shall be for Charterers' account.

48.   *War Risk Insurance*

Basic war risk insurance premium for worldwide trading shall be for Owners' account and additional premium for hull and machinery and Officers/crew and crew war bonus, if any, due to vessel's trading to the restricted area shall be for Charterers' account but extra war premium not to exceed London underwriters' minimum scale and Charterers to benefit from Owners' NCB rebate. However, if such insurance is not obtainable commercially or through a government program, the vessel shall not be required to enter or remain at any such port or zone.

Un-amended Conwartime Clause 2013 to be incorporated in this Charter Party:

**CONWARTIME 2013**
**War Risks Clause for Time Chartering**

(a) For the purpose of this Clause, the words:

(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(ii) "War Risks" shall include any actual, threatened or reported:

war, act of war, civil war or hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy and/or violent robbery and/or capture/seizure (hereinafter "Piracy"); acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the government of any state or territory whether recognised or not, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or may become dangerous to the Vessel, cargo, crew or other persons on board the Vessel.

(b) The Vessel shall not be obliged to proceed or required to continue to or through, any port, place, area or zone, or any waterway or canal (hereinafter "Area"), where it appears that the Vessel, cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be exposed to War Risks whether such risk existed at the time of entering into this Charter Party or occurred thereafter. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or may become dangerous, after entry into it, the Vessel shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade as set out in Sub-clause (a), or to proceed to an Area where it may be subject to search and/or confiscation by a belligerent.

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

(d) If the Vessel proceeds to or through an Area exposed to War Risks, the Charterers shall reimburse to the Owners any additional premiums required by the Owners' insurers and the costs of any additional insurances that the Owners reasonably require in connection with War Risks.

(e) All payments arising under Sub-clause (d) shall be settled within fifteen (15) days of receipt of Owners' supported invoices or on redelivery, whichever occurs first.

(f) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an Area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(g) The Vessel shall have liberty:

(i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the government of the nation under whose flag the Vessel sails, or other government to whose laws the Owners are subject, or any other government of any state or territory whether recognised or not, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the requirements of the Owners' insurers under the terms of the Vessel's insurance(s);

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any alternative port any cargo or part thereof which may expose the Vessel to being held liable as a contraband carrier;

(v) to call at any alternative port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment, detention or similar measures.

(h) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice. All costs, risk and expenses for the alternative discharge shall be for the Charterers' account.

(i) The Charterers shall indemnify the Owners for claims arising out of the Vessel proceeding in accordance with any of the provisions of Sub-clauses (b) to (h) which are made under any bills of lading, waybills or other documents evidencing contracts of carriage.

(j) When acting in accordance with any of the provisions of Sub-clauses (b) to (h) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

49.   **Panama/Suez Canal Transit**
Owners guarantee that the vessel shall be fully fitted for Panama(old Panamax locks only)/Suez Canal transit and in possession of valid certificate during the currency of this Charter to comply with current regulations and requirements of both Canals.

Charterers to render cooperation to Owners for submission of initial transit formalities to the Suez and Panama Canal authorities. Should any discrepancies between tonnage figures described in Canal certificates issued by vessel's classification and by the relevant Canal authorities arise, the latter shall be final and such discrepancies are not considered as misrepresentation.

50.   **Boycott**
If the vessel is boycotted, picketed, blacklisted or if any similar incident occurs at any port or place by shore and/or port laborers and/or tugboats and/or pilots and/or government and/or any authority by reason of the vessel's flag/registry/manning or ownership or terms and conditions on which members of the Officers/crew are employed, or by reason of the vessel's construction and/or her cargo gear and/or her fittings and/or her other equipments, all directly related consequences and any extra expenses reasonably incurred therefrom to be for Owners' account and Charterers are entitled to place the vessel off hire for any time lost by such reason.

51.   **Deratting Certificate**
The vessel shall be delivered with a valid deratting or deratting exemption certificate. If such certificate does not cover the whole period of this Charter, cost of renewal of certificate and any required fumigation for obtaining of such certificate, if necessary, shall be for Owners' account. Any detention and extra expenses incurred thereby shall be also for Owners' account.

52.   **Quarantine**
Normal quarantine time and expenses for vessel's entering port shall be for Charterers' account but any time of detention and expenses for quarantine due to pestilence, epidemics and illness of Captain, Officers and crew shall be for Owners' account except where that pestilence, epidemic or illness was contracted at a port or place called whilst under this Charter.

53.   **Equipment**
The vessel shall comply with all international and local laws and regulations at any port of call under this Charter Party, including all environmental regulations and Commonwealth of Australia Navigation (Orders) Regulations, in particular but not limited to Marine Orders Part 32 (Cargo Handling Equipment), which governs the vessel's hold and crane ladders as well as ship's cargo-handling equipment, and Marine Order Part 23 (Equipment – Miscellaneous and Safety Measures), which govern gangways and lighting.

The vessel shall also comply with the requirements set out in the amendment to the Code of Safe Practice for Solid Bulk Cargoes (IMSBC Code) dated 1996 for the carriage of bulk coal by sea. This is covered by Marine Notice 11/96 (or later revision/amendment) issued by the Australian Maritime Safety Authority (AMSA).

54.   **P & I Club**
Owners guarantee that the vessel shall be fully covered by a P & I Club member of the International Group of P & I Associations. Charterers have the benefit of Owners' P & I Club as far as the rules permit.

55.   **Owners' Agents**
Owners to appoint Owners' agents to attend for all Owners' matters such as hospitalization, repatriation of crew, repairs, supply of vessel's stores and provisions, etc. In case Owners are unable to arrange

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

same, Charterers to agree to have their agents attend such matters with Owners paying actual expense.

Charterers' agents are available to perform the following services to Owners: cash advance to the Master by the Owners, crew mail, arranging fresh water supplies, minor medical attendance.

These services to be provided at actual cost and no agency fee is applicable but Owners to settle with agents and to be ultimately responsible for settling same.

### 56. Deductions
Charterers are not entitled to deduct from hire payments any disbursements for Owners' account as owners will appoint and pay agents directly.

### 57. Deviation / Put Back
Should the vessel put back whilst on voyage by reason of breakdown of machinery, collision, stranding, fire or the accident or damage to the vessel, or dry-docking or periodical survey, or deviate from the course of the voyage caused by sickness of or accident to the Captain, Officers, crew or any person on board the vessel (other than persons traveling at Charterers' request), or by reason of sending stowaway or refugee, salvage, or by reason of the refusal of the Captain, Officers or crew to do their duties without any specific and valid ground for rejection, or any Owners' matters, the payment of hire shall be suspended from the time of inefficiency in port or at sea until the vessel is again efficient in the same position or regains a point of progress equivalent to that when the hire ceased hereunder. Bunkers consumed while vessel is off-hire and all extra expenses incurred during such period shall be for Owners' account.

### 58. Capture, Seizure, Arrest
Should the vessel be captured or seized or detained or arrested by any authority or by any legal process during the currency of this Charter Party for any reason attributable to the Owners, the payment of hire shall be suspended until the time of her release. Any extra expenses incurred by and/or during such capture or seizure or detention or arrest shall be for Owners' account.

This Clause is inoperable should such capture or seizure or detention or arrest be caused by any reason attributable to the Charterers or their agents or by reason of cargo carried.

### 59. Smuggling
Any delay, expense and/or fines incurred on account of smuggling shall be for Owners' account if caused by the Officers and/or crew or shall be for Charterers ' account if caused by Charterers' supercargo and/or their staff or agents.

### 60. Return Premium
Charterers shall have the benefit of any return insurance premium receivable by Owners from their underwriters, as and when received from the underwriters, by reason of the vessel being in port for a minimum period of 30 days if on full hire for this period or pro rata for the time actually on hire, in which case Charterers to accept speed reductions and/or excessive consumption. See also clause 99.

### 61. Hold Condition on Redelivery
Vessel shall be redelivered by the Charterers to the Owners with clean holds. However, Charterers shall have the option to redeliver the vessel with holds unclean, in consideration of which the Charterers shall pay a lumpsum of USD 5,000.00 excluding removal/disposal of dunnage/lashing materials, if any.

### 62. Gangway Watchmen
Expenses for gangway watchmen if ordered by the vessel to be for Owners' account but if ordered by Charterers or required by port regulations, such expenses shall be for Charterers' account.

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

### 63. Additional Equipment, Fittings

Charterers, subject to the Captain's approval which not to be unreasonably withheld, shall be at liberty to fit/weld any additional equipment and fittings for loading, discharging and/or securing cargo. Such work shall be done at the Charterers' expense and time and Charterers shall remove such equipment and fittings at their expense and time prior to redelivery Alternatively, Owners and Charterers to agree on a reasonable compensation for non-removal of extra fittings.

### 64. BIMCO Asian Gypsy Moth Clause for Time Charter Parties

(a) The Owners shall deliver the Vessel free of Asian Gypsy Moth (AGM). If the Vessel has within the last twenty-four (24) months prior to delivery traded to an area where there is a risk of infestation by AGM, the Owners shall, on delivery, provide an inspection certificate stating that the Vessel is free from infestation by AGM issued by an appropriate and recognised certification body (an AGM Free Certificate) dated no earlier than the date of departure from the last port of call in such area.

(b) Should the Charterers order the Vessel to an area where there is a risk of infestation by AGM, the Charterers shall take all reasonable steps at their expense to mitigate the risk of infestation. If infestation should nevertheless occur, the Charterers shall ensure that such infestation is removed from the Vessel. Without prejudice to this obligation, the Charterers shall provide an AGM Free Certificate from the last port of call in the aforementioned area. Notwithstanding the issuing of such a certificate, should an infestation of AGM be found or suspected, the Charterers shall be responsible for any consequences whatsoever, including but not limited to costs and third party liabilities. The Vessel shall remain on hire throughout.

(c) The Charterers shall redeliver the Vessel free of AGM. If the Vessel has traded to an area where there is a risk of infestation by AGM the Charterers shall, on redelivery, provide an AGM Free Certificate dated no earlier than the date of departure from the last port of call in such area.

### 65. Paramount Clause

Clause Paramount, US Clause Paramount, Canadian Clause Paramount, UK Clause Paramount, BIMCO P & I Bunkering Clause, wherever applicable, shall be deemed to form a part of this Charter Party and shall be contained in all Bill(s) of Lading issued hereunder. Conwartime 2013 War Risk Clause shall also be deemed to form part of this Charter Party. In the event of conflict between Conwartime and BIMCO Piracy Clause, the Piracy Clause shall prevail.

### 66. Intermediate Hold Cleaning

All intermediate hold cleaning during the course of this Charter shall be done at the sole time, risk and expense of the Charterers. However when requested to do so by Charterers, the crew shall render all due assistance in cleaning holds between voyages subject weather, local regulations, trade union labour regulations and time permitting. Any such work is to be carried out as Charterers' servants.

Owners/vessel shall not be responsible for passing subsequent intermediate hold surveys. In addition to any bonus (which may be paid to the crew at Charterers' discretion  and which Charterers shall arrange directly through Master), Charterers are to pay Owners together with next hire payment USD 700.00 per hold for clean cargoes for crew services, except for dirties for which additional payment to be made (see clause 47.)

It is understood that such assistance in hold cleaning is always only possible provided shore regulations permit. Removal and subsequent disposal of cargo dunnage, separation materials and/ or fittings to be arranged / performed by Charterers' in their time and at their risk and expense. Fresh water and/ or chemicals and equipment (if required) for hold cleaning to be provided and paid for by Charterers.

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

Throughout the currency of this Charter Party and at redelivery, the Charterers shall remain responsible for all costs and time, including deviation, if any, associated with the removal and disposal of cargo-related residues and/or hold washing water and/or chemicals and detergents and/or waste as defined by MARPOL Annex V, Section 1, or other applicable rules relating to the disposal of such substances. Master to use due diligence to insure compliance with MARPOL regulations.

Any delay, costs, consequences or action against Owners/ Vessel arising from cleaning between Australian ports to be entirely at Charterers' risk and expense.

### 67.    *ITF Clause*
Owners of the vessel guarantee that the minimum terms and conditions of employment of the crew are now, or will be prior to the presentation of the vessel for loading, and will remain for the period of the Charter Party covered by an ITF agreement or bona fide Trade Union agreement acceptable to the ITF, failing which vessel to be off-hire for any time lost and any extra expense to be for Owners' account.

### 68.    *Hold Condition on Arrival First Load Port*
On arrival first loading port under this Charter Party, vessel's holds to be clean, swept, dry, free from any previous cargo residue and/or loose rust/rust scales or any other foreign material(s) and ready in all respect in all compartments to load Charterers' intended cargo in accordance with relevant local independent surveyors' satisfaction.

Should the vessel not be clean and ready in every respect, Charterers have the option to put the vessel off hire from time of rejection until vessel again has been accepted. If holds have been rejected, Charterers are to arrange re-inspection within 12 hours after the master declares the holds to be ready for the second inspection, failing which the vessel shall be considered to be back on-hire 12 hours after the master's declaration.

If some holds/cargo carrying compartments are not accepted, Charterers shall have the option of accepting the vessel with those which are accepted, and in that case Charterers shall pay hire proportionate to the number of holds/cargo carrying compartments which have passed survey.

This clause to be considered a complete code for handling hold condition on delivery.

### 69.    *Adding Off-Hire*
Should the vessel be off-hire for more than 3 (three) consecutive days during the currency of this Charter for any reason whatsoever, the Charterers have the option of adding such agreed off-hire time (except off-hire owing to periodical docking) to the Charter period, which to be declared within 15 days after the occurrence.

### 70.    *BIMCO Ship to Ship Transfer Clause for Time Charter Parties*

- (a) The Charterers shall have the right to order the Vessel to conduct ship to ship cargo operations, including the use of floating cranes and barges. All such ship to ship transfers shall be at the Charterers' risk, cost, expense and time.

- (b) The Charterers shall direct the Vessel to a safe area for the conduct of such ship to ship operations where the Vessel can safely proceed to, lie and depart from, always afloat, but always subject to the Master's approval. The Charterers shall provide adequate fendering, securing and mooring equipment, and hoses and/or other equipment, as necessary for these operations, to the satisfaction of the Master.

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

- (c) The Charterers shall obtain any and all relevant permissions from proper authorities to perform ship to ship operations and such operations shall be carried out in conformity with best industry practice.

- (d) If, at any time, the Master considers that the operations are, or may become, unsafe, he may order them to be suspended or discontinued. In either event the Master shall have the right to order the other vessel away from the Vessel or to remove the Vessel.

- (e) If the Owners are required to extend their existing insurance policies to cover ship to ship operations or incur any other additional cost/expense, the Charterers shall reimburse the Owners for any additional premium or cost/expense incurred.

- (f) The Charterers shall indemnify the Owners against any and all consequences arising out of the ship to ship operations including but not limited to damage to the Vessel and other costs and expenses incurred as a result of such damage, including any loss of hire; damage to or claims arising from other alongside vessels, equipment, floating cranes or barges; loss of or damage to cargo; and pollution.

71. **Oil Pollution and Financial Responsibility**
    1) Owners warrant that during the currency of this Charter Party they will comply fully with any rules and/or regulations presently in force and any legislation enacted with respect to pollution by oil or any other substances (including any rules and/or regulations issued thereunder) issued by any government department or other authorities, and also any similar legislation enforced by any nation of the world, relevant to vessel's actual/required trading under this Charter Party.

    2) Owners warrant that throughout the currency of this Charter Party they will provide the vessel with valid Certificates of Financial Responsibility for Oil Pollution issued pursuant to: (1) Sec. 311 (p) of the U.S. Federal Water Pollution Control Act, as amended and (2) any certificates which may be required by U.S. Federal legislation at any time during the currency of this Charter. Should any delay or detention of the vessel occur from failure by Owners to comply with the said acts, laws, rules, regulations or legislations, or failure to hold the relevant certificates, the hire shall cease for the period of such delay or detention, and all extra expenses incurred because of such failure shall be for Owners' account.

72. **Safety including Drugs and Alcohol**
Owners shall have on board the vessel an effective occupational health and safety policy with the object that due care and attention is given by crewmembers to safe working practices in all operations pertaining to the vessel. The Owners shall have a policy regarding drug and alcohol abuse on board with the object no crewmember will navigate a ship or operate its on-board equipment whilst impaired by drugs or alcohol.

The policy will also have the objective of strictly prohibiting the possession, use, transport and distribution of illicit or non-prescribed drugs by crewmembers. The Owners shall exercise due diligence throughout the period of the Charter Party to ensure that such policies are complied with.

73. **BIMCO ISM Clause**
From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "THE COMPANY" (as defined by ISM Code) shall comply with the requirements of the

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "The Company" to comply with the ISM Code shall be for the Owners' account.

74.     Hire to be calculated basis GMT.

75.     **Dunnage Clause**
The Vessel shall be delivered and redelivered free of all dunnage, lining and packing materials.

During the currency of this Charter Party the Charterers shall provide dunnage, lining and packing materials as required at their expense.

The Charterers shall ensure that all dunnage used shall comply with applicable phyto-sanitary regulations.

Throughout the currency of the Charter Party and at redelivery, the Charterers shall remain responsible for all costs and time, including deviation, if any, associated with the removal and disposal of dunnage, lining and packing materials in accordance with MARPOL 73/78 Annex V or any other applicable rules relating to the disposal of such materials.

76.     **Change of Name**
The vessel shall not change ownership, name, flag, class, technical and/or crew management during the currency of this Charter Party without Charterers' prior approval, which shall not be unreasonably withheld.

77.     **Weather Routing**
The vessel shall be capable at all times during the currency of this Charter Party of steaming as per vessel's description (Clause 46) except during fouling periods (see Clause 99).

The Charterers may in their option and at their cost engage an independent weather routing service to supply routing advice and monitor the vessel's performance.

The Master will comply with Charterer's independent weather routing service's reporting procedures at all times and endeavor to follow Charterer's (or their routing service's) recommended routing.  However, the final choice of selecting the safest route will be the Master's decision, providing it is justified, in which case Master to inform Charterers as soon as possible.

In the event of consistent discrepancy between the deck logs and independent weather routing service where a commercial/amicable solution cannot be found, a third party mutually agreed independent weather bureau to be appointed, the findings of which to be binding by both parties and expenses of above weather bureau to be equally shared.

No hire to be deducted for alleged underperformance claim until it has been agreed by both parties. In the event of disagreement and if an amicable solution cannot be found then the matter to be referred to arbitration.

78.     **Bulk Carrier Safety Clause**

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

A) Charterers shall instruct the Terminal Operators or their representatives to cooperate with the Master in completing the *IMO Ship/Shore Safety Checklist* and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

B) In addition to the above and notwithstanding any provision in this Charter Party in respect of loading/discharging rates, Charterers shall instruct the Terminal Operators to load/ discharge the vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the vessel's draught, trim, stability, stress or any other factor which may affect the safety of the vessel.

C) At any time during cargo operations the Master may, if he deems it necessary for reasons of safety of the vessel, instruct the Terminal Operators or their representatives to slow down or stop the loading or discharging.

79.    **BIMCO North American Advance Cargo Notification Clause for Time Charter Parties 2016**

1. US Notification Requirements for Time Charter Parties

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

(i) Have in place a SCAC (Standard Carrier Alpha Code);

(ii) Have in place an ICB (International Carrier Bond);

(iii) Provide the Owners with a timely confirmation of (i) and (ii) above; and

(iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

2. Canadian Notification Requirements for Time Charter Parties

(a) As between Owners and Charterers, Charterers shall be deemed to be the Conveyance Operating Carrier for the purposes of the Canada Customs Act and any related regulations, memorandums or notices issued by the Canada Border Services Agency ("CBSA").

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

(b) Subject to sub-clause (c) below, Charterers will be responsible for obtaining a Marine Carrier Code (Bonded or Non-Bonded) as may be required and for providing the CBSA with the Advance Commercial Information by Electronic Data Interchange or otherwise on a timely basis.

(c) When the vessel calls at a port in Canada other than as instructed by Charterers, Owners shall provide Charterers with all information necessary for the timely and accurate submission of Advance Commercial Information to the CBSA.

(d) Each party shall indemnify the other party for any and all fines, penalties, expenses, loss, damage, delay or any other claim, including attorney's fees, arising from its failure to comply with this clause.

(e) For the avoidance of doubt, nothing contained in this clause is intended to vary any other provision of this charter as to responsibility for cargo and identity of carrier.

80. Deleted.

81.   ***BIMCO ISPS/MTSA Clause for Time Charter Parties 2005***

**(a)(i)** The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

**(ii)** Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

**(iii)** Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

**(b)(i)** The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

*"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".*

**(ii)** Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

**(c)** Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

**(d)** If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

## 82. *Hamburg Rules Charter Party Clause*

With reference to Clause 8 hereunder, neither the Charterers nor their Agents shall permit the issue of any bill of lading, waybill or other document evidencing a contract of carriage (whether or not signed on behalf of the Owner or on the Charterers' behalf or on behalf of any Sub-Charterers) incorporating, where not compulsorily applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules. Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this clause.

## 83. *Steel Pre-Loading Survey*

In case of loading finished steel/steel products, pre-loading cargo survey to be carried out by Owners' P & I Club surveyor and costs to be shared equally between Owners and Charterers.

84.    Owners have the option to sell the vessel, change the ownership and/or management and/or flag during the currency of the Charter Party, transferring the balance of the Charter to Buyers. Owners unconditionally guarantee such sale or change will not in any way involve changing of the terms and conditions of this Charter Party. Furthermore, such sale or change shall be subject to Charterers' prior consent, which shall not be unreasonably withheld.

Details of the intended new ownership to be given to Charterers with sufficient time to allow a full and complete checking on their background.

Should the intended new ownership/management not meet Charterers' requirements and should Owners continue with such sale or change, then Charterers shall have the option of canceling this Charter Party, reserving Charterers' all claims, rights, under this Charter.

85.    Owners guarantee that on delivery, vessel's hatch covers are weathertight and same to remain throughout this Charter period and if any hatch cover found defective, same to be rectified at Owners' time and expense to an independent surveyor's satisfaction, unless non-weather-tightness originates from default on the part of the cargo(es) carried and/or Charterers' and/or their servants' default, in which case same to be rectified by Charterers and Owners not to be held responsible for any consequences thereof. Charterers have the right to carry out hose test, using the Class-approved testing method, on any/all hatches at their time and expense at any time during this Charter.

86.    Owners guarantee vessel's holds are to be clear of any fittings/superstructures such as car deck, curtain pates, center fitting, whatsoever.

87.    Owners warrant that the vessel is suitable for worldwide trading including Australia/New Zealand with AHL/WWF/ITF or equivalent in good order.

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

88.     Charterers to have free use of vessel's gears, cranes and grabs, etc., as on board. Owners warrant vessel's grabs to be maintained/operated in good condition during this Charter Party, normal wear and tear excepted, unless any default or malfunction originates from default on the part of the Charterers and/or their servants and/or cargoes handled.

89.     Owners warrant tank top is flat/steel-floored and suitable for normal grab load/discharging operations.

90.     To the best of the Owners' knowledge and belief, the vessel is not blacklisted by the USCG under either the Paris or Tokyo MOU's or by any labor organization such as ITF and is eligible to trade worldwide in accordance with the trading restrictions in the Charter Party.

## 91. Dry Dock
Dry-docking in case of emergency only.

## 92. *Bunker Quality Control Clause for Time Chartering*
    (1) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and auxiliaries and which conform to the specification(s) mutually agreed under this Charter.

    (2) At the time of delivery of the Vessel the Owners shall place at the disposal of the Charterers, the bunker delivery note(s) and any samples relating to the fuels existing on board.

    (3) During the currency of the Charter the Charterers shall ensure that bunker delivery notes are presented to the Vessel on the delivery of fuel(s) and that during bunkering representative samples of the fuel(s) supplied shall be taken at the Vessel's bunkering manifold and sealed in the presence of competent representatives of the Charterers and the Vessel.

    (4) The fuel samples shall be retained by the Vessel for 90 (ninety) days after the date of delivery or for whatever period necessary in the case of a prior dispute and any dispute as to whether the bunker fuels conform to the agreed specification(s) shall be settled by analysis of the sample(s) by VISWA LABS whose findings shall be conclusive evidence as to conformity or otherwise with the bunker fuels specification(s).

    (5) The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the ship's engines or auxiliaries the Owners shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker consumption nor for any time lost and any other consequences.

93.     Vessel is consigned to Charterers' agents at all ports and will provide all information requested timely, including ETA / ETD, insofar known, however any filings for places such as Brazil, South Africa and USA which employ an electronic filing arrangement shall be Charterers' responsibility.

## 94. BIMCO Piracy Clause for Time Charter Parties 2013

(a) The Vessel shall not be obliged to proceed or required to continue to or through, any port, place, area or zone, or any waterway or canal (hereinafter "Area") which, in the reasonable judgement of the Master and/or the Owners, is dangerous to the Vessel, cargo, crew or other persons on board the Vessel due to any actual, threatened or reported acts of piracy and/or violent robbery and/or

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

capture/seizure (hereinafter "Piracy"), whether such risk existed at the time of entering into this Charter Party or occurred thereafter. Should the Vessel be within any such place as aforesaid which only becomes dangerous, or may become dangerous, after entry into it, the Vessel shall be at liberty to leave it.

(b) If in accordance with sub-clause (a) the Owners decide that the Vessel shall not proceed or continue to or through the Area they must immediately inform the Charterers. The Charterers shall be obliged to issue alternative voyage orders and shall indemnify the Owners for any claims from holders of the Bills of Lading or third parties caused by waiting for such orders and/or the performance of an alternative voyage. Any time lost as a result of complying with such orders shall not be considered off-hire.

(c) If the Owners consent or if the Vessel proceeds to or through an Area exposed to the risk of Piracy the Owners shall have the liberty:

(i) to take reasonable preventative measures to protect the Vessel, crew and cargo including but not limited to re-routing within the Area, proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course, or engaging security personnel and/or deploying equipment on or about the Vessel (including embarkation/disembarkation).

(ii) to comply with the requirements of the Owners' insurers under the terms of the Vessel's insurance(s);

(iii) to comply with all orders, directions, recommendations or advice given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group (including military authorities) whatsoever acting with the power to compel compliance with their orders or directions; and

(iv) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

and the Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by the Vessel proceeding as aforesaid, save to the extent that such claims are covered by additional insurance as provided in sub-clause (d)(iii).

(d) Costs
(i) If the Vessel proceeds to or through an Area where due to risk of Piracy additional costs will be incurred including but not limited to additional personnel and preventative measures to avoid Piracy, such reasonable costs shall be for the Charterers' account. Any time lost waiting for convoys, following recommended routing, timing, or reducing speed or taking measures to minimise risk, shall be for the Charterers' account and the Vessel shall remain on hire;

(ii) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an 7area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers;

(iii) If the Vessel proceeds to or through an Area exposed to the risk of Piracy, the Charterers shall reimburse to the Owners any additional premiums required by the Owners' insurers and the costs of any additional insurances that the Owners reasonably require in connection with Piracy risks which may include but not be limited to War Loss of Hire and/or maritime K&R.

21

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

(iv) All payments arising under Sub-clause (d) shall be settled within fifteen (15) days of receipt of Owners' supported invoices or on redelivery, whichever occurs first.

(e) If the Vessel is attacked by pirates any time lost shall be for the account of the Charterers and the Vessel shall remain on hire.

(f) If the Vessel is seized by pirates the Owners shall keep the Charterers closely informed of the efforts made to have the Vessel released. The Vessel shall remain on hire throughout the seizure and the Charterers' obligations shall remain unaffected, except that hire payments shall cease as of the ninety-first (91st) day after the seizure until release. The Charterers shall pay hire, or if the Vessel has been redelivered, the equivalent of Charter Party hire, for any time lost in making good any damage and deterioration resulting from the seizure. The Charterers shall not be liable for late redelivery under this Charter Party resulting from the seizure of the Vessel.

(g) If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this Clause and any implied or express provision of the Charter Party, this Clause shall prevail.

95.     Fumigation of grain or meal cargo in transit permitted at Charterers' risk/time and expense provided that fumigant used is a standard commercially-used product applied by a licensed and bonded fumigator or marine chemist and crew is provided with full instructions, MSDS, and the necessary equipment such as SCBA, gas testing equipment and placards. Marine chemist, if available, to enter vessel's holds to remove fumigant pillows or cachets from the vessel's holds. Installation, removal and disposal of fumigant materials to be arranged by Charterers at their time risk and expense.

96.     Negotiations and fixture, if any, to be kept strictly private and confidential but since Owner is an affiliate of a publicly quoted company, it may be required to disclose the facts of this fixture.

97.     Charterers to have the option to use bulldozers in vessel's holds provided not exceeding the tank top strength.

98.     If required, Stevedores to lift on board, shift from hold to hold, and discharge the bulldozers by use of vessel's gear.

99.     **Hull Fouling**

(a) If, in accordance with Charterers' orders, the Vessel remains at or shifts within ports, places, anchorages and/or berths for a period exceeding 20 consecutive or cumulative days in which the total navigating time between ports is less than 48 hours any warranties concerning speed and consumption shall be suspended pending inspection of the Vessel's underwater parts including, but not limited to, the hull, sea chests, rudder and propeller.

(b) In accordance with sub-clause (a), either party may call for inspection which shall be arranged jointly by Owners and/or Charterers and undertaken at Charterers' risk, cost, expense and time.

(c) If, as a result of the inspection fouling is observed, and either party calls for cleaning of any of the underwater parts, such cleaning shall be undertaken by the Charterers at their risk, cost, expense and time in consultation with the Owners and subject to Owners' approval of the cleaning works and method to be undertaken.

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

(i) Cleaning shall always be under the supervision of the Master and, in respect of the underwater hull coating, in accordance with the paint manufacturers' recommended guidelines on cleaning, if any. Such cleaning shall be carried out by a reputable experienced cleaning service without damage to the Vessel's underwater parts or coating.  The cleaning shall result in the restoration of the affected area to a thoroughly efficient state and appearance and Charterers to provide supporting documentation to Owners immediately upon completion of the works carried out.

(ii) If, at the port or place of inspection, cleaning as required under this Sub-clause (c) is not permitted or possible, or if Charterers choose to postpone cleaning, speed and consumption warranties shall remain suspended until such cleaning has been completed.

(d) Cleaning in accordance with this clause shall always be carried out prior to redelivery. If, nevertheless, Charterers are prevented from carrying out such cleaning, Charterers to remain responsible for the eventual cost and time of cleaning, and for any damages due to a drop in performance speed or excess consumption until such time as the hull is cleaned.  In such case Owners to arrange cleaning as soon as practicable and to advise Charterers of their intentions.

100.   **Bills of Lading**
In the case Original Bill(s) of Lading are not available prior to vessel's arrival at the discharge port, Owners to allow discharge of the cargo against Charterers' Letter of Indemnity basis Owners' PANDI Club standard wording issued on Charterers' letterhead and signed by an authorized officer of the Charterers only without bank countersignature.  Any LOI to be submitted to Owners at least 2 working days prior to arrival at the discharge port to allow sufficient time for review and approval, failing which Owners will approve LOI on a best endeavor basis but not to be responsible for any delays in discharge.

For all steel cargoes, Charterers' Bill(s) of Lading to be issued (i.e. stating that the Charterers are the "Carrier") and to be signed "for and on behalf of Carrier". Owners to be sent a copy of the Bill(s) of Lading for review prior to signing/release.

101.   **Bunker Fuel Sulphur Content Clause**
a.  Without prejudice to anything else contained in this Charter Party, the Charterers shall pay reasonable expenses if any in readying vessels tanks and supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

b.  Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i)   The Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

(ii)  The Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

Subject to having complied with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

c. For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

102.    ***BIMCO Anti-Corruption Clause for Charter Parties***

**(a)** The parties agree that in connection with the performance of this Charter Party they shall each:

(i) comply at all times with all applicable anti-corruption legislation and have procedures in place that are, to the best of its knowledge and belief, designed to prevent the commission of any offence under such legislation by any member of its organisation or by any person providing services for it or on its behalf; and

(ii) make and keep books, records, and accounts which in reasonable detail accurately and fairly reflect the transactions in connection with this Charter Party.

**(b)** If a demand for payment, goods or any other thing of value ("Demand") is made to the Master or the Owners by any official, any contractor or sub-contractor engaged by or acting on behalf of Owners or Charterers or any other person not employed by Owners or Charterers and it appears that meeting such Demand would breach any applicable anti-corruption legislation, then the Master or the Owners shall notify the Charterers as soon as practicable and the parties shall cooperate in taking reasonable steps to resist the Demand.

**(c)** If, despite taking reasonable steps, the Demand is not withdrawn, the Master or the Owners may issue a letter of protest, addressed or copied to the Charterers. If the Master or the Owners issue such a letter, then, in the absence of clear evidence to the contrary, it shall be deemed that any delay to the Vessel is the result of resisting the Demand and (as applicable):

(i) the Vessel shall remain on hire; or

(ii) any time lost as a result thereof shall count as laytime or (if the Vessel is already on demurrage) as time on demurrage.

**(d)** If either party fails to comply with any applicable anti-corruption legislation it shall defend and indemnify the other party against any fine, penalty, liability, loss or damage and for any related costs (including, without limitation, court costs and legal fees) arising from such breach.

**(e)** Without prejudice to any of its other rights under this Charter Party, either party may terminate this Charter Party without incurring any liability to the other party if

(i) at any time the other party or any member of its organisation has committed a breach of any applicable anti-corruption legislation in connection with this Charter Party; and

(ii) such breach causes the non-breaching party to be in breach of any applicable anti-corruption legislation.

Any such right to terminate must be exercised without undue delay.

(f) Each party represents and warrants that in connection with the negotiation of this Charter Party neither it nor any member of its organisation has committed any breach of applicable anti-corruption legislation. Breach of this Sub-clause (f) shall entitle the other party to terminate the Charter Party without incurring any liability to the other.

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

103.   **BIMCO Bunker Non-Lien Clause for Time Charter Parties**

(a) The Charterers will not directly or indirectly suffer, nor permit to be continued, any lien, any encumbrance, or any rights of any kind whatsoever over the Vessel in respect of the supply of bunkers.

(b) The Charterers shall:

(i) prior to ordering any bunkers for the Vessel inform the sellers of the bunkers in writing (the "Non-Lien Notice") that the bunkers to be supplied to the Vessel are solely for the Charterers' account, and that neither the Vessel, the Owners nor the Master is a party to the bunker supply contract and no lien, encumbrance or any rights shall arise on the Vessel; and

(ii) after ordering bunkers inform the Owners in writing of the name and contact details of the sellers of the bunkers and, if the Owners so request, provide Owners with a copy of the Non-Lien Notice.

(c) If the Charterers fail to comply with sub-clause (b)(ii), the Master shall be entitled to refuse to allow the bunkers to be supplied to the Vessel and if the Master so refuses hire shall continue to accrue and any extra expenses arising out of or in connection with such refusal shall be for the Charterers' account.

(d) If in compliance with any of the provisions of this Clause, anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter Party by the Owners.

(e) As soon as possible after the due date of payment for bunkers for each supply made during the charter period, the Charterers shall provide the Owners with written evidence or acknowledgement of payment from the bunker sellers.

(f) The Charterers shall procure that this Clause shall be incorporated into all sub-time charters.


104.   **BIMCO Infectious or Contagious Diseases Clause for Time Charter Parties**

(a)   For the purposes of this Clause, the words:

"Disease" means a highly infectious or contagious disease that is seriously harmful to humans.

"Affected Area" means any port or place where there is a risk of exposure to the Vessel, crew or other persons on board to the Disease and/or to a risk of quarantine or other restrictions being imposed in connection with the Disease.

(b)   The Vessel shall not be obliged to proceed to or continue to or remain at any place which, in the reasonable judgement of the Master/Owners, is an Affected Area.

(c)   If the Owners decide in accordance with Sub-clause (b) that the Vessel shall not proceed or continue to an Affected Area they shall immediately notify the Charterers.

(d)   If the Vessel is at any place which the Master in his reasonable judgement considers to have become an Affected Area, the Vessel may leave immediately, with or without cargo on board, after notifying the Charterers.

(e)   In the event of Sub-clause (c) or (d) the Charterers shall be obliged, notwithstanding any other terms of this Charter Party, to issue alternative voyage orders. If the Charterers do not issue such alternative voyage orders within forty-eight (48) hours of receipt of the Owners' notification, the Owners may discharge any cargo already on board at any port or place. The Vessel shall remain on

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

hire throughout and the Charterers shall be responsible for all additional costs, expenses and liabilities incurred in connection with such orders/delivery of cargo.

(f)    In any event, the Owners shall not be obliged to load cargo or to sign, and the Charterers shall not allow or authorise the issue on the Owners' behalf of, bills of lading, waybills or other documents evidencing contracts of carriage for any Affected Area.

(g)   The Charterers shall indemnify the Owners for any costs, expenses or liabilities incurred by the Owners, including claims from holders of bills of lading, as a consequence of the Vessel waiting for and/or complying with the alternative voyage orders.

(h)   If, notwithstanding Sub-clauses (b) to (f), the Vessel does proceed to or continue to or remain at an Affected Area:

(i) The Owners shall notify the Charterers of their decision but the Owners shall not be deemed to have waived any of their rights under this Charter Party.

(ii) The Owners shall endeavour to take such reasonable measures in relation to the Disease as may from time to time be recommended by the World Health Organisation.

(iii) Any additional costs, expenses or liabilities whatsoever arising out of the Vessel visiting or having visited an Affected Area, including but not limited to screening, cleaning, fumigating and/or quarantining the Vessel and its crew, shall be for the Charterers' account and the Vessel shall remain on hire throughout.

(i)    The Vessel shall have liberty to comply with all orders, directions, recommendations or advice of competent authorities and/or the Flag State of the Vessel in respect of arrival, routes, ports of call, destinations, discharge of cargo, delivery or in any other respect whatsoever relating to issues arising as a result of the Vessel being or having been ordered to an Affected Area.

(j)    If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, nor shall it be or give rise to an off-hire event, but shall be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this Clause and any implied or express provision of this Charter Party, this Clause shall prevail to the extent of such conflict, but no further.

(k)   The Charterers shall indemnify the Owners if after the currency of this Charter Party any delays, costs, expenses or liabilities whatsoever are incurred as a result of the Vessel having visited an Affected Area during the currency of this Charter Party.

(l)    The Charterers shall procure that this Clause shall be incorporated into all sub-charters and bills of lading, waybills or other documents evidencing contracts of carriage issued pursuant to this Charter Party.

105.   **MODIFIED BIMCO WORDING for Time Charter Parties:**

i.   The Owners shall not be obliged to comply with any orders for the employment of the Vessel in any carriage, trade or on a voyage which, in the reasonable judgment of the Owners, will expose the Vessel, Owners, managers, crew, the Vessel's insurers, or their re-insurers, to any sanction or prohibition imposed by any State, Supranational or International Governmental Organisation.

ii.  If the Vessel is already performing an employment to which such sanction or prohibition is subsequently applied, the Owners shall have the right to refuse to proceed with the employment and the Charterers shall be obliged to issue alternative voyage orders within 48 hours of receipt of

*Rider to M/V "Crowned Eagle" Time Charter dated February 11, 2016*

Owners' notification of their refusal to proceed. If the Charterers do not issue such alternative voyage orders the Owners may discharge any cargo already loaded at any safe port (including the port of loading). The Vessel to remain on hire pending completion of Charterers' alternative voyage orders or delivery of cargo by the Owners and Charterers to remain responsible for all additional costs and expenses incurred in connection with such orders/delivery of cargo. If in compliance with this Sub-clause (b) anything is done or not done, such shall not be deemed a deviation.

iii. The Charterers shall indemnify the Owners against any and all claims whatsoever brought by the owners of the cargo and/or the holders of Bills of Lading and/or sub-charterers against the Owners by reason of the Owners' compliance with such alternative voyage orders or delivery of the cargo in accordance with Sub-clause (b).

iv. The Charterers shall procure that this Clause shall be incorporated into all sub-charters and Bills of Lading issued pursuant to this Charter Party.

***(e) For purposes of this Clause, references to sanctions or prohibitions shall include sanctions or prohibitions imposed by the UN and its Security Council, EU (including its member states), the UK and/or U.S., in each case as if such sanctions or prohibitions were binding on each party referenced (to the extent compliance with would not violate the laws and regulations of the U.S.). The Charterers shall promptly provide information as reasonably necessary for Owners to determine compliance with this Clause.



THE BALTIC EXCHANGE DRY CARGO QUESTIONNAIRE (BALTIC99)                                 Version 2

| 1. | GENERAL INFORMATION | |
|---|---|---|
| 1.1 | Date updated: | May 15, 2019 |
| 1.2 | Vessel's name: | New London Eagle |
| 1.3 | IMO number: | 9754991 |
| 1.4 | Vessel's previous name(s) and date(s) of change: | Essence of Seatrek (Jan 09, 2018) |
| 1.5 | Flag: | Marshall Islands |
| 1.6 | Port of Registry: | majuro |
| 1.7 | Type of vessel: | Bulkcarrier |
| 1.8 | Type of hull: | Single Hull |
| **Ownership and Operation** | | |
| 1.9 | Registered owner - Full style: | NEW LONDON EAGLE LLC<br>THE TRUST COMPANY OF THE<br>MARSHALL ISLANDS,INC<br>Marshall Islands<br>Tel: (+) 1 203 276 8100<br>Fax: (+) 1 203 276 8199 |
| 1.10 | Parent company/group to which the owner belongs - Full style: | |
| 1.11 | Technical operator - Full style: | Eagle Ship Management LLC<br>300 First Stamford Place Stamford<br>CT, 06902<br>United States<br>Tel: 203-276-8100<br>Fax: 203-276-8191<br>Email: tech@eagleshipmgmt.com<br>Web: www.eagleships.com |
| 1.12 | Commercial operator - Full style: | Eagle Shipping International (USA)<br>LLC<br>300 First Stamford Place Stamford<br>CT, 06901<br>United States<br>Tel: 203-276-8100<br>Fax: 203-276-8191<br>Email: operations@eagleships.com<br>Web: www.eagleships.com |
| 1.13 | Disponent owner - Full style: | |
| 1.14 | Does disponent owner have vessel on time charter or bareboat: | Owned |
| 1.15 | Since when vessel has been under Disponent owner: | |
| 1.16 | Number of vessels in disponent owner's fleet: | |
| **Builder** | | |
| 1.17 | Builder (where built) / Yard number: | Yangzhou Dayang<br>Shipbuilding Co., Ltd | |
| 1.18 | Date delivered (built): | Aug 15, 2015 |
| **Classification** | | |
| 1.19 | Classification society: | Lloyds Register |
| 1.20 | Class notation: | 100A1 BULK CARRIER, CSR, BC-A,<br>GRAB (20), HOLD Nos. 2 and 4 May<br>Be Left Empty, ESP, IWS. LI LMC,<br>UMS Descriptive Note: ShipRight<br>SCM |
| 1.21 | If Classification society changed, name of previous society: | Det Norske Veritas |
| 1.22 | If Classification society changed, date of change: | Jan 09, 2018 |
| 1.23 | Date and place of last dry dock: | Aug 15, 2015 | Yangzhou<br>Dayang<br>Shipbuilding<br>Co., Ltd |
| 1.24 | Date next dry dock is due: | | |
| 1.25 | Date of last special survey / next survey due: | Aug 13, 2015 | Aug 12, 2020 |
| 1.26 | Date of last annual survey / next survey due: | Jul 27, 2018 | Aug 12, 2020 |

| | | | | |
|---|---|---|---|---|
| 1.27 | Is vessel entered in classification approved enhanced survey program? | Yes | | |
| 1.28 | Does vessel comply with IACS unified requirements regarding number 1 cargo hold and double bottom tank steel structure? | Yes | | |
| | Has this compliance been verified by the classification society? | Yes | | |

**Dimensions**

| | | | | |
|---|---|---|---|---|
| 1.29 | Length Over All (LOA): | 199.99 Metres | | |
| 1.30 | Length Between Perpendiculars (LBP): | 194.50 Metres | | |
| 1.31 | Extreme breadth (Beam): | 32.26 Metres | | |
| 1.32 | Moulded depth: | 18.5 Metres | | |
| 1.33 | Keel to Masthead (KTM) / KTM in collapsed condition (if applicable): | 48.90 Metres | Metres | |
| 1.34 | Distance from waterline to top of hatch coamings or top of hatch covers if side-rolling hatches | No1. Hatch | Midships | Last Hatch |
| | Ballast condition: (cargo holds not flooded, basis 50% bunkers) | 16.02 Metres | 14.97 Metres | 13.93 Metres |
| | Full ballast condition: (cargo holds flooded, basis 50% bunkers) | 12.50 Metres | 12.05 Metres | 11.68 Metres |
| | Light condition (basis 50% bunkers): | 17.778 Metres | 18.08 Metres | 18.335 Metres |
| | Fully laden condition: | 7.58 Metres | 7.48 Metres | 7.48 Metres |
| 1.35 | Distance from keel to top of hatch coamings (or top of hatch covers if side-rolling hatches): | 20.86 Metres | 21.26 Metres | 21.61 Metres |

**Tonnages**

| | | | |
|---|---|---|---|
| 1.36 | Gross Tonnage (GT) / Net Registered Tonnage (NRT): | 35873 | 21218 |
| 1.37 | Suez Canal Tonnage - Gross (SCGT) / Net (SCNT): | 37320.75 | 33554.03 |
| 1.38 | Panama Canal Net Tonnage (PCNT): | 21218 | |

**Loadline Information**

| | | Deadweight | Draft | TPC |
|---|---|---|---|---|
| 1.39 | Loadline | | | |
| | Summer: | 63140 Metric Tonnes | 13.3 Metres | 62.13 Metric Tonnes |
| | Winter: | 61419 Metric Tonnes | 13.023 Metres | 62.12 Metric Tonnes |
| | Winter North Atlantic: | Metric Tonnes | Metres | Metric Tonnes |
| | Fresh water: | 63143 Metric Tonnes | 13.602 Metres | 62.15 Metric Tonnes |
| | Tropical: | 64861 Metric Tonnes | 13.577 Metres | 62.14 Metric Tonnes |
| | Tropical fresh water: | 64823 Metric Tonnes | 13.879 Metres | 62.20 Metric Tonnes |
| | Normal ballast condition: | 19524 Metric Tonnes | 6.00 Metres (ballast hold not flooded, basis 50% bunkers (about) draft F4.80M/A7.20M) | 56.04 Metric Tonnes |
| | Lightship: | 11782 Metric Tonnes | 2.566 Metres | 52.23 Metric Tonnes |
| | FWA at summer draft: | | 302 Millimetres | |

**Is vessel fitted for:**

| | | | |
|---|---|---|---|
| 1.40 | Transit of Panama Canal? | Yes | |
| | If yes, state deadweight all told on 39ft 6in / 12.039m (SG 0.9954): | 55319.86 Metric Tonnes | |
| | If yes, is Panama deadweight all told affected by vessel's bilge turn radius? | | |
| 1.41 | Transit of Suez Canal? | Yes | |
| 1.42 | Transit of St. Lawrence Seaway? | Yes | |
| | If yes, state deadweight all told on 26ft / 7.92m fresh water: | Metric Tonnes | |

**Recent Operational History**

| 1.43 | Has vessel been involved in a pollution, grounding, serious casualty or collision incident during the past 12 months? If yes, give details: | Pollution: / Grounding: / Casualty: / Collision: / |
|---|---|---|

| 1.44 | Voyage History | | | |
|---|---|---|---|---|
| | Voy# | Charterer | Cargo | Load-Discharge Ports |
| | Last: | | | Contact owner for details. |
| | 2nd: | | | Contact owner for details. |
| | 3rd: | | | Contact owner for details. |
| | 4th: | | | Contact owner for details. |
| | 5th: | | | Contact owner for details. |

| 1.45 | Specify the security level at which the ship is currently operating (ISSC): | Level 1 |
|---|---|---|

| 2. | CERTIFICATION | Issued | Last Annual | Expires |
|---|---|---|---|---|
| 2.1 | Safety Equipment Certificate: | Mar 08, 2019 | Jul 27, 2018 | Aug 12, 2020 |
| 2.2 | Safety Radio Certificate: | Jan 10, 2018 | Jul 27, 2018 | Aug 12, 2020 |
| 2.3 | Safety Construction Certificate: | Jan 10, 2018 | Jul 27, 2018 | Aug 12, 2020 |
| 2.4 | Loadline Certificate: | Jan 10, 2018 | Jul 27, 2018 | Aug 12, 2020 |
| 2.5 | Safety Management Certificate (SMC): | May 30, 2018 | | May 29, 2023 |
| 2.6 | Document of Compliance (DOC): | May 10, 2016 | May 10, 2018 | Feb 17, 2020 |
| 2.7 | Gear survey: | | | |
| 2.8 | Cargo securing manual: | | | |
| 2.9 | International Oil Pollution Prevention Certificate (IOPPC): | Jan 10, 2018 | | Aug 12, 2020 |
| 2.10 | Ship Sanitation Control (SSCC) / Ship Sanitation Control Exemption (SSCE) Certificate | May 12, 2019 | - | Nov 11, 2019 |
| 2.11 | USCG COFR: | | - | |
| 2.12 | International Ship Security Certificate (ISSC): | May 30, 2018 | - | May 29, 2023 |

| 3. | CREW MANAGEMENT | |
|---|---|---|
| 3.1 | Number of Officers: | 8 |
| 3.2 | Number of Ratings: | 11 |
| 3.3 | Name and nationality of Master: | / |
| 3.4 | Nationality of Officers: | Ukrainian |
| 3.5 | Nationality of Ratings: | Ukrainian |
| 3.6 | What is the common working language onboard: | ENGLISH |
| 3.7 | Do officers speak and understand English? | Yes |

| 4. | SAFETY MANAGEMENT | | |
|---|---|---|---|
| 4.1 | Is the vessel ISM certified? | Yes | |
| 4.2 | Document of Compliance (DOC) certificate number / issuing authority: | 940503-3114421-001 | ABS |
| 4.3 | Safety Management (SMC) certificate number / issuing authority: | | ABS |
| | State outstanding recommendations, if any: | | |
| 4.4 | Is the vessel operated under a Quality Management System? | Yes | |
| | If Yes, what type of system (ISO9002 or IMO Resolution A.741(18)): | IMO Resolution A.741(18) | |

| 5. | CARGO ARRANGEMENTS |
|---|---|
| Holds | |
| 5.1 | Number of holds: | 5 |
| 5.2 | Hold dimensions: | |

| 5.3 | Are vessel's holds clear and free of any obstructions? | Yes | |
|---|---|---|---|
| 5.4 | Capacity, by hold, excluding wing/topside tanks but including hatchways: | Grain | Bale |
| | Hold #1: | 12376.2 Cu. Metres | 12067.8 Cu. Metres |
| | Hold #2: | 16501.4 Cu. Metres | 16089.0 Cu. Metres |
| | Hold #3: | 16006.0 Cu. Metres | 15605.9 Cu. Metres |
| | Hold #4: | 16518.2 Cu. Metres | 16105.2 Cu. Metres |
| | Hold #5: | 16089.0 Cu. Metres | 15686.8 Cu. Metres |
| | Hold #6: | Cu. Metres | Cu. Metres |
| | Hold #7: | Cu. Metres | Cu. Metres |
| | Hold #8: | Cu. Metres | Cu. Metres |
| | Hold #9: | Cu. Metres | Cu. Metres |
| | Total: | 77490.8 Cu. Metres | 75554.7 Cu. Metres |
| 5.5 | Is vessel strengthened for the carriage of heavy cargoes? | Yes | |
| 5.6 | If yes, state which holds may be left empty: | 2 & 4 | |
| 5.7 | Is tanktop steel suitable for grab discharge? | Yes | |
| 5.8 | State whether bulkhead corrugations are vertical or horizontal: | Vertical | |
| 5.9 | Tanktop strength: | Hold #1, #3, #5: 25 MT/sqm<br>Hold #2, #4: 20 MT/sqm | |
| 5.10 | Are holds CO2 fitted? | Yes | |
| 5.11 | Are holds fitted with smoke detection system? | No | |
| 5.12 | Is vessel fitted with Australian type approved holds ladders? | Yes | |
| 5.13 | Has vessel a functioning class certified loadmaster/loadicator or similar calculator? | Yes | |
| 5.14 | Are holds hoppered at: | | |
| | Hold side? | Yes | |
| | Forward bulkhead? | Yes | |
| | Aft bulkhead? | Yes | |
| 5.15 | Can vessel's holds be described as box shaped? | No | |
| 5.16 | Measurement of any tank slopes/hoppering:<br>(height and distance from vessel's side at tank top) | 2~5- 4.4MTRS 1- 4.4MTRS 6- 6.6MTRS | |
| 5.17 | Flat floor measurement of cargo holds at tank top: | Hold #1: CH 1- L 26.0W 23.4 (F) 12.2 Mtrs<br>Hold #2: CH 2- L 29.8W 23.4 Mtrs<br>Hold #3: CH 3- L 27.4 W 23.4 Mtrs<br>Hold #4: CH 4 -L 29.8 W 23.4 Mtrs<br>Hold #5: CH5 - L30.6 W 23.4 (A) 10.4 Mtrs | |
| 5.18 | Are vessel's holds electrically ventilated? | No | |
| | If yes, state number of air-changes per hour basis empty holds: | | |
| 5.19 | Type of hold paint: | Jotaguards 630, Grey & Red | |
| 5.20 | Is vessel fitted for carriage of grain in accordance with chapter V1 of SOLAS 1974 and amendments without requiring bagging, strapping and securing when loading a full cargo (deadweight) of heavy grain in bulk (stowage factor 42 cu. feet) with ends untrimmed? | Yes | |
| 5.21 | Is the vessel fitted with A60 Steel Bulkhead? | Yes (Fire redardant material Bulkhead between CH5 and Engine room) | |
| **Deck and Hatches** | | | |
| 5.22 | Number of hatches: | 5 | |
| 5.23 | Make and type of hatch covers: | Folding Type | |

| 5.24 | Hatch dimensions: | | Hatch #1: 14.76 X 17.02<br>Hatch #2, #3, #4, #5: 22.14 x 18.64 | |
|---|---|---|---|---|
| 5.25 | Hatch span (distance from front of forward hatch to aft of rear hatch): | | 146.99 Metres | |
| 5.26 | Strength of hatch covers: | | 2.2 MT/sqm | |
| 5.27 | Number, diameter and location of cement holes | | 2 X DIA= 0.70MTRS | |
| 5.28 | Distance from ship's rail to near and far edge of hatch covers/coaming near and far (Please advise the minimum width clear of any obstruction for each hold): | | 6.80 MTRS | |
| 5.29 | Distance from bow to fore of 1st hold opening: | | 12.20 Metres | |
| 5.30 | Distance from stern to aft of last hold opening: | | 36.00 Metres | |
| 5.31 | State deck strength: | | MT/sqm (CH #1 -4.50 t/m2 CH 2-5=5.0 T/M2) | |
| **Ballast** | | | | |
| 5.32 | Capacity of ballast tanks (100%): | | 18364.1 Cu. Metres | |
| 5.33 | Ballast holds capacity, state which hold(s): | | 3 = 16406.0 MT | |
| 5.34 | Vessel's ballasting time / rate of ballasting: | | 9.18 HRS X 2000 M3/HR | Cu. Metres/Hour |
| 5.35 | Vessel's deballasting time / rate of deballasting: | | 16HRS PUMP 2000 M3/HR | Cu. Metres/Hour |
| 5.36 | Unpumpable quantity: | | 150 Cu. Metres | |

| 6. | **CARGO GEAR (ONLY TO BE COMPLETED IF APPLICABLE)** | | | |
|---|---|---|---|---|
| 6.1 | If geared state make and type: | | Masada- Mitsubishi | |
| 6.2 | Number/location of derricks/cranes: | | 4 x 36 Metric Tonnes center crossdecks between holds,36T HOOK MODE,28T GRAB MODE | |
| 6.3 | Maximum outreach of gear beyond ships rail | | 12.90 Metres | |
| 6.4 | Maximum outreach of gear beyond ships rail with maximum cargo lift on hook: | | 12.90 Metres | |
| 6.5 | If gantry cranes/horizontal slewing cranes - state minimum clearance distance crane hook to top of hatch coaming: | | Metres | |
| 6.6 | Time needed for full cycle with maximum cargo lift on hook: | | 210 Seconds | |
| 6.7 | Hoisting time of gear: | | Metres/Minute | |
| 6.8 | Luffing time of gear: | | 52 Seconds | |
| 6.9 | Slewing time of gear: | | 0.5 rpm | |
| 6.10 | Is gear combinable for heavy lift? | | No | |
| 6.11 | Are winches electro-hydraulic? | | Yes | |
| 6.12 | If vessel has grabs on board - state: | | | |
| | | Type: | Model/Type-14 cbm Radio Remote controlled Grab | |
| | | Capacity: | 4 x 14 Cu. Metres | |
| | | Power source of grabs: | Amps | 12 Volts |
| | | Location of power source: | Inside the grab | |
| 6.13 | Does vessel have enough power to run 4 cranes and 4 shore grabs (if applicable). If not pls state how many? | | YES | |
| 6.14 | Is vessel fitted with sufficient lights at each hatch for night work? | | Yes | |
| 6.15 | Is vessel logs fitted? | | No | |
| | If yes, state number, type and height of stanchions/sockets, if on board: | | N/A | |
| 6.16 | Is vessel log racks fitted? | | No | |
| 6.17 | Timber Loadline (if applicable) | Deadweight | Draft | TPC |
| | Summer: | Metric Tonnes | Metres | Metric Tonnes |
| | Winter: | Metric | Metres | Metric |

|  |  | Tonnes |  | Tonnes |
|---|---|---|---|---|
|  | Winter North Atlantic: | Metric Tonnes | Metres | Metric Tonnes |
|  | Fresh water: | Metric Tonnes | Metres | Metric Tonnes |
|  | Tropical: | Metric Tonnes | Metres | Metric Tonnes |
|  | Tropical fresh water: | Metric Tonnes | Metres | Metric Tonnes |

| 7. | CONTAINER BULKERS/MULTI PURPOSE (ONLY TO BE COMPLETED IF APPLICABLE) | | |
|---|---|---|---|
| 7.1 | Capacity in direct stow of TEU/FEU basis empty tanks: | | |
|  | Capacity in direct stow of TEU/FEU basis full tanks: | | |
| 7.2 | Are all containers within reach of vessel's gear? | N/A | |
| 7.3 | If no, state self sustained capacity: | | |
| 7.4 | If vessel fitted with all permanent and loose fittings/lashing materials for above number of TEU/FEU? | | |
| 7.5 | Is vessel fitted with recessed holes/shoes on tanktop and container shoes on weatherdeck and hatch covers? | | |
| 7.6 | Advise stack weights and number of tiers on/under deck per TEU: | | |
|  | Advise stack weights and number of tiers on/under deck per FEU: | | |
| 7.7 | Has vessel a container spreader on board? | | |
| 7.8 | Number and type of reefer plugs: | | |

| 8. | ENGINE ROOM, SPEED AND CONSUMPTION | | |
|---|---|---|---|
| 8.1 | Is vessel fitted with a shaft generator? | No | |
| **Engine Room** | | | |
| 8.2 | Engine make/model and type: | HHM-MAN B&W 5S60ME-C8.1 / | |
| 8.3 | BHP / RPM of main engine at MCR: | 100 % | 8300 bhp | 91 rpm |
| 8.4 | BHP / RPM of main engine at NCR (as % of MCR): | 85 % | 6640 bhp | 84.5 rpm |
| **Fuel** | | | |
| 8.5 | What type/viscosity of fuel is used for main propulsion: | HSFO 380CST/LSDO | |
|  | Capacity of main engine bunker tanks: | 1754.4 Cu. Metres | |
| 8.6 | What type/viscosity of fuel is used in the generating plant: | HSFO 380 CST/LSDO | |
|  | Capacity of aux engine(s) bunker tanks: | 563.5 Cu. Metres | |
| **Speed** | | | |
| 8.7 | Ballast: | Knots (WSNP) | |
|  | Laden: | Knots (WSNP) | |
| **Consumptions** | | | |
| 8.8 | Passage | Main | Aux |
|  | Ballast: | MT/Day | MT/Day |
|  | Laden: | MT/Day | MT/Day |
| 8.9 | In Port | Main | Aux |
|  | Working: | MT/Day | MT/Day |
|  | Idle: | MT/Day | MT/Day |
|  | Other (specify): | | |

| 9. | MISCELLANEOUS | |
|---|---|---|
| **Communications and Electronics** | | |
| 9.1 | Call sign: | V7EX2 |
| 9.2 | Vessel's INMARSAT number: | |

| 9.3 | Vessel's telex number: | | |
|------|-------------------------|--|--|
| 9.4 | Vessel's fax number: | | |
| 9.5 | Vessel's email address: | 069newlondoneagle@vesselmail.org | |
| 9.6 | Vessel's MMSI No. (Maritime Mobile Selective call Identity Code): | | |
| 9.7 | Vessel's onboard electrical supply (V / Hz): | | |
| **Constants/Fresh Water** | | | |
| 9.8 | Constants excluding fresh water: | 450 Metric Tonnes | |
| 9.9 | Daily freshwater consumption: | 8 MT/Day | |
| 9.10 | Fresh water capacity: | 396.8 Cu. Metres | |
| 9.11 | State capacity and daily production of evaporator: | 20 MT/Day | 20 Metric Tonnes |
| 9.12 | Normal fresh water reserve: | 200 Metric Tonnes | |
| **Insurance** | | | |
| 9.13 | P & I Club - Full style: | | |
| 9.14 | P & I Club coverage: | US$ | |
| 9.15 | Where is the owners hull and machinery placed: | | |
| 9.16 | Hull & Machinery insured value: | US$ | |
| **Vetting** | | | |
| 9.17 | Is the vessel RIGHTSHIP approved: | Yes | |
| 9.18 | Date/Place of last RIGHTSHIP Inspection: | / | |
| **Port State Control** | | | |
| 9.19 | Date and place of last Port State Control inspection. | / | |
| 9.20 | Has the vessel been detained by Port State Control in the last 12 months? | | |
| | Any outstanding deficiencies as reported by any Port State Control. If yes, provide details: | , | |
| 9.21 | Any Australian Maritime Safety Authority (AMSA) detentions or noted deficiencies. If so, please advise details and specify when/where these items were repaired. | | |

| 10. | **SUPPLEMENTARY INFORMATION FOR SPECIFIC COMMODITIES/TRADES** |
|------|---------------------------------------------------------------|
| 10.1 | |

June 2008 (Q88Dry.com)



*Oxford | London | Sydney | Singapore | Bogotá*

# GRC/6864/Medmar Inc.

**Infospectrum Rating Report**
Compiled: 18 October 2018
Downloaded: 12 June 2019
Client: Eagle Shipping International (USA) LLC



This report is supplied subject to Infospectrum's standard conditions of supply at http://portal.infospectrum.net/Infospectrum-tcs.pdf (or on request) and your attention is also drawn to the disclaimer and proprietary rights notice overleaf. You should read this before using the document.


## InfoSpectrum

# Order Details

| | |
|---|---|
| **Subject company** | GRC/6864/Medmar Inc. |
| **Rating date** | 18 October 2018 |
| **Report created for** | Eagle Shipping International (USA) LLC |
| **Ordered by** | Jan Phillip Rauno - Hamburg |

# Contents

Company Identity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Company Details . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Recent Developments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
Financial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
    Financial commentary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Rating and Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Rating . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Rating Explanation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Disclaimer and Proprietary Rights Notice

This document is proprietary and confidential to Infospectrum Ltd ("Infospectrum"). © Infospectrum Ltd [2019]. Data base right maker – Infospectrum. All rights reserved. It may only be copied and distributed within your organization and/or to third parties and used to the extent this is expressly permitted in writing by Infospectrum. Please refer to your Service Agreement with Infospectrum and our standard conditions of supply (via http://portal.infospectrum.net/Infospectrum-tcs.pdf) for more information on what you can and cannot do with this document.

Please note this document: (i) is only valid as at its date of issue; (ii) represents the current opinions of Infospectrum as at the date of its issue, which Infospectrum has endeavoured to substantiate through appropriate research but the accuracy of any facts stated or of any statements made in this document cannot be guaranteed; and (iii) does not constitute a definitive or conclusive judgement of a particular entity's worth or financial standing. The document should be used as a tool in assessing the subject company and not as the recipient's sole basis for any decision - or in substitution for the recipient's due diligence - in deciding whether and how to trade with the subject company or otherwise. Infospectrum excludes and disclaims any and all liability and responsibility to any entity or person who relies on the document or any part of it or on any information contained within it.

This document is confidential and may be privileged. If you are not the intended recipient of this document (the intended recipient being the client for whom it was supplied by Infospectrum), the disclosure, reproduction, distribution or other dissemination or use of this document (including any action taken in reliance upon the contents of this document) is strictly prohibited.

Nothing in this disclaimer seeks to exclude or limit Infospectrum's liability for death or personal injury caused by its negligence or for fraud or for any other liability to the extent to which such liability may not be excluded by law.

If you have received this document in error, please return it to the sender immediately.

Infospectrum Ltd
60 St. Aldates Oxford OX1 1ST United Kingdom
Tel: +44(0) 1865 420400  Fax: +44(0) 1865 420401  Website: www.infospectrum.net

This report was produced on 12 June 2019 by Infospectrum for Ian Phillip Rauno - Hamburg of Eagle Shipping International (USA) LLC

 **InfoSpectrum**

# Company Identity

| Registered Company Name | Medmar Inc. |
|---|---|
| Trading Name | As above |
| Registered Address | c/o Caribbean Management Services Ltd, Richmond House, P.O. Box 127, Providenciales, Turks & Caicos Islands |
| Trading Address | 1 Leoforos Possidonos Avenue and 3 Moraitini Street, Building 1, 1/F Paleo Faliro, Athens, 17561, Greece |
| Telephone | +30 210 480 5500 |
| Fax | +30 210 480 5503 |
| Email | info@medmar.gr |

# Company Details

| Company Type | Privately Owned |
|---|---|
| Company Status | Operating |
| Sector | Charter Operator |
| Date of Incorporation | 18 March 1982 |
| Place of Incorporation | Turks & Caicos Islands |
| Company Registered Number | E97 |
| Share Capital | Not disclosed by the Turks & Caicos Islands corporate authorities |
| Shareholders | Not disclosed by the Turks & Caicos Islands corporate authorities, but believed to be ultimately controlled by Donald McTaggart interests |
| Directors | Not disclosed by the Turks & Caicos Islands corporate authorities |
| Managers | Include: Donald McTaggart - Chairman Capt. Yannis Boukouvalis - General Manager Spyros Foulos - Financial Manager Tassos Efstathiou - Chartering Manager Yannis Eleftheriou - Vessel Operator Yannis Kalossakas - Vessel Operator |
| Affiliates | Mac Shipping SA, Monaco Medmar Lines Inc., Liberia Dominion Grain AG, Switzerland |

This report was produced on 12 June 2019 by Infospectrum for Jan Philip Raune - Hamburg of Eagle Shipping International (USA) LLC

Infospectrum Ltd
60 St. Aldates Oxford OX1 1ST United Kingdom
Tel: +44(0) 1865 420400  Fax: +44(0) 1865 420401  Website: www.infospectrum.net

 InfoSpectrum

# History

Medmar Inc., (hereafter referred to as Medmar) is a private limited company that was incorporated in the Turks & Caicos Islands in 1982, and operates out of Greece as a branch of a foreign company on the basis of the most recent revision of Law 89/67. The company acts as a charter operator and forms part of a business established by the late John McTaggart, which is now controlled by his son, Donald. Also at the same trading address as Medmar is Medmar Lines Inc., (hereafter referred to as MLI), which is registered in Liberia, and until recently operated as the manager of vessels chartered-in from Medmar. The structure was subsequently simplified by way of phasing out the function of MLI (to some extent turning MLI into a dormant entity) and Medmar prevailing as the main contractual counterparty.

The McTaggart family formerly worked in partnership with John Chandris, who held shares in Dominion International, a leading exponent of Suez Canal Transit services, and Medmar. The McTaggart family, on the other hand, held investments in the Chandris-managed bunker business Macoil International SA. However, the two parties separated their business interests in the late 1990s. The founder, John McTaggart, passed away in 2002, leaving his son Donald (currently in his mid-50s) in sole beneficial control. Medmar was represented in London (United Kingdom) by McTaggart Shipping & Management Co., Ltd, which is now dormant, with the London office closed due to cost saving, leaving a single chartering manager in the UK who works from his home. There is an affiliated commodity trading company that operates from Geneva, Switzerland, known as Dominion Grain AG, and a further group entity which has been established in Monaco named Mac Shipping SA. Dominion Grain AG is said to aggregate small grain parcels in Bulgaria/Black Sea for export, with Mac Shipping SA acting as a chartering entity (although the extent of its use is not known).

Donald McTaggart had a long-standing relationship with the Greek ship owning family which was led by the late Elias D. Papageorgiou until he passed away in 2013. Through a 50:50 ship owning partnership that was implemented between John McTaggart and Elias Papageorgiou, the two families, represented by Donald McTaggart and Elias Papageorgiou's daughter, Christiana, controlled a fleet of four bulk carriers; two Panamax (1999 and 2001-built) and two Kamsarmax (2011-built) that were managed by Athens-based ship management company, Sea Justice SA. This relationship has now terminated, with Medmar-related companies selling their share in the vessels to Papageorgiou family interests and thus having no more shared business with the Papageorgiou family or Sea Justice SA.

Infospectrum Ltd
60 St. Aldates Oxford OX1 1ST United Kingdom
Tel: +44(0) 1865 420400 Fax: +44(0) 1865 420401 Website: www.infospectrum.net

This report was produced on 12 June 2019 by Infospectrum for Ian Philip Rauno - Hamburg of Eagle Shipping International (USA) LLC



# Operations

Medmar is a charter operator for a number of significant clients, believed to include Yemen Company for Industrial Investment Ltd, Severstal of Russia, Midstar FZE of the United Arab Emirates, Torunlar Guda of Turkey, and the United States-based Gavilon group. The subject's management informed us that the business is effectively acting as the chartering counterparty for cargoes of grain and sugar to Yemen and iron ore from Russia/Finland to steel mills in Turkey; cargoes are fixed on a spot basis. The grain business is mostly carried out in Handysize to Supramax ships, with only one port in Yemen having the required draft for Panamax discharge. The iron ore business is carried out almost exclusively in Panamaxes. Shipments are made on a mix of voyage and time charter trip terms, with the company reportedly chartering-in around 50 vessels per year; management estimates volumes to be circa 3m tonnes per annum. We were informed that Medmar does not carry out any speculative trading.

Management stated that Medmar is also targeting the involvement in the transportation of fuel oil. The details of this trading were not given to us, other than the intention to execute a contract for the provision of shipping to a power plant operation in Ghana. We are led to believe that the small tanker shipping operations will be conducted from the office in Greece, as well as a branch of Medmar in Ghana. The project is said to have started as a partnership with a major fuel oil supplier, which has since stepped back, and Medmar's management is currently looking for another partner in order to develop the business. We cannot confirm that this business will be carried out in the name of Medmar, although management reported that Medmar is the ultimate counterparty for any business carried out by the group of companies; we take this on trust.

We were informed by Medmar's management that the subject's principal is also involved in a joint venture (JV) with another undisclosed Greek ship owner, and has already proceeded with the acquisition of a modern bulk carrier. Initially, in late 2017, Medmar took over the bareboat charter of the 2015-built Ultramax bulk carrier, mv Ultra Omega. The deal includes an obligation to purchase the vessel for an undisclosed sum before the end of the bareboat charter. The deal is said to have been arranged through Korea Asset Management Corporation (Kamco), which was set up to manage the distressed assets of South Korean banks. We understand that, upon her acquisition, the ship will still be owned by an offshore-registered special purpose vehicle (SPV), with ultimate beneficial ownership held by Medmar's principal and another undisclosed Greek investor, and commercial management in the name of Medmar. We were also informed that the aforementioned JV has agreed to purchase another four Kamsarmax units, with its second vessel being the 2011-built Kamsarmax bulk carrier, mv Trade

Infospectrum Ltd
60 St. Aldates Oxford OX1 1ST United Kingdom
Tel: +44(0) 1865 420400  Fax: +44(0) 1865 420401  Website: www.infospectrum.net

This report was prepared on 12 June 2019 by Infospectrum for Ian Philip Raune, Hamburg of Eagle Shipping International (USA) LLC



Vision, that will be reportedly acquired from the bankrupt compatriot Toisa Ltd as a distressed asset. Further details on the remaining acquisitions were not provided by management:

# Recent Developments

Nothing other than the aforementioned recent vessel acquisitions reportedly linked to Medmar's principals.

This report was produced on 12 June 2019 by Infospectrum for Ian Philip Rauro - Hamburg of Eagle Shipping International (USA) LLC.

Infospectrum Ltd
60 St. Aldates Oxford OX1 1ST United Kingdom
Tel: +44(0) 1865 420400  Fax: +44(0) 1865 420401  Website: www.infospectrum.net



# Financial

Statutory requirements: Not required to file accounts

## Financial commentary

Medmar is registered in the Turks & Caicos Islands, and operates out of Greece on the basis of the most recent revision of Law 89/67. This legislation allows foreign registered companies to operate out of Greek territory with tax concessions and exemption from financial disclosure. There are, therefore, no accounts published. Management has not disclosed much detail on the company's current financial performance, however, reported that revenue reached circa USD 27m in 2017. Management stated that Medmar has no directional exposure to the freight market at present, simply receiving a margin for its shipping services, with 2017 being a profitable year; this has to be taken on trust.

In regards to the company's balance sheet, we have traced no significant assets directly attributable to Medmar. Any balance sheet filed by the company is likely to be dominated by current items, primarily incoming freight and hire, and outgoing payments to vessel owners and bunker suppliers. We take on trust that Medmar will purchase the mvs Ultra Omega and Trade Vision, as well as another three Kamsarmaxes, which would indicate some access to funds, but also some cooperation with partners who have the funds to invest in tonnage. We would assume that the vessels will be owned by SPVs and, as such, would not appear on Medmar's balance sheet. Judging by the company's overall performance, and from fairly consistent delays in payments, cash flow interruptions might occur, but we believe that these are primarily attributed to slow-paying shippers or receivers.

Infospectrum Ltd
60 St. Aldates Oxford OX1 1ST United Kingdom
Tel: +44(0) 1865 420400  Fax: +44(0) 1865 420401  Website: www.infospectrum.net

This report was produced on 12 June 2019 by Infospectrum for Jan Philip Reuss - Hamburg of Eagle Shipping International (US.A) LLC

 **InfoSpectrum**

# References

We have received feedback from several ship owning/operating sources which have dealt with Medmar during 2018, and the subject appears to have a generally mixed, albeit improved, reputation in the market. Three sources at owners indicated fixing with Medmar in the past months, with charter hire payments delayed for some days, but paid in full after a few days; our sources indicated no operative problems. Moreover, another ship owner source indicated that they have just agreed to fix one of their managed Supramaxes with Medmar.

Regarding feedback received from the marine fuels segment, past feedback received reported that Medmar used to be a slow payer, with some of our sources deciding to cut credit due to prolonged payment delays; the situation has reportedly improved in the past year, with suppliers extending credit lines of USD low-to-mid-six figures. Representatives from three bunker trading companies confirmed supplying Medmar's chartered-in units on 60-day terms; the subject usually settles invoices with delays that can reach up to 30 days, however, the average repayment period is 20 days over agreed terms.

# Sanctions Check

We have undertaken a search of consolidated sanctions/SDN lists based on the latest information from the US Office of Foreign Assets Control, the EU Common Foreign and Security Policy and the UK Treasury. As of 18 October 2018, our searches yielded the following results:

- Subject Company: Medmar Inc. - No match
- Directors: Not disclosed
- Perceived Ultimate Beneficial Owner: Donald McTaggart - No match

This report was produced on 12 June 2019 by Infospectrum for Jan Phillip Raune - Hamburg of Eagle Shipping International (USA) LLC

Infospectrum Ltd
60 St. Aldates Oxford OX1 1ST United Kingdom
Tel: +44(0) 1865 420400  Fax: +44(0) 1865 420401  Website: www.infospectrum.net

 **InfoSpectrum**

# Rating and Assessment

## Rating

Rating Date: 18 October 2018

|  | Opinion | Trend |
|---|---|---|
| Financial scale: | (+) USD 20m to USD 50m I/I | ↑ |
| Overall Performance: | (BB) | → |
| Payment Performance: | Delays but within sector norms. | ↑ |
| Credit Opinion: | USD 300,000 | → |
| Overall Rating: | 5 | → |
| Suggested Review Period: | 3 Months | → |

# Assessment

Operating from Greece, Medmar Inc., (Medmar) is a charter operating business founded by the late John McTaggart, and currently managed and perceived as controlled by his son, Greek shipping entrepreneur, Donald McTaggart. Medmar is the contractual counterparty for tonnage secured to support the company's spot cargo bookings based on the principals' long-term relationships with shippers and receivers in the Baltic Sea, Turkey, and Yemen, in particular. In recent years, the perceived owner, Donald McTaggart, divested from dry bulk ship owning and competitive operating, focusing on restructuring and re-sizing Medmar by focusing on tonnage provision for a small number of close clients. Management reported that this has been the main source of income in recent years, which has lowered the risk of the business seemingly with some success. In 2018, Medmar appears to be in an expansionary strategy; this expansion is set to, once again, restructure Medmar's operations, with the principals reportedly partnering with Greek investors and proceeding with the acquisitions of modern bulk carriers, which will

Infospectrum Ltd
60 St. Aldates Oxford OX1 1ST United Kingdom
Tel: +44(0) 1865 420400  Fax: +44(0) 1865 420401  Website: www.infospectrum.net

This report was produced on 12 June 2019 by Infospectrum for Jan Philip Raunio - Hamburg of Eagle Shipping International (USA) LLC



be reportedly commercially managed by Medmar upon their deliveries.

The recently-reported purchases of units suggest that the principals have access to funding. This improved position has also filtered through to the company's recently improved payment performance, with payments to ship owners and marine fuel companies still not in accordance with terms, but delays reported by our sources are, on average, within sector norms. On the basis of the information available, we feel that Medmar represents a reasonable risk for a modest business relationship, in keeping with the size and scope of the business; we suggest that payments and vessel delivery developments should be closely monitored.

This report was produced on 12 June 2019 by Infospectrum for Ian Philip Rouse - Hamburg of Eagle Shipping International (USA) LLC

Infospectrum Ltd
60 St. Aldates Oxford OX1 1ST United Kingdom
Tel: +44(0) 1865 420400  Fax: +44(0) 1865 420401  Website: www.infospectrum.net



# Rating Explanation

## Financial Scale Key
[size by turnover or estimation of turnover, + - indicates if the company is profitable (+) or loss making (-)]

- Turnover of USD 250m+
- USD 100m to USD 250m
- USD 50m to USD 100m
- USD 20m to USD 50m
- USD 5m to USD 20m
- Under USD 5m

## Overall Performance Key
[our perception of the company's performance relating to operational performance (in prevailing market conditions) and commercial morality]

AA = Excellent
A = Good
BB = Satisfactory

B = Some Concern
C = Poor
D = Liquidation/Not Operating

## Payment Performance Key
[our perception of the company's payment behaviour]

- Always to term or early
- Usually to terms/good
- Delays but within sector norms
- Late, beyond sector norms
- Severely late, default

## Overall Rating
[1-10 scale]

1 = Negligible – Risk of default is negligible
2 = Very Low – Very low risk counter party
3 = Low – Little risk of default
4 = Below Average – Moderate Risk
5 = Average – Adequate performance

6 = Above Average – Borderline/Marginal
7 = Vulnerable – Weak credit profile
8 = High – likely chance of default
9 = Very High – Under severe duress
10 = Extreme – Imminent default/Failure

## Credit Opinion
[suggested level of credit exposure in USD. If secured trading is the norm, this is indicated]

## Suggested Review Period
[prudent timescale to review account, in months]

## Trend

= Upwards, good, improved

= Stable, unchanged

= Declining, deterioration noted

## Assessment
[text facility for additional factors/remarks and/or explanation of rating]

## Additional Factors
N/A = Not available or not applicable
I/I = Insufficient Information

S/C = Special Circumstances – refer to text
PLG = Part of a large group

**Please note:** Ratings and performance guidelines are only valid at the date of issue of the report. They are provided under our terms of sale and are made in good faith. Reports should be used as a tool in assessing the subject and are not intended to be definitive judgments of the standing or worth of a company. The information provided should not be used as the sole basis or substitution for due diligence procedures by yourselves in deciding whether and how to trade with the subject company

Infospectrum Ltd
60 St. Aldates Oxford OX1 1ST United Kingdom
Tel: +44(0) 1865 420400  Fax: +44(0) 1865 420401  Website: www.infospectrum.net

This report was produced on 12 June 2019 by Infospectrum for Ian Phillip Reaurio - Hamburg of Eagle Shipping International (USA) LLC.





# Company PROFILE

# Medmar Inc.

Medmar Inc.

# Success
## in a
## competittive
# market



www.medmar.gr

## About
# Medmar

Medmar and its affiliates were founded in 1969. Established in response to requests from potential trading partners. The founder and Chairman of the company until his death in 2002 was John McTaggart. With his extensive experience in the chartering and operation of every type of vessel built us into one of the leading providers of chartering, brokering, management, agency and other specialised services to ship owners and charterers throughout the world.

The keystone of our corporate strategy is flexibility

Over the years, Medmar has established a core of key people with the expertise to put this strategy into action. With an established market reputation and with an emphasis on strategic shipping, we are able to provide our clients with a fully tailor-made range of services for all their worldwide shipping requirements.

All our offices are comprehensively equipped with the latest telecommunications and networked computing equipment, ensuring that contracts are rigorously analysed, identified, allocated, priced and monitored with exceptional speed.

Equally exceptional is the personal commitment of Medmar's highly experienced staff, which include a team of qualified marine superintendents carefully selected for their experience. After receiving additional training within Medmar, the superintendents travel the world to attend tonnage. They are also responsible for anticipating and resolving problems and facilitating loading and discharging operations.

We have continued to differentiate ourselves from our key competitors in a number of ways:

- The success of our forecasting
- Our insistence on a good working knowledge of the countries we trade, firmly based on acts
- The tactical exploitation of joint venture arrangements.

*As we approach our 50th anniversary, it is with pleasure that we note the progress of Medmar -and with eagerness that we look to the future. We are here to provide fully tailor-made worldwide services in commodities transportation, ship ownership and ship management.*

Medmar Inc. - Athens, Greece

1, Pakai Psatakoron Ave. & 3, Monifor Street - 17561 Paleo Falion - Greece
Tel: +30 210 48 05 500 Fax: +30 210 48 05 503, Email: info@medmar.gr  www.medmar.gr

Medmar Inc.

Our **Activities**

**Our principal activities**
- Trading
- Tonnage Chartering
- Vessel Operation
- Commercial Management
- Specialist Services
- Joint Ventures

## Trading

Medmar Inc. – Registered in Turks and Caicos Island, is a company that brings the expertise and financial support necessary for international energy trading to provide the better service and solutions to the end consumers in order to meet their energy needs within a fast growing markets. We are currently registered to trade with refineries, other trading companies, major oil companies, power providers, bunkering suppliers, and state oil companies.

We are focused on developing businesses in Latin America, Europe and West Africa by designing an dynamic trading network, supported by a stringent risk management system and providing specialized local solutions to face challenging energy issues in both developed and emerging market countries.

Medmar Inc. - Athens, Greece

1, Pallos Posidonos Ave. & 2, Moraitini Street - 17561 Palaio Faliro - Greece
Tel: +30 210 48 05 500 Fax: +30 210 48 05 503, Email: info@medmar.gr  www.medmar.gr

www.medmar.gr

Medmar Inc.

# Our **Activities**

**Our principal activities**

- Trading
- Tonnage Chartering
- Vessel Operation
- Contracts of Affreightment
- Specialist Services
- Joint Ventures

## Tonnage Chartering

It is our company's policy to provide high quality shipping services to first class cargo interests and hence chartering and operating vessels on time charter for one trip or for period, as well as on voyage basis.

The chartered in fleet, ranges from 'Handies' to 'Cape size', the size of vessels varying according to customer requirements and market conditions and operate world wide mainly under Contracts of Affreightments with some of the worlds largest companies including, Canadian Wheatboard, Bunge U.S.A., T. Klaveness, CSN Brasil, CSN Portugal, Toepfer Alfred C.Hamburg, Glencore, Transammonia AG Lanchen, Siderar Argentina, Exiros Argentina, Severstal Russia, OAO Karelsky Okatysh, Lalemant, Carbocol Bogota, Canadian Foodgrain, Cosco Singapore, Safmarine Johanneshurg, Sucden Kerry Int'l S.A, Ingwe Coal Corp., E.D & F Man Sugar, Dominiion Grain, Glegon International, Mount Isa Mines, BHP Transport, LKAB Sweden, Consol Sales Company, National Power PLC, Enel FTL S.P.A, SSM Coal B.V, Transcor AG, YECO, Kenana Sugar Co. Ltd, Abdullah Mohamed Fahem Yemen, Usiminas Brasil, Cargill International, Luis Dreyfus, Raymore, Hanjin, Canadian Forest Navigation, Oldendorf, Oetker etc.

Medmar Inc. – Athens, Greece

1, Palea Poulizoou Ave. & 3, Moraitini Street - 17561 Palaio Faliro - Greece
Tel: +30 210 48 05 500 Fax: +30 210 48 05 003, Email: info@medmar.gr www.medmar.gr

www.medmar.gr

Medmar Inc.

COMPANY PROFILE

Our **Activities**

### Our principal activities

- Trading
- Tonnage Chartering
- Vessel Operation
- Contracts of Affreightment
- Specialist Services
- Joint Ventures



## Vessel Operation

The Operations department's top priority is to ensure safe, smooth and economical running of the fleet and to ensure that the fleet's contractual obligations are met.

Among other things, our operations department's services include:

- Post-fixture support
- Issue voyage instructions
- Ensure the proper, safe and most efficient stowing of cargoes on board the vessels, as well as the quickest dispatch at both ends of the voyage
- Ensure ships perform as per the charter party agreements
- Ensure the safe and efficient carriage and delivery of cargoes
- Supervise the disbursement of all funds necessary to run the ships
- Arrange for freight/hire/demurrage collection
- Arrange for the provision of the vessels with bunkers
- It is also imperative to co-ordinate the implementation of, and compliance with, the plethora of ever-changing maritime codes and regulations governing international shipping.

The operations team includes a team of qualified marine superintendents carefully selected for their experience. After receiving additional training with Medmar, the superintendents travel the world to attend tonnage and they are also responsible for anticipating and resolving problems and facilitating loading and discharging operations.

Medmar Inc. - Athens, Greece

1, Paleo Psychico Ave. & 3, Moraitini Street - 17561 Paleo Faliro - Greece
Tel: +30 210 48 05 500 Fax: +30 210 48 05 603, Email: info@medmar.gr  www.medmar.gr

www.medmar.gr

Medmar Inc.

Our **Activities**

COMPANY PROFILE

### Our principal activities

- Trading
- Tonnage Chartering
- Vessel Operations
- **Contracts of Affreightment**
- Specialist Services
- Joint Ventures

## Contracts of Affreightment

Thanks to good relations of long standing with both public and some of the world's largest industrial private sector companies, the Group is asked every year to undertake a significant number of contracts. The Group concentrates on the carriage of various cargoes (mostly in bulk) such as coal, iron ore, bauxites, fertilizers, alumina, yellow corn, sugar, soya beans/meals/pellets and specializes in wheat from U.S.A, Canada, Australia, Black Sea and the Continent. Due to the multiplicity of contracts and on-going contracts of affreightment, the Group is able to provide shipowners with valuable openings into the global freight market. Arrangements can be geared to a shipowner's profile and include profit sharing.



www.medmar.gr

Medmar Inc. -

1, Paisa Possidonos Ave. & 3, Moraitini Street - 17561 Paleo Faliro - Greece
Tel: +30 210 48 05 500 Fax: +30 210 48 05 503, Email: info@medmar.gr  www.medmar.gr

Medmar Inc.

## Our **Activities**

**Our principal activities**

- Trading
- Tonnage Chartering
- Vessel Operation
- Commercial management
- Specialist Services
- Joint Ventures

## Specialist Services

We can attend a full range of management services in both joint-venture projects and for our own contracted tonnage. Acting often in conjunction with local experts, we are specialists in Greece, Egypt, Turkey , Libya , Yemen, Sudan, Antwerp and throughout Northern Europe, Brazil, Argentina (especially Upriver) and Finland in loading panamax/cape vessels during winter period.



Greece

1, Paleo Posidonos Ave. & 3, Moraïtini Street - 17561 Paleo Faliro - Greece.
Tel: +30 210 48 05 500 Fax: +30 210 48 05 503, Email: info@medmar.gr · www.medmar.gr

www.medmar.gr

Our **Activities**

### Our principal activities

- Trading
- Tonnage Chartering
- Vessel Operation
- Contracts of Affreightment
- Specialist Services
- Joint Ventures

## Joint Ventures

Medmar's contractual commitments and established market reputation enabled it to participate in both on and off-shore projects, including ship-owning until very recently. Medmar participated in a 50/50 joint venture with Sea Justice S.A. of which its current fleet consists of four bulk carriers, namely M/V ENDLESS of 73.427 tons deadweight built in 1999, M/V ANGELINA of 74.540 tons deadweight built in 2001, M/V ILIA of 80.309 tons deadweight built in 2011 and M/V INDIA of 80.254 tons deadweight built also in 2011. Medmar together with Sea Justice S.A. since their joint venture , which started in 1992 , and until its recent dissolution have owned and managed a total of 22 vessels varying from 26.000 tons handy size bulker to 125.000 tons OBO carrier.



www.medmar.gr

Medmar Inc. - Athens, Greece

1. Paleo Posidonos Ave. & 3, Moraitini Street - 17561 Paleo Faliro - Greece
Tel: +30 210 48 05 500 Fax: +30 210 48 05 500, Email : info@medmar.gr  www.medmar.gr

Medmar Inc.

COMPANY PROFILE

## Our
# CLIENTS

We are proud to offer high quality services to our multi-national clients, which include some of the below listed major companies



Yemen company for
Industrial Investment Ltd.

**Paterson Grain**
Founded in 1908 by the great Canadian entrepreneur Senator Norman M. Paterson, the Paterson brand has become a guarantee of integrity, quality and an exceptional customer first attitude.
Paterson Grain outperforms its competitors by maintaining an incomparable reputation and integrating itself into every facet of the grain industry. Paterson Grain is involved in seed sales, crop inputs, financial services to farmers, grain handling, grain exports, and through its sibling companies, transportation, milling, and consumer food products.

**Yemen Company for Industrial Investment Ltd.**
YCII, is one of the biggest food and industrial companies in Yemen, specializing in wheat, flour, corn and soya.



**Salif International for Trade and Investment Co. Ltd.**
Leading importer and exporter of sugar in Yemen.



*The DeLong Co., Inc.*

**Delong**
For over 100 years, The DeLong Co., Inc. provides information, products and services to the farming industry. In addition to being a grain elevator and major supplier of food grains domestically and internationally, The DeLong Co., Inc. also provides seed, fertilizer and chemical inputs and services for growers in Wisconsin and Illinois.


TORUNLAR GIDA

**Torunlar GIDA**
Torunlar Gida Sanayi ve Ticaret A.S. was founded in 1976 and is based in Istanbul, Turkey. The company produces, imports, and sells animal feed raw materials and oilseeds. It operates in cracking oilseeds; processing beetroots; and planting, processing, and cracking rice. The company offers paddy rice and raw/refined oils; and beef/sugar, including molasses and wet beet pulp. It also provides soybean and soybean pulp, sunflower seed and sunflower pulp, canola seed and canola pulp, corn, and wheat.

**Severstal**
Achieve more together

**Severstal Resurs**
Severstal is one of the world's leading vertically integrated steel and steel related mining companies. Karelskiy Okatysh is one of the leading and modern iron ore mining complexes in Russia. It produces 20% of Russian iron ore pellets.
www.severstal.com

# www.medmar.gr

Medmar Inc. - Athens, Greece

1, Palea Poseidonos Ave. & 3, Moraitini Street., 17561 Paleo Faliro - Greece
Tel: +30 210 48 65 500 Fax: +30 210 48 65 503, Email: info@medmar.gr www.medmar.gr

Medmar Inc.

COMPANY PROFILE

# ACCREDIATIONS

West of England

## Our P&I Club

The West of England is a leading mutual marine insurer providing its worldwide membership of shipowners, charterers and operators with liability insurance and related services. It also safeguards and promotes its Members' interests in many other areas of their business.

## ISO 9001 Certified

In 1997, Medmar, as befits a modern progressive company, obtained and annually maintains the EN ISO 9001 Certificate of Quality Management System, accredited by Lloyd's Register of Shipping.

BIMCO

## Proud Members of BIMCO.

The Baltic and International Maritime Council (BIMCO) is the largest of the international shipping associations representing shipowners;



Medmar Inc. - Athens, Greece

1, Plea Possidonor Ave. & 3, Moraitis Street , 17561 Palko Faliro - Greece
Tel +30 210 48 05 500 Fax +30 210 48 05 503, Email: info@medmar.gr  www.medmar.gr

www.medmar.gr

# CONTACT us



www.medmar.gr

For Enquiries on Administration:
management@medmar.gr

For Enquiries on Chartering:
chartering@medmar.gr

For Enquiries on Operation:
operation@medmar.gr

Medmar Inc. - Athens, Greece

1,Palea Posidonos Ave. & 3 ,Moraitoi Street - 17561 Paleo Faliro - Greece
Tel: +30 210 48 05 500 Fax: +30 210 48 05 503, Email: info@medmar.gr www.medmar.gr

**Oleary, Patrick**

| | |
|---|---|
| **From:** | msavaglio |
| **Sent:** | Tuesday, August 13, 2019 12:25 PM |
| **To:** | mail@londonshipbroking.com |
| **Cc:** | Eagle Postfix; Eagle Accounting |
| **Subject:** | Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141086> |
| **Attachments:** | NLE Hire Aug 14-17.pdf |

Good Day,

Please find our Hire Invoice for period upto est  redelivery which is due Tomorrow, August 14

Thanks

Best Regards

**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

---

**From:** mail@londonshipbroking.com
**Sent:** 8/13/2019 1:12:52 PM
**To:** operations@eagleships.com
**Subject:** Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141086>

[External Email - Please use caution]

London Shipbroking Co. Ltd., c/o The Baltic Exchange, 38 St. Mary Axe, London EC3A 8BH
Tel: MF direct: +44 207 993 5761; JW direct: +44 207 993 2452
Email: mail@londonshipbroking.com

Date: 13/08/2019, Time: 18:11:44, Our Ref: 202665-JHN  Fw: MV NEW LONDON EAGLE D1418/Z2250 **
MSG#:<141086>

Ed/John
cc ops/pf

qte

1



=Msg fr Owners=

Re: M/V New London Eagle / Acc Medmar CP DD 10.06.2019 / Redelivery Notice
---

Kindly note that as per vessel's present available information, we hereby tender our redelivery notice and advise Owners that we expect subject vessel to be redelivered dlosp Shanghai on about 17.08.2019 agw wp wog uce.

This is to serve as 4 days redelivery notice.

Above notice is given in good faith, always without prejudice and without guarantee, and basis current available information which is always subject to change.

Further notices to follow.

Best regards
Ops Dpt

unq


+
Thanks and best regards
John Weir
Dir: +44 207 993 2452
Mob: +44 7802 600 985


[Message sent via SOFTWAY Communicator]



NEW LONDON EAGLE LLC
C/O EAGLE SHIPPING INTERNATIONAL USA LLC
300, FIRST STAMFORD PLACE, STAMFORD

UNITED STATES

# Hire Payment

To:  Medmar Inc.
122, Blue Mountain Road
p.o. box 127
Providencials - Turks and Caicos Islands
British West Indies
TURKS AND CAICOS ISLANDS

Invoice Date: 08/08/2019
Invoice Number: 015129TCOB
Due Date: 08/08/2019

## Transit Details

| Vessel/Voyage: | NEW LONDON EAGLE/201905 |
| CP Date: | 06/10/2019 |

| Delivery Port: | CORPUS CHRISTI |
| Redelivery Port: | SHANGHAI |

## Invoice Details

| Line Item | Amount (USD) |
| --- | --- |
| Hire 3.0000000 days (08/14/19 14:00 GMT - 08/17/19 14:00 GMT) @ USD 19,500.00/day | 58,500.00 |
| Hire Commission For LONDON SHIPBROKING (1.25%) | (731.25) |
| Hire Address Commission (3.75%) | (2,193.75) |
| Victualling For Period | 150.00 |
| Total Due: | 55,725.00 |

## Terms and Instructions

| | |
| --- | --- |
| Payment Terms: | |
| Due To: | NEW LONDON EAGLE LLC |
| Beneficiary Bank: | ABN AMRO BANK N.V. AMSTERDAM 1082 PP AMSTERDAM GUSTAV MAHLERLAAN 10 AMSTERDAM 1082 PP AMSTERDAM |
| Comment: | |
| Payment Reference: | 015129TCOB |
| Swift Code: | ABNANL2A |
| Account Number: | 809420686 |
| IBAN: | NL68ABNA0809420686 |

From: "mail@londonshipbroking.com" <mail@londonshipbroking.com>
Sent: Wednesday, August 14, 2019, 9:22 AM
To: Eagle Operations <operations@eagleships.com>
Cc: Eagle Postfix <postfix@eagleships.com>; Eagle Accounting
<EagleAccounting@eagleships.com>
Subject: Re: Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141086>

---

[External Email - Please use caution]

London Shipbroking Co. Ltd., c/o The Baltic Exchange, 38 St. Mary Axe, London
EC3A 8BH
Tel: MF direct: +44 207 993 5761; JW direct: +44 207 993 2452
Email: mail@londonshipbroking.com

Date: 14/08/2019, Time: 15:21:04, Our Ref: 202685-JHN  Re: Re: Fw: MV NEW
LONDON EAGLE D1418/Z2250 ** MSG#:<141086>

Michael/John

qte
=======msg to owners ====


Owners last well received.

In view of vessel's imminent redelivery, and in order to avoid multiple
transactions,
Charterers intend to proceed with settlement of PFHS immediately after
vessel's redelivery.

Owners understanding and assistance will be highly appreciated.

Many thanks in advance for Owners cooperation.



Thanks & Best Regards
unq

+
Thanks and best regards
John Weir
Dir: +44 207 993 2452
Mob: +44 7802 600 985


[Message sent via SOFTWAY Communicator]

---Original Message---
From: Eagle Operations < operations@eagleships.com >
To: "mail@londonshipbroking.com" < mail@londonshipbroking.com >
CC: Eagle Postfix < postfix@eagleships.com >, Eagle Accounting <
EagleAccounting@eagleships.com >

EXHIBIT
3

Subject: Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141086>
Date: Tue, 13 Aug 2019 17:24:04 +0000


Good Day,

Please find our Hire Invoice for period upto est  redelivery which is due
Tomorrow, August 14

Thanks

Best Regards

Michael Savaglio
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
https://protect-us.mimecast.com/s/a5kTCBBvkpTvk6lcz2RjE?domain=eagleships.com




From: mail@londonshipbroking.com
Sent: 8/13/2019 1:12:52 PM
To: operations@eagleships.com
Subject: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141086>

[External Email - Please use caution]

London Shipbroking Co. Ltd., c/o The Baltic Exchange, 38 St. Mary Axe, London
EC3A 8BH
Tel: MF direct: +44 207 993 5761; JW direct: +44 207 993 2452
Email: mail@londonshipbroking.com

Date: 13/08/2019, Time: 18:11:44, Our Ref: 202665-JHN  Fw: MV NEW LONDON
EAGLE D1418/Z2250 ** MSG#:<141086>


Ed/John
cc ops/pf

qte

=Msg fr Owners=

Re: M/V New London Eagle / Acc Medmar CP DD 10.06.2019 / Redelivery Notice
---

Kindly note that as per vessel's present available information, we hereby
tender our

redelivery notice and advise Owners that we expect subject vessel to be redelivered
dlosp Shanghai on about 17.08.2019 agw wp wog uce.

This is to serve as 4 days redelivery notice.

Above notice is given in good faith, always without prejudice and without guarantee,
and basis current available information which is always subject to change.

Further notices to follow.

Best regards
Ops Dpt

unq


+
Thanks and best regards
John Weir
Dir: +44 207 993 2452
Mob: +44 7802 600 985


[Message sent via SOFTWAY Communicator]

From: xyu
Sent: Sunday, August 18, 2019, 8:57 PM
To: Medmar Operations <operation@medmar.gr>
Subject: Re: MV New London Eagle - AGM inspection OLDMSG#:<141448> ** MSG#:<141470>

Good day sirs,
We are pleased to confirm again AGM inspection was timely managed and done at discharge berth in Shanghai by owners local agents without delay to ship schedule.
We shalll revert vouchers for AGM inspection and owners agency fees for your payment shortly.
Mr. Xin Yu
Senior Operations Manager
Eagle Bulk Pte Ltd
Direct: 65 6508 6887
Mobile: 65 8218 3588
Email: operations@eagleships.com

From: Medmar Operations <operation@medmar.gr>
Sent: 8/18/2019 11:11:22 PM
To: xyu@eagleships.com
Cc: operations@eagleships.com
Subject: RE: Re: MV New London Eagle - AGM inspection OLDMSG#:<141448> ** MSG#:<141470>
[External Email - Please use caution]
DATE: 18-Aug-2019 18:18
MSG : 141470
Dear mr Xin,
Accept our thnx in services offered through our this smooth t/c period with your vessel and ops team.
Thanks in particular for the last stage support at dis port with the AGM cert issue.
Medmar inc will undertake costs incurred in our favor.
Looking forward to future t/c occasions with Eagle organization .
Kind Regards
Medmar Cpt Marios Bisbikis
_____Original Message_____
FROM:Yu Xin <xyu@eagleships.com>
Good day Capt
Have you got confirmation from local chtrs agents that AGM is arranged?
Xin
Get Outlook for Android<https://aka.ms/ghei36>

From: New London Eagle <069newlondoneagle@vesselmail.org>
Sent: Saturday, August 17, 2019 2:52:15 PM
To: Medmar Operations <operation@medmar.gr>
Cc: Yu Xin <xyu@eagleships.com>; Wang Duanwei <dwang@eagleships.com>; Eagle Operations <operations@eagleships.com>; fc@fcshipping.com.cn <fc@fcshipping.com.cn>
Subject: Re: MV New London Eagle - AGM inspection ** MSG#:<141448>
Good Day Dear Cpt Marios,
Thanks for your message which well noted.



RIC, Fc shipping pls urgently arrange AGM inspection to our ship in Shanghai before departure from berth. Cost to be covered under Medmar Chrts Pda account as per message below.

---

Thanks and Best Regards,
Capt. Yuriy Bondar
Master of the mv New London Eagle
IOP Voice ?+881677752471? (Bridge)
IOP Voice ?+881677752472 (Master)
Cell Phone : +372 54823555
On 17-08-2019 06:27, Medmar Operations wrote:
> DATE: 17-Aug-2019 09:27
> MSG : 141448
>
>
> Dear cpt Yuriy,
>
> pls go ahead in arrangments of our attending agents Fc shipping.
> cost to be covered under Medmar-chrts Pda account.
>
>
>
>
> Thanks & Best Regards
>
>
> Cpt Marios Bisbikis
> TEL.: +30 210 480 55 21/22
> MOB.: +30 694 453 65 14
>
>
>
>
>
>
>
>
>
>
> _____ Original Message _____
>
> Received Inc.MSG.: 6729000 Date: Sat 17/Aug/2019 09:21 (UTC
> +03:00)
> From: <New London Eagle <069newlondoneagle@vesselmail.org>
> To : Medmar Operations <operation@medmar.gr>
> Cc : Yu Xin <xyu@eagleships.com>, Wang Duanwei <dwang@eagleships.com>,
> Eagle Operations <operations@eagleships.com>, <fc@fcshipping.com.cn>

> Subject: MV New London Eagle - AGM inspection
>
> _____
> Good day Dear Sirs,
>
> Please urgently arrange AGM inspection to our ship in Shanghai before
> departure from berth as per CP.
>
> ---
> Thanks and Best Regards,
> Capt. Yuriy Bondar
> Master of the mv New London Eagle
> IOP Voice ?+881677752471? (Bridge)
> IOP Voice ?+881677752472 (Master)
> Cell Phone : +372 54823555
>
> On 17-08-2019 03:37, Yu Xin wrote:
> Good day Capt
>
> Reverting the instruction.
>
> Ref AGM inspection
>
> Current time charterers and charterers must arrange AGM inspection to
> your ship in shanghai before ship departure from berth.
>
> Please urgently check with current time charterers and ask them to
> arrange AGM inspection for your ship as per CP.
>
> Thank you
>
> Xin Yu
>
> Eagle Bulk
>
>
> _____
> Sent with Danaos Info@GATE Communication Software
_____
Sent with Danaos Info@GATE Communication Software

From: msavaglio
Sent: Tuesday, August 27, 2019, 9:24 AM
To: "mail@londonshipbroking.com" <mail@londonshipbroking.com>
Cc: Eagle Postfix <postfix@eagleships.com>
Subject: Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>

Good Day,
Owners wish to thank Charterers for a smooth fixture
Unless overlooked, we cannot trace Charterers FHS., Could Charterers please revert with same so we can reconcile voyage?
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

**From:** mail@londonshipbroking.com
**Sent:** 8/19/2019 4:11:03 AM
**To:** operations@eagleships.com
**Cc:** postfix@eagleships.com
**Subject:** Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
[External Email - Please use caution]
London Shipbroking Co. Ltd., c/o The Baltic Exchange, 38 St. Mary Axe, London EC3A 8BH
Tel: MF direct: +44 207 993 5761; JW direct: +44 207 993 2452
Email: mail@londonshipbroking.com
Date: 19/08/2019, Time: 09:09:32, Our Ref: 202749-MIK Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Ed/Mike
good day.
Received from Chtrs over the weekend:
qte
Re: M/V New London Eagle / Acc Medmar CP DD 10.06.2019 / Redelivery Notice
---
Kindly note that as per vessel's present available information, we hereby tender our redelivery notice and advise Owners that we expect subject vessel to be redelivered dlosp Shanghai on 18.08.2019 agw wp wog uce.
This is to serve as 1 day definite redelivery notice.
Above notice is given in good faith, always without prejudice and without guarantee, and basis current available information which is always subject to change.
Best regards
Ops Dpt


EXHIBIT
5

unqte
rgds
Thanks and best regards
Michael Fisher
Direct: +44 207 993 5761
Mobile: +44 7768 943 190
[Message sent via SOFTWAY Communicator]

From: Eagle Operations <operations@eagleships.com>
Sent: Thursday, August 29, 2019, 10:11 AM
To: "mail@londonshipbroking.com" <mail@londonshipbroking.com>
Cc: Eagle Postfix <postfix@eagleships.com>
Subject: Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Attachments: TC Out Hire Statement Report (74).pdf

Good Day,
Please find Owners FHS,
Please advise remittance details of large outstanding balance
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

__
**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 8/27/2019 10:24:27 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Good Day,
Owners wish to thank Charterers for a smooth fixture
Unless overlooked, we cannot trace Charterers FHS., Could Charterers please revert with same so we
can reconcile voyage?
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

__
**From:** mail@londonshipbroking.com
**Sent:** 8/19/2019 4:11:03 AM
**To:** operations@eagleships.com
**Cc:** postfix@eagleships.com
**Subject:** Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
[External Email - Please use caution]



London Shipbroking Co. Ltd., c/o The Baltic Exchange, 38 St. Mary Axe, London EC3A 8BH
Tel: MF direct: +44 207 993 5761; JW direct: +44 207 993 2452
Email: mail@londonshipbroking.com
Date: 19/08/2019, Time: 09:09:32, Our Ref: 202749-MIK Fw: MV NEW LONDON EAGLE D1418/Z2250 **
MSG#:<141460>
Ed/Mike
good day.
Received from Chtrs over the weekend:
qte
Re: M/V New London Eagle / Acc Medmar CP DD 10.06.2019 / Redelivery Notice
---
Kindly note that as per vessel's present available information, we hereby tender our
redelivery notice and advise Owners that we expect subject vessel to be redelivered
dlosp Shanghai on 18.08.2019 agw wp wog uce.
This is to serve as 1 day definite redelivery notice.
Above notice is given in good faith, always without prejudice and without guarantee,
and basis current available information which is always subject to change.
Best regards
Ops Dpt
unqte
rgds
Thanks and best regards
Michael Fisher
Direct: +44 207 993 5761
Mobile: +44 7768 943 190
[Message sent via SOFTWAY Communicator]



# Hire Statement

**Vessel: NEW LONDON EAGLE**        **CP Date: Jun 10 2019**        **Charterer: Medmar Inc.**

**Delivery: Jun 24 2019**        **Redelivery: Aug 18 2019**        **Printed On: Aug 29 2019**

**Gross Hire**

| | | |
|---|---|---|
| 06/24/19 14:00 - 08/18/19 10:15, 54.843750 @ 19,500.00 | | 1,069,453.13 |
| 100.00 % OFF HIRE-HOLD CLEANING (06/24/19 14:24 - 06/26/19 08:45, 1.764583 Days) | 34,409.38 | |
| Total Off Hire | | (34,409.38) |
| Net Hire | | 1,035,043.75 |

**Hire Commissions**

| | |
|---|---|
| Commission For LONDON SHIPBROKING (06/24/19 14:00 - 08/18/19 10:15, 1.25%) | (13,368.16) |
| Address Commission (06/24/19 14:00 - 08/18/19 10:15, 3.75%) | (40,104.49) |
| 100.00 % OFF HIRE Commission For LONDON SHIPBROKING (06/24/19 14:24 - 06/26/19 08:45, 1.25%) | 430.12 |
| 100.00 % OFF HIRE Address Commission (06/24/19 14:24 - 06/26/19 08:45, 3.75%) | 1,290.35 |
| Total Hire Commissions | (51,752.19) |

**Bunker Value on Delivery**

| | | |
|---|---|---|
| IFO Delivery (524.900 MT @425.00) | 223,082.50 | |
| LGO Delivery (169.400 MT @675.00) | 114,345.00 | |
| Total Bunker Value At Delivery | | 337,427.50 |

**Bunker Value on Redelivery**

| | | |
|---|---|---|
| IFO Redelivery (458.200 MT @425.00) | 194,735.00 | |
| LGO Redelivery (133.000 MT @675.00) | 89,775.00 | |
| Total Bunker Value At Redelivery | | (284,510.00) |

| | |
|---|---|
| Victualling @ 50.00 / Day (06/24/19 14:00-08/18/19 10:15) | 2,742.19 |
| Total Victualling | 2,653.96 |

**Owner's Expenses**

| | | |
|---|---|---|
| Rebill, Vendor: SINOPOS, Inv. No.: 201908004 AGM INSPECTION (015248TCOB, 08/27/2019) | 2,207.26 | |
| Total Owner's Expenses | | 2,207.26 |

**Other Adjustment**

| | | |
|---|---|---|
| 100.00 % OFF HIRE LGO 5.294 MT @ 675.00 (06/24/19 14:24 - 06/26/19 08:45, 1.764583 Days) | (3,573.45) | |
| ILOHC (015248TCOB, 08/27/2019) | 5,000.00 | |
| Dockage during Holds cleaning (015147TCOB, 08/13/2019) | (34,815.82) | |
| Total Adjustment | | (33,389.27) |

**Payment**

| | |
|---|---:|
| Amount Received On 07/02/2019 | 546,700.46 |
| Amount Received On 07/15/2019 | 278,625.00 |
| Amount Received On 08/05/2019 | 50,921.53 |
| Total Amount Received | (876,246.99) |
| Balance In Owner's Favor | 131,434.02 |

From: Eagle Operations <operations@eagleships.com>
Sent: Friday, August 30, 2019, 9:09 AM
To: "mail@londonshipbroking.com" <mail@londonshipbroking.com>
Cc: Eagle Postfix <postfix@eagleships.com>
Subject: Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>

Good Day,
Please advise
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 8/29/2019 11:10:39 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Good Day,
Please find Owners FHS,
Please advise remittance details of large outstanding balance
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 8/27/2019 10:24:27 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Good Day,
Owners wish to thank Charterers for a smooth fixture

EXHIBIT 7

Unless overlooked, we cannot trace Charterers FHS., Could Charterers please revert with same so we can reconcile voyage?
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

___

**From:** mail@londonshipbroking.com
**Sent:** 8/19/2019 4:11:03 AM
**To:** operations@eagleships.com
**Cc:** postfix@eagleships.com
**Subject:** Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
[External Email - Please use caution]
London Shipbroking Co. Ltd., c/o The Baltic Exchange, 38 St. Mary Axe, London EC3A 8BH
Tel: MF direct: +44 207 993 5761; JW direct: +44 207 993 2452
Email: mail@londonshipbroking.com
Date: 19/08/2019, Time: 09:09:32, Our Ref: 202749-MIK Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Ed/Mike
good day.
Received from Chtrs over the weekend:
qte
Re: M/V New London Eagle / Acc Medmar CP DD 10.06.2019 / Redelivery Notice
---

Kindly note that as per vessel's present available information, we hereby tender our redelivery notice and advise Owners that we expect subject vessel to be redelivered dlosp Shanghai on 18.08.2019 agw wp wog uce.
This is to serve as 1 day definite redelivery notice.
Above notice is given in good faith, always without prejudice and without guarantee, and basis current available information which is always subject to change.
Best regards
Ops Dpt
unqte
rgds
Thanks and best regards
Michael Fisher
Direct: +44 207 993 5761
Mobile: +44 7768 943 190
[Message sent via SOFTWAY Communicator]

From: msavaglio
Sent: Tuesday, September 3, 2019, 7:30 AM
To: "mail@londonshipbroking.com" <mail@londonshipbroking.com>
Cc: Eagle Postfix <postfix@eagleships.com>
Subject: Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Attachments: Re: Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141086>.eml; Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>.eml; Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>(1).eml; Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>(2).eml

To: London Ship Broking
From: Eagle Shipping International (USA) LLC
Re: New London Eagle / MEDMAR Final Hire
Good Day,
Subject Vessel redelivered to Owners on August 18, 2019. As per Owners FHS there is a balance of $131,434.02 Due Owners which is now substantially overdue
As per Charterers, they stated that they would settle outstanding balance promptly upon redelivery. As of today we regret that we have not received any response from Charterers or your office which is disappointing to say the least.
Owners appreciate Charterers good cooperation during this fixture, however this delay in settlement is unacceptable and must be rectified without further delay.
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

---

**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 8/30/2019 10:08:41 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Good Day,
Please advise
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com


EXHIBIT
8

**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 8/29/2019 11:10:39 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Good Day,
Please find Owners FHS,
Please advise remittance details of large outstanding balance
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 8/27/2019 10:24:27 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Good Day,
Owners wish to thank Charterers for a smooth fixture
Unless overlooked, we cannot trace Charterers FHS., Could Charterers please revert with same so we
can reconcile voyage?
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

**From:** mail@londonshipbroking.com
**Sent:** 8/19/2019 4:11:03 AM
**To:** operations@eagleships.com
**Cc:** postfix@eagleships.com
**Subject:** Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
[External Email - Please use caution]

London Shipbroking Co. Ltd., c/o The Baltic Exchange, 38 St. Mary Axe, London EC3A 8BH
Tel: MF direct: +44 207 993 5761; JW direct: +44 207 993 2452
Email: mail@londonshipbroking.com
Date: 19/08/2019, Time: 09:09:32, Our Ref: 202749-MIK Fw: MV NEW LONDON EAGLE D1418/Z2250 **
MSG#:<141460>
Ed/Mike
good day.
Received from Chtrs over the weekend:
qte
Re: M/V New London Eagle / Acc Medmar CP DD 10.06.2019 / Redelivery Notice
---
Kindly note that as per vessel's present available information, we hereby tender our
redelivery notice and advise Owners that we expect subject vessel to be redelivered
dlosp Shanghai on 18.08.2019 agw wp wog uce.
This is to serve as 1 day definite redelivery notice.
Above notice is given in good faith, always without prejudice and without guarantee,
and basis current available information which is always subject to change.
Best regards
Ops Dpt
unqte
rgds
Thanks and best regards
Michael Fisher
Direct: +44 207 993 5761
Mobile: +44 7768 943 190
[Message sent via SOFTWAY Communicator]

From: "mail@londonshipbroking.com" <mail@londonshipbroking.com>
Sent: Wednesday, August 14, 2019, 9:22 AM
To: Eagle Operations <operations@eagleships.com>
Cc: Eagle Postfix <postfix@eagleships.com>; Eagle Accounting
<EagleAccounting@eagleships.com>
Subject: Re: Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141086>

---

[External Email - Please use caution]

London Shipbroking Co. Ltd., c/o The Baltic Exchange, 38 St. Mary Axe, London
EC3A 8BH
Tel: MF direct: +44 207 993 5761; JW direct: +44 207 993 2452
Email: mail@londonshipbroking.com

Date: 14/08/2019, Time: 15:21:04, Our Ref: 202685-JHN  Re: Re: Fw: MV NEW
LONDON EAGLE D1418/Z2250 ** MSG#:<141086>

Michael/John

qte
=======msg to owners ====


Owners last well received.

In view of vessel's imminent redelivery, and in order to avoid multiple
transactions,
Charterers intend to proceed with settlement of PFHS immediately after
vessel's redelivery.

Owners understanding and assistance will be highly appreciated.

Many thanks in advance for Owners cooperation.


Thanks & Best Regards
unq

+
Thanks and best regards
John Weir
Dir: +44 207 993 2452
Mob: +44 7802 600 985


[Message sent via SOFTWAY Communicator]

---Original Message---
From: Eagle Operations < operations@eagleships.com >
To: "mail@londonshipbroking.com" < mail@londonshipbroking.com >
CC: Eagle Postfix < postfix@eagleships.com >, Eagle Accounting <
EagleAccounting@eagleships.com >

Subject: Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141086>
Date: Tue, 13 Aug 2019 17:24:04 +0000


Good Day,

Please find our Hire Invoice for period upto est  redelivery which is due
Tomorrow, August 14

Thanks

Best Regards

Michael Savaglio
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
https://protect-us.mimecast.com/s/a5kTCBBvkpTvk6lcz2RjE?domain=eagleships.com

_____

From: mail@londonshipbroking.com
Sent: 8/13/2019 1:12:52 PM
To: operations@eagleships.com
Subject: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141086>

[External Email - Please use caution]

London Shipbroking Co. Ltd., c/o The Baltic Exchange, 38 St. Mary Axe, London
EC3A 8BH
Tel: MF direct: +44 207 993 5761; JW direct: +44 207 993 2452
Email: mail@londonshipbroking.com

Date: 13/08/2019, Time: 18:11:44, Our Ref: 202665-JHN  Fw: MV NEW LONDON
EAGLE D1418/Z2250 ** MSG#:<141086>


Ed/John
cc ops/pf

qte

=Msg fr Owners=

Re: M/V New London Eagle / Acc Medmar CP DD 10.06.2019 / Redelivery Notice
---

Kindly note that as per vessel's present available information, we hereby
tender our

redelivery notice and advise Owners that we expect subject vessel to be
redelivered
dlosp Shanghai on about 17.08.2019 agw wp wog uce.

This is to serve as 4 days redelivery notice.

Above notice is given in good faith, always without prejudice and without
guarantee,
and basis current available information which is always subject to change.

Further notices to follow.

Best regards
Ops Dpt

unq


+
Thanks and best regards
John Weir
Dir: +44 207 993 2452
Mob: +44 7802 600 985


[Message sent via SOFTWAY Communicator]

From: Eagle Operations <operations@eagleships.com>
Sent: Friday, August 30, 2019, 9:09 AM
To: "mail@londonshipbroking.com" <mail@londonshipbroking.com>
Cc: Eagle Postfix <postfix@eagleships.com>
Subject: Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>

---

Good Day,
Please advise
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

---

**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 8/29/2019 11:10:39 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Good Day,
Please find Owners FHS,
Please advise remittance details of large outstanding balance
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

---

**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 8/27/2019 10:24:27 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Good Day,
Owners wish to thank Charterers for a smooth fixture

Unless overlooked, we cannot trace Charterers FHS., Could Charterers please revert with same so we can reconcile voyage?
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

**From:** mail@londonshipbroking.com
**Sent:** 8/19/2019 4:11:03 AM
**To:** operations@eagleships.com
**Cc:** postfix@eagleships.com
**Subject:** Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
[External Email - Please use caution]
London Shipbroking Co. Ltd., c/o The Baltic Exchange, 38 St. Mary Axe, London EC3A 8BH
Tel: MF direct: +44 207 993 5761; JW direct: +44 207 993 2452
Email: mail@londonshipbroking.com
Date: 19/08/2019, Time: 09:09:32, Our Ref: 202749-MIK Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Ed/Mike
good day.
Received from Chtrs over the weekend:
qte
Re: M/V New London Eagle / Acc Medmar CP DD 10.06.2019 / Redelivery Notice
---
Kindly note that as per vessel's present available information, we hereby tender our redelivery notice and advise Owners that we expect subject vessel to be redelivered dlosp Shanghai on 18.08.2019 agw wp wog uce.
This is to serve as 1 day definite redelivery notice.
Above notice is given in good faith, always without prejudice and without guarantee, and basis current available information which is always subject to change.
Best regards
Ops Dpt
unqte
rgds
Thanks and best regards
Michael Fisher
Direct: +44 207 993 5761
Mobile: +44 7768 943 190
[Message sent via SOFTWAY Communicator]

From: Eagle Operations <operations@eagleships.com>
Sent: Thursday, August 29, 2019, 10:11 AM
To: "mail@londonshipbroking.com" <mail@londonshipbroking.com>
Cc: Eagle Postfix <postfix@eagleships.com>
Subject: Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Attachments: TC Out Hire Statement Report (74).pdf

Good Day,
Please find Owners FHS,
Please advise remittance details of large outstanding balance
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 8/27/2019 10:24:27 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Good Day,
Owners wish to thank Charterers for a smooth fixture
Unless overlooked, we cannot trace Charterers FHS., Could Charterers please revert with same so we
can reconcile voyage?
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

**From:** mail@londonshipbroking.com
**Sent:** 8/19/2019 4:11:03 AM
**To:** operations@eagleships.com
**Cc:** postfix@eagleships.com
**Subject:** Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
[External Email - Please use caution]

London Shipbroking Co. Ltd., c/o The Baltic Exchange, 38 St. Mary Axe, London EC3A 8BH
Tel: MF direct: +44 207 993 5761; JW direct: +44 207 993 2452
Email: mail@londonshipbroking.com
Date: 19/08/2019, Time: 09:09:32, Our Ref: 202749-MIK Fw: MV NEW LONDON EAGLE D1418/Z2250 **
MSG#:<141460>
Ed/Mike
good day.
Received from Chtrs over the weekend:
qte
Re: M/V New London Eagle / Acc Medmar CP DD 10.06.2019 / Redelivery Notice
---
Kindly note that as per vessel's present available information, we hereby tender our
redelivery notice and advise Owners that we expect subject vessel to be redelivered
dlosp Shanghai on 18.08.2019 agw wp wog uce.
This is to serve as 1 day definite redelivery notice.
Above notice is given in good faith, always without prejudice and without guarantee,
and basis current available information which is always subject to change.
Best regards
Ops Dpt
unqte
rgds
Thanks and best regards
Michael Fisher
Direct: +44 207 993 5761
Mobile: +44 7768 943 190
[Message sent via SOFTWAY Communicator]



# Hire Statement

**Vessel: NEW LONDON EAGLE**        **CP Date: Jun 10 2019**        **Charterer: Medmar Inc.**

**Delivery: Jun 24 2019**        **Redelivery: Aug 18 2019**        **Printed On: Aug 29 2019**

**Gross Hire**

| | | |
|---|---:|---:|
| 06/24/19 14:00 - 08/18/19 10:15, 54.843750 @ 19,500.00 | | 1,069,453.13 |
| 100.00 % OFF HIRE-HOLD CLEANING (06/24/19 14:24 - 06/26/19 08:45, 1.764583 Days) | 34,409.38 | |
| Total Off Hire | | (34,409.38) |
| Net Hire | | 1,035,043.75 |

**Hire Commissions**

| | |
|---|---:|
| Commission For LONDON SHIPBROKING (06/24/19 14:00 - 08/18/19 10:15, 1.25%) | (13,368.16) |
| Address Commission (06/24/19 14:00 - 08/18/19 10:15, 3.75%) | (40,104.49) |
| 100.00 % OFF HIRE Commission For LONDON SHIPBROKING (06/24/19 14:24 - 06/26/19 08:45, 1.25%) | 430.12 |
| 100.00 % OFF HIRE Address Commission (06/24/19 14:24 - 06/26/19 08:45, 3.75%) | 1,290.35 |
| Total Hire Commissions | (51,752.19) |

**Bunker Value on Delivery**

| | | |
|---|---:|---:|
| IFO Delivery (524.900 MT @425.00) | 223,082.50 | |
| LGO Delivery (169.400 MT @675.00) | 114,345.00 | |
| Total Bunker Value At Delivery | | 337,427.50 |

**Bunker Value on Redelivery**

| | | |
|---|---:|---:|
| IFO Redelivery (458.200 MT @425.00) | 194,735.00 | |
| LGO Redelivery (133.000 MT @675.00) | 89,775.00 | |
| Total Bunker Value At Redelivery | | (284,510.00) |

| | |
|---|---:|
| Victualling @ 50.00 / Day (06/24/19 14:00-08/18/19 10:15) | 2,742.19 |
| Total Victualling | 2,653.96 |

**Owner's Expenses**

| | | |
|---|---:|---:|
| Rebill, Vendor: SINOPOS, Inv. No.: 201908004 AGM INSPECTION (015248TCOB, 08/27/2019) | 2,207.26 | |
| Total Owner's Expenses | | 2,207.26 |

**Other Adjustment**

| | | |
|---|---:|---:|
| 100.00 % OFF HIRE LGO 5.294 MT @ 675.00 (06/24/19 14:24 - 06/26/19 08:45, 1.764583 Days) | (3,573.45) | |
| ILOHC (015248TCOB, 08/27/2019) | 5,000.00 | |
| Dockage during Holds cleaning (015147TCOB, 08/13/2019) | (34,815.82) | |
| Total Adjustment | | (33,389.27) |

**Payment**

| | |
|---|---:|
| Amount Received On 07/02/2019 | 546,700.46 |
| Amount Received On 07/15/2019 | 278,625.00 |
| Amount Received On 08/05/2019 | 50,921.53 |
| Total Amount Received | (876,246.99) |
| Balance In Owner's Favor | 131,434.02 |

From: msavaglio
Sent: Tuesday, August 27, 2019, 9:24 AM
To: "mail@londonshipbroking.com" <mail@londonshipbroking.com>
Cc: Eagle Postfix <postfix@eagleships.com>
Subject: Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>

Good Day,
Owners wish to thank Charterers for a smooth fixture
Unless overlooked, we cannot trace Charterers FHS., Could Charterers please revert with same so we
can reconcile voyage?
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

**From:** mail@londonshipbroking.com
**Sent:** 8/19/2019 4:11:03 AM
**To:** operations@eagleships.com
**Cc:** postfix@eagleships.com
**Subject:** Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
[External Email - Please use caution]
London Shipbroking Co. Ltd., c/o The Baltic Exchange, 38 St. Mary Axe, London EC3A 8BH
Tel: MF direct: +44 207 993 5761; JW direct: +44 207 993 2452
Email: mail@londonshipbroking.com
Date: 19/08/2019, Time: 09:09:32, Our Ref: 202749-MIK Fw: MV NEW LONDON EAGLE D1418/Z2250 **
MSG#:<141460>
Ed/Mike
good day.
Received from Chtrs over the weekend:
qte
Re: M/V New London Eagle / Acc Medmar CP DD 10.06.2019 / Redelivery Notice
---
Kindly note that as per vessel's present available information, we hereby tender our
redelivery notice and advise Owners that we expect subject vessel to be redelivered
dlosp Shanghai on 18.08.2019 agw wp wog uce.
This is to serve as 1 day definite redelivery notice.
Above notice is given in good faith, always without prejudice and without guarantee,
and basis current available information which is always subject to change.
Best regards
Ops Dpt

unqte
rgds
Thanks and best regards
Michael Fisher
Direct: +44 207 993 5761
Mobile: +44 7768 943 190
[Message sent via SOFTWAY Communicator]

From: msavaglio
Sent: Wednesday, September 4, 2019, 11:17 AM
To: "mail@londonshipbroking.com" <mail@londonshipbroking.com>
Cc: Eagle Postfix <postfix@eagleships.com>
Subject: Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>

Good Day,
Further to our last, we are very disappointed at receiving no reply from Charterers.
For avoidance of Doubt, Owners require a substantive reply and remittance schedule no later than Close of Business (17:00 US East Coast Time) September 5, 2019 otherwise Owners regret they will have to involve Legal counsel going forward
Pleased to hear
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 9/3/2019 8:30:42 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
To: London Ship Broking
From: Eagle Shipping International (USA) LLC
Re: New London Eagle / MEDMAR Final Hire
Good Day,
Subject Vessel redelivered to Owners on August 18, 2019. As per Owners FHS there is a balance of $131,434.02 Due Owners which is now substantially overdue
As per Charterers, they stated that they would settle outstanding balance promptly upon redelivery. As of today we regret that we have not received any response from Charterers or your office which is disappointing to say the least.
Owners appreciate Charterers good cooperation during this fixture, however this delay in settlement is unacceptable and must be rectified without further delay.
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com


EXHIBIT
9

**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 8/30/2019 10:08:41 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Good Day,
Please advise
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 8/29/2019 11:10:39 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Good Day,
Please find Owners FHS,
Please advise remittance details of large outstanding balance
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 8/27/2019 10:24:27 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Good Day,
Owners wish to thank Charterers for a smooth fixture

Unless overlooked, we cannot trace Charterers FHS., Could Charterers please revert with same so we can reconcile voyage?
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

---

**From:** mail@londonshipbroking.com
**Sent:** 8/19/2019 4:11:03 AM
**To:** operations@eagleships.com
**Cc:** postfix@eagleships.com
**Subject:** Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
[External Email - Please use caution]
London Shipbroking Co. Ltd., c/o The Baltic Exchange, 38 St. Mary Axe, London EC3A 8BH
Tel: MF direct: +44 207 993 5761; JW direct: +44 207 993 2452
Email: mail@londonshipbroking.com
Date: 19/08/2019, Time: 09:09:32, Our Ref: 202749-MIK Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Ed/Mike
good day.
Received from Chtrs over the weekend:
qte
Re: M/V New London Eagle / Acc Medmar CP DD 10.06.2019 / Redelivery Notice
---
Kindly note that as per vessel's present available information, we hereby tender our redelivery notice and advise Owners that we expect subject vessel to be redelivered dlosp Shanghai on 18.08.2019 agw wp wog uce.
This is to serve as 1 day definite redelivery notice.
Above notice is given in good faith, always without prejudice and without guarantee, and basis current available information which is always subject to change.
Best regards
Ops Dpt
unqte
rgds
Thanks and best regards
Michael Fisher
Direct: +44 207 993 5761
Mobile: +44 7768 943 190
[Message sent via SOFTWAY Communicator]

From: msavaglio
Sent: Thursday, September 5, 2019, 1:04 PM
To: "mail@londonshipbroking.com" <mail@londonshipbroking.com>
Subject: Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>

John/Mike
Good Day
From Owners,
We thank Charterers for their last which is noted.
Owners remind Charterers that Charterers assured Owners that Outstanding balance would be paid promptly on redelivery.
In light of a smooth fixture up to that point, Owners allowed same, however Owners must emphasize their disappointment in Charterers lack of timely settlement or even prompt communication regarding the matter.
The vessel Redelivered August 18, and we have received no payment or communication until below asking Owners to essentially extend credit to Charterers until September 23, more than a month after redelivery, to which Owners cannot agree.
Owners must demand immediate settlement of full balance owed, otherwise Owners regret that they will have no choice but take necessary measures to protect their interests.
Owners rights fully reserved
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

---

**From:** mail@londonshipbroking.com
**Sent:** 9/5/2019 10:11:40 AM
**To:** operations@eagleships.com
**Subject:** Re: Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>

[External Email - Please use caution]

# London Shipbroking Co. Ltd.
c/o The Baltic Exchange, 38 St. Mary Axe, London EC3A 8BH
Tel: MF direct: +44 207 993 5761; JW direct: +44 207 993 2452
Email: mail@londonshipbroking.com
Date: 05/09/2019, Time: 15:10:39, Our Ref: 203130-JHN Re: Re: Fw: MV NEW
LONDON EAGLE D1418/Z2250 ** MSG#:<141460>

Michael/John
qte

Message Number: 143259
From: operation@medmar.gr



```
To: mail@londonshipbroking.com
Sent: Thursday, Sep 5, 2019 16:58 (UTC +03:00)
Subject: RE: MV NEW LONDON EAGLE D1418/Z2250
```

=msg for Owners=

Re: MV NEW LONDON EAGLE

---

Good day,

We refer to the below matter and to the amount currently outstanding ($131434.02).

First of all we want to re-assure Owners that Charterers will comply in full to their contractual obligation and settle this outstanding balance.

Nevertheless, for reasons related to delays in incoming payments, Charterers are now in the position to settle the above outstanding amount

on 23/9/2019.

We really apologize for the inconvenience and would appreciate Owners understanding and acceptance of Owners to the suggested payment

schedule.

Best regards

Medmar Inc/Ops dpt

unq

Thanks and best regards
John Weir
Dir: +44 207 993 2452
Mob: +44 7802 600 985

[Message sent via SOFTWAY Communicator]

```
---Original Message---
From: Eagle Operations < operations@eagleships.com >
To: "mail@londonshipbroking.com" < mail@londonshipbroking.com >
CC: Eagle Postfix < postfix@eagleships.com >
Subject: Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 **
MSG#:<141460>
Date: Wed, 4 Sep 2019 16:15:44 +0000
```

Good Day,
Further to our last, we are very disappointed at receiving no reply from Charterers.

For avoidance of Doubt, Owners require a substantive reply and remittance schedule no later than Close of Business (17:00 US East Coast Time) September 5, 2019 otherwise Owners regret they will have to involve Legal counsel going forward

Pleased to hear

Best Regards

**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

---

**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 9/3/2019 8:30:42 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>

To: London Ship Broking
From: Eagle Shipping International (USA) LLC
Re: New London Eagle / MEDMAR Final Hire
Good Day,
Subject Vessel redelivered to Owners on August 18, 2019. As per Owners FHS there is a balance of $131,434.02 Due Owners which is now substantially overdue
As per Charterers, they stated that they would settle outstanding balance promptly upon redelivery. As of today we regret that we have not received any response from Charterers or your office which is disappointing to say the least.
Owners appreciate Charterers good cooperation during this fixture, however this delay in settlement is unacceptable and must be rectified without further delay.
Best Regards

**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

---

**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 8/30/2019 10:08:41 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Good Day,
Please advise

Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

---

**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 8/29/2019 11:10:39 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Good Day,
Please find Owners FHS,
Please advise remittance details of large outstanding balance
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

---

**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 8/27/2019 10:24:27 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Good Day,
Owners wish to thank Charterers for a smooth fixture
Unless overlooked, we cannot trace Charterers FHS., Could Charterers please revert with same so we can reconcile voyage?
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)

operations@eagleships.com
www.eagleships.com

---

**From:** mail@londonshipbroking.com
**Sent:** 8/19/2019 4:11:03 AM
**To:** operations@eagleships.com
**Cc:** postfix@eagleships.com
**Subject:** Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
[External Email - Please use caution]
London Shipbroking Co. Ltd., c/o The Baltic Exchange, 38 St. Mary Axe, London EC3A 8BH
Tel: MF direct: +44 207 993 5761; JW direct: +44 207 993 2452
Email: mail@londonshipbroking.com
Date: 19/08/2019, Time: 09:09:32, Our Ref: 202749-MIK Fw: MV NEW LONDON EAGLE D1418/Z2250 **
MSG#:<141460>
Ed/Mike
good day.
Received from Chtrs over the weekend:
qte
Re: M/V New London Eagle / Acc Medmar CP DD 10.06.2019 / Redelivery Notice
---
Kindly note that as per vessel's present available information, we hereby tender our
redelivery notice and advise Owners that we expect subject vessel to be redelivered
dlosp Shanghai on 18.08.2019 agw wp wog uce.
This is to serve as 1 day definite redelivery notice.
Above notice is given in good faith, always without prejudice and without guarantee,
and basis current available information which is always subject to change.
Best regards
Ops Dpt
unqte
rgds
Thanks and best regards
Michael Fisher
Direct: +44 207 993 5761
Mobile: +44 7768 943 190
[Message sent via SOFTWAY Communicator]

From: "mail@londonshipbroking.com" <mail@londonshipbroking.com>

Sent: Monday, September 9, 2019, 5:22 AM

To: Eagle Operations <operations@eagleships.com>

Subject: Re: Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>

---

[External Email - Please use caution]

# London Shipbroking Co. Ltd.

c/o The Baltic Exchange, 38 St. Mary Axe, London EC3A 8BH
Tel: MF direct: +44 207 993 5761; JW direct: +44 207 993 2452
Email: mail@londonshipbroking.com
Date: 09/09/2019, Time: 11:20:43, Our Ref: 203172-JHN Re: Re: Fw: MV NEW
LONDON EAGLE D1418/Z2250 ** MSG#:<141460>

Mike/John
qte

Message Number: 143561
From: operation@medmar.gr
To: mail@londonshipbroking.com
Sent: Monday, Sep 9, 2019 13:25 (UTC +03:00)
Subject: RE: MV NEW LONDON EAGLE D1418/Z2250

john /Marios good day,

pls pass to owners

=========

Dear sirs good day,

we hereby reconfirm that our offer for firm due hire payment date on 23rd of september
remains valid and will be resulted ammicable settlement of subject vessel CP .

Please accept our Apologies for the incovienience caused once again .

Our owners torelance has been highly apreciated .

Reverting with proof of payment on above date given.

kind Regards

Medmar Inc
unq



EXHIBIT
11

Thanks and best regards
John Weir
Dir: +44 207 993 2452
Mob: +44 7802 600 985

---

*[Message sent via SOFTWAY Communicator]*

---Original Message---
From: Eagle Operations < operations@eagleships.com >
To: "mail@londonshipbroking.com" < mail@londonshipbroking.com >
Subject: Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 **
MSG#:<141460>
Date: Thu, 5 Sep 2019 18:03:02 +0000
John/Mike
Good Day
From Owners,
We thank Charterers for their last which is noted.
Owners remind Charterers that Charterers assured Owners that Outstanding balance would be paid
promptly on redelivery.
In light of a smooth fixture up to that point, Owners allowed same, however Owners must emphasize
their disappointment in Charterers lack of timely settlement or even prompt communication regarding
the matter.
The vessel Redelivered August 18, and we have received no payment or communication until below
asking Owners to essentially extend credit to Charterers until September 23, more than a month after
redelivery, to which Owners cannot agree.
Owners must demand immediate settlement of full balance owed, otherwise Owners regret that they
will have no choice but take necessary measures to protect their interests.
Owners rights fully reserved
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

---

**From:** mail@londonshipbroking.com
**Sent:** 9/5/2019 10:11:40 AM
**To:** operations@eagleships.com
**Subject:** Re: Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>

**[External Email** - Please use caution]

# London Shipbroking Co. Ltd.

c/o The Baltic Exchange, 38 St. Mary Axe, London EC3A 8BH
Tel: MF direct: +44 207 993 5761; JW direct: +44 207 993 2452
Email: mail@londonshipbroking.com
Date: 05/09/2019, Time: 15:10:39, Our Ref: 203130-JHN Re: Re: Fw: MV NEW
LONDON EAGLE D1418/Z2250 ** MSG#:<141460>

Michael/John

qte

```
Message Number: 143259
From: operation@medmar.gr
To: mail@londonshipbroking.com
Sent: Thursday, Sep 5, 2019 16:58 (UTC +03:00)
Subject: RE: MV NEW LONDON EAGLE D1418/Z2250
```

=msg for Owners=

Re: MV NEW LONDON EAGLE

---

Good day,

We refer to the below matter and to the amount currently outstanding ($131434.02).

First of all we want to re-assure Owners that Charterers will comply in full to their contractual obligation and settle this outstanding balance.

Nevertheless, for reasons related to delays in incoming payments, Charterers are now in the position to settle the above outstanding amount

on 23/9/2019.

We really apologize for the inconvenience and would appreciate Owners understanding and acceptance of Owners to the suggested payment

schedule.

Best regards

Medmar Inc/Ops dpt

unq

Thanks and best regards
John Weir
Dir: +44 207 993 2452
Mob: +44 7802 600 985

[Message sent via SOFTWAY Communicator]

---Original Message---

From: Eagle Operations < operations@eagleships.com >
To: "mail@londonshipbroking.com" < mail@londonshipbroking.com >
CC: Eagle Postfix < postfix@eagleships.com >
Subject: Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 **
MSG#:<141460>
Date: Wed, 4 Sep 2019 16:15:44 +0000

Good Day,
Further to our last, we are very disappointed at receiving no reply from Charterers.
For avoidance of Doubt, Owners require a substantive reply and remittance schedule no later than Close of Business (17:00 US East Coast Time) September 5, 2019 otherwise Owners regret they will have to involve Legal counsel going forward
Pleased to hear
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

---

**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 9/3/2019 8:30:42 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
To: London Ship Broking
From: Eagle Shipping International (USA) LLC
Re: New London Eagle / MEDMAR Final Hire
Good Day,
Subject Vessel redelivered to Owners on August 18, 2019. As per Owners FHS there is a balance of $131,434.02 Due Owners which is now substantially overdue
As per Charterers, they stated that they would settle outstanding balance promptly upon redelivery. As of today we regret that we have not received any response from Charterers or your office which is disappointing to say the least.
Owners appreciate Charterers good cooperation during this fixture, however this delay in settlement is unacceptable and must be rectified without further delay.
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 8/30/2019 10:08:41 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Good Day,
Please advise
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 8/29/2019 11:10:39 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Good Day,
Please find Owners FHS,
Please advise remittance details of large outstanding balance
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

**From:** Eagle Operations <operations@eagleships.com>
**Sent:** 8/27/2019 10:24:27 AM
**To:** mail@londonshipbroking.com
**Cc:** postfix@eagleships.com
**Subject:** Re: Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Good Day,
Owners wish to thank Charterers for a smooth fixture

Unless overlooked, we cannot trace Charterers FHS., Could Charterers please revert with same so we can reconcile voyage?
Thanks
Best Regards
**Michael Savaglio**
Operations Manager
Eagle Shipping International (USA) LLC
+1 203 276 8133 (direct)
+1 203 276 8100 (office)
+1 646 628 2092 (mobile)
operations@eagleships.com
www.eagleships.com

---

**From:** mail@londonshipbroking.com
**Sent:** 8/19/2019 4:11:03 AM
**To:** operations@eagleships.com
**Cc:** postfix@eagleships.com
**Subject:** Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
[External Email - Please use caution]
London Shipbroking Co. Ltd., c/o The Baltic Exchange, 38 St. Mary Axe, London EC3A 8BH
Tel: MF direct: +44 207 993 5761; JW direct: +44 207 993 2452
Email: mail@londonshipbroking.com
Date: 19/08/2019, Time: 09:09:32, Our Ref: 202749-MIK Fw: MV NEW LONDON EAGLE D1418/Z2250 ** MSG#:<141460>
Ed/Mike
good day.
Received from Chtrs over the weekend:
qte
Re: M/V New London Eagle / Acc Medmar CP DD 10.06.2019 / Redelivery Notice
---
Kindly note that as per vessel's present available information, we hereby tender our redelivery notice and advise Owners that we expect subject vessel to be redelivered dlosp Shanghai on 18.08.2019 agw wp wog uce.
This is to serve as 1 day definite redelivery notice.
Above notice is given in good faith, always without prejudice and without guarantee, and basis current available information which is always subject to change.
Best regards
Ops Dpt
unqte
rgds
Thanks and best regards
Michael Fisher
Direct: +44 207 993 5761
Mobile: +44 7768 943 190
[Message sent via SOFTWAY Communicator]